RICHARD A. HEARN (ISB No. 5574)
JOHN B. INGELSTROM (ISB No. 2659)
HEARN LAW, PLC
151 N. 3rd Ave., Ste. 100
P.O. Box 70
Pocatello, Idaho 83204
Telephone: (208) 904-0004
Facsimile: (208) 904-1816
E-mail: hearn@hearnlawyers.com
         jbi@hearnlawyers.com

EMILY MACMASTER (ISB No. 6449)
MacMaster Law, PLLC
3363 N. Lakeharbor Lane
Boise, Idaho 83703
Telephone: (208) 608-2235
E-mail: emily@macmasterlaw.com
         emacmaster07@gmail.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KEEVA ROSSOW,<br><br>    Plaintiff,<br><br>vs.<br><br>DAVE JEPPESEN, Director, Idaho Department of Health and Welfare, in his official capacity,<br><br>    Defendant. | Case No.: 1:23-cv-131-BLW<br><br>**CLASS ACTION**<br><br>**DECLARATION OF EMILY A. MACMASTER IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

**Emily Mac Master**, pursuant to 28 U.S.C. § 1746, being competent to make this declaration,

hereby declares as follows:

**DECLARATION OF EMILY A. MACMASTER IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – 1**

1.      I am an attorney duly licensed in the State of Idaho and admitted to practice before this Court. I am a counsel of record for Plaintiff in this action..

2.      Attached as Exhibit A hereto are true and correct copies of excerpts from the transcript of the Deposition of Dave Jeppesen taken on March 7, 2024 in this action (highlighted for the Court's convenience), including Exhibits A, B, G, H, I, and J thereto.

3.      Attached as Exhibit B hereto is a true and correct copy of an e-mail from Defendant's counsel Brian Church to Plaintiff's counsel Rick Hearn and me, dated July 26, 2024, with service of Defendants' First Supplemental Responses to Plaintiff's First Set of Discovery Requests to Defendant attached thereto. This e-mail also provided links to electronic documents identified as VOL004 and VOL005.

4.      Attached as Exhibit C hereto is a true and correct copy of a spreadsheet produced in discovery by Defendant on August 1, 2024, identified by Bates Nos. IDHW_00003774-3890. The spreadsheet was initially produced on July 26, 2024 with additional redactions in error, which Mr. Church then represented were corrected in this August 1, 2024 spreadsheet.

5.      In neither the First Supplemental Responses nor the spreadsheet at Exhibits B–C hereto did Defendant identify the relationships of reporting parties and persons "substantiated" by Idaho Department of Health and Welfare ("IDHW") between 2021–2024 for listing on the Central Registry due to prenatal use of THC. The Defendant did not disclose whether the reporting party (for each such person on the Central Registry) was a family member, nurse, doctor, police officer or school official, or whether there was another type of relationship—nor did the Defendant identify police, fire, or emergency services agencies involved in the reporting of these women to the IDHW. *See* Memorandum Decision and Order, at Docket No. 52, pp. 10–11. Plaintiff Rossow contends that she is due this Court-ordered discovery, which the Defendant now disputes.

**DECLARATION OF EMILY A. MACMASTER IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – 2**

6.      Attached as <u>Exhibit D</u> hereto is a true and correct copy of an e-mail from Mr. Church to Mr. Hearn and me, dated July 18, 2024, with an attached letter from Mr. Church to Mr. Hearn and me of that same date regarding Plaintiff's Request for Production No. 12 ("RFP 12"), in which I have highlighted text at page 2 of the letter for the Court's convenience.

7.      Attached as <u>Exhibit E</u> hereto is a true and correct copy of an e-mail that I sent to Mr. Church, dated July 29, 2024, regarding, in part, missing discovery required to be produced within 45 days of the Court's entry of the Memorandum Decision and Order, at Docket No. 52.

8.      Attached as <u>Exhibit F</u> hereto is a true and correct copy of an e-mail from Mr. Church to Mr. Hearn and me, dated August 1, 2024 with an attached letter from Mr. Church to Mr. Hearn and me of that same date regarding discovery required by the Memorandum Decision and Order at Docket No. 52, and verifications for discovery responses. The spreadsheet attached as <u>Exhibit C</u> hereto was provided via an electronic link identified as <u>VOL006</u> in this e-mail.

9.      Attached as <u>Exhibit G</u> hereto is a true and correct copy of an e-mail that I sent to Mr. Church, dated August 6, 2024, requesting at least any documents that were ready to be produced in supplemental response to RFP 12, while reserving rights to address remaining issues, and requesting a description of columns in the spreadsheet of persons listed on the Central Registry for THC use that was produced by Defendant.

10.      Attached as <u>Exhibit H</u> hereto is a true and correct copy of an e-mail from Mr. Church to me, on which Mr. Hearn was copied, dated August 6, 2024, with an attached letter from Mr. Church to Mr. Hearn and me of that same date, regarding a partial production by the Defendant of forms showing disclosure of information from the Central Registry in 2024 and labeling columns in the spreadsheet identified by Bates Nos. IDHW_00003773-3980.

**DECLARATION OF EMILY A. MACMASTER IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – 3**

11.     Mr. Church's August 6, 2024 e-mail attached as <u>Exhibit H</u> hereto provided an electronic link identified as <u>VOL007</u> to forms and related documents. Attached hereto as <u>Exhibit I</u> hereto are the 2024 forms entitled, "Authorization and Consent to Release Information from the Idaho Child Abuse and Neglect Central Registry," and related documents produced by the Defendant on August 6, 2024 with Mr. Church's e-mail and letter attached as <u>Exhibit H</u> hereto. This partial production was limited to six months of 2024 disclosures about persons on the Central Registry for prenatal use of THC. The Defendant did not produce any such forms for 2021, 2022, or 2023 or related responsive records.

12.     The August 6, 2024 letter at <u>Exhibit H</u> hereto incorrectly asserts a resolution of the Defendant's post-Court Order "dispute" over RFP 12. To the contrary, the Memorandum Decision and Order required the Defendant to produce by July 26, 2024, in response to RFP 12, "all reports and other documents regarding inquiries received, access granted to, and/or the release of names or other information about persons listed on the Central Registry pursuant to IDAPA 160.60.01.562.02." The Defendant has not yet produced all responsive documents.

13.     In this action, Defendant has not yet served any written discovery upon Plaintiff Rossow or noticed the taking of any depositions.

I declare under penalty of perjury under the laws of the United States of America and the State of Idaho that the foregoing is true and correct.

DATED this 13th day of August 2024.

/s  Emily A. MacMaster
Emily Mac Master

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 13th day of August 2024, I caused a true and correct copy of the foregoing document to be served by the method indicated below upon:

Brian Church (ISB No. 9391)
STATE OF IDAHO
OFFICE OF ATTORNEY GENERAL
P.O. Box 83720
Boise, Idaho 83720-0010
Facsimile: (208) 854-8073
brian.church@ag.idaho.gov

*Attorneys for Defendant*

☒ CM/ECF system

☐ E-Mail

☐ U.S. Mail, Postage Prepaid

☐ Hand Delivery

☐ Certified Mail, Return Receipt Requested

☐ Overnight Mail

By: /s/  Emily A. MacMaster
         Emily A. MacMaster

**DECLARATION OF EMILY A. MACMASTER IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – 5**

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

_____

KEEVA ROSSOW,                          )
                                       )  Case No.
                    Plaintiff,         )  1:23-cv-131-BLW
                                       )
vs.                                    )
                                       )
DAVE JEPPESEN, Director, Idaho         )
Department of Health and Welfare,      )
in his official capacity,              )
                                       )
                    Defendant.         )
_____)


DEPOSITION OF DAVE JEPPESEN

. . .

MacMaster Law, PLLC

3363 North Lakeharbor Lane  .  Boise, Idaho


Thursday, March 7, 2024

Beginning at 1:00 p.m. Mountain Daylight Time

                         QnA COURT REPORTING, LLC

                         Lori A. Pulsifer, RDR, CRR, Idaho CSR 354

                         P.O. Box 1058, Eagle, Idaho 83616-1058

                         realtimeQnA@msn.com . QnAcourtreporting.com

(ELECTRONIC COPY)        208.484.6309 . 208.286.7426 (fax)

**Deposition of Dave Jeppesen**                    **March 7, 2024**

Page 2

```
 1
 2                    A P P E A R A N C E S
 3
        FOR THE PLAINTIFF:
 4      Mr. Richard A. Hearn
        Attorney at Law
 5      HEARN LAW, PLC
        151 North Third Avenue
 6      Suite 100
        Pocatello, Idaho 83204
 7      Phone:  208.904.0004
        Fax:    208.904.1816
 8      Email:  hearn@hearnlawyers.com
 9      Ms. Emily MacMaster
        Attorney at Law
10      MacMASTER LAW, PLLC
        3336 North Lakeharbor Lane
11      Boise, Idaho 83703
        Phone:  208.608.2235
12      Email:  emily@macmasterlaw.com
                emacmaster07@gmail.com
13
14      FOR THE DEFENDANT:
        Mr. Brian V. Church
15      Deputy Attorney General
        Ms. Alexis Kovacs
16      Paralegal
        IDAHO OFFICE OF ATTORNEY GENERAL
17      P.O. Box 83720
        Boise, Idaho 83720-0010
18      Phone:  208.334.2400
        Fax:    208.854.8073
19      Email:  brian.church@ag.idaho.gov
                alexis.kovacs@ag.idaho.gov
20
21      FOR THE DEFENDANT IN HIS PERSONAL CAPACITY:
        Mr. Sean "Jack" Corkery
22      Assistant Solicitor General
        IDAHO OFFICE OF ATTORNEY GENERAL
23      P.O. Box 83720
        Boise, Idaho 83720-0010
24      Email:  jack.corkery@ag.idaho.gov
25
```

**Deposition of Dave Jeppesen**                                    **March 7, 2024**

Page 3

```
 1          I N D E X   O F   E X A M I N A T I O N
 2    Deponent's Name                              Page Number
 3    DAVE JEPPESEN
 4        Examination by Mr. Hearn...................    5
 5                              . . .
 6
 7             I N D E X   O F   E X H I B I T S
 8    Exhibit No.    Description                    Page Marked
 9
      Exhibit A      Family and Community Services
10                   Administration. 12.21.2023,
                     Organizational Chart, Bates No.
11                   IDHW_00000247                      14
12
      Exhibit B      Family and Community Services,
13                   Child Welfare Central Support,
                     12.21.2023, Organizational Chart,
14                   Bates No. IDHW_00000248            26
15
      Exhibit C-1    Family and Community Services,
16                   Service Integration Navigation
                     and 2-1-1 CareLine, 12.21.2023,
17                   Organizational Chart,
                     Bates No. IDHW_00000251            38
18
19    Exhibit C-2    Family and Community Services,
                     Infant Toddler Program and
20                   Children's Developmental
                     Disabilities, 12.21.2023,
21                   Organizational Chart,
                     Bates No. IDHW_00000252            38
22
23
24
25
```

**Deposition of Dave Jeppesen**                    **March 7, 2024**

1        I N D E X   O F   E X H I B I T S (continued)
2    Exhibit No.      Description                    Page Marked
3

     Exhibit C-3      Family and Community Services,
4                     Developmental Disabilities
                      Crisis Prevention and Court
5                     Services Team, 12.21.2023,
                      Organizational Chart,
6                     Bates No. IDHW_00000253            38
7

     Exhibit D        Family and Community Services,
8                     Operational Design, 12.21.2023,
                      Organizational Chart,
9                     Bates No. IDHW_00000250            41
10

     Exhibit E        Family and Community Services,
11                    Support Systems, 12.21.2023,
                      Organizational Chart,
12                    Bates No. IDHW_00000249            42
13

     Exhibit F        IDAPA 16.06.01.563, Idaho
14                    Administrative Code, Chapter 563   43
15

     Exhibit G        Preliminary Order re: Appeal
16                    No. 22-77161, In the Fair Hearings
                      Unit of the Idaho Attorney
17                    General's Office, dated 08.22.22   51
18

     Exhibit H        Final Decision and Order re:
19                    Appeal No. 22-77161, Before the
                      Department of Health and Welfare,
20                    State of Idaho                     53
21

     Exhibit I        02.10.2022 letter to Richard Hearn
22                    from Idaho Department of Health
                      and Welfare re: Keeva Rossow       61
23

24   Exhibit J        1991 Ida. AG Lexis 1, Idaho
                      Attorney General Opinion No.
25                    91-1                               64

**Deposition of Dave Jeppesen**                                  **March 7, 2024**

5 (Pages 5 to 8)

Page 5

1          . . .
2          THE DEPOSITION OF DAVE JEPPESEN was taken on
3   behalf of the Plaintiff the 7th day of March 2024 at the
4   office of MacMaster Law, PLLC, located at 3363 North
5   Lakeharbor Lane, Boise, Idaho, before Lori A. Pulsifer,
6   Court Reporter and Notary Public within and for the
7   State of Idaho, to be used in an action pending before
8   the United States District Court for the District of
9   Idaho, said cause being Case No. 1:23-cv-131-BLW.
10         The following testimony was adduced, to wit:
11         . . .
12         DAVE JEPPESEN,
13   having been first duly sworn, testified as follows:
14
15         E X A M I N A T I O N
16   QUESTIONS BY MR. HEARN:
17      Q.   Could you just state your name for the record,
18   please?
19      A.   Yes.  My name is Dave Jeppesen.
20         MR. CHURCH:  And, Rick, before we go on, just
21   to put a couple things on the record, I am here on
22   behalf -- I am Brian Church, here on behalf of the
23   Defendant, Director of Idaho Department of Health and
24   Welfare.
25         Jack Corkery is the attorney on behalf

Page 6

1   Mr. Jeppesen.
2          The Defendant, Director Jeppesen, will want to
3   review and sign, under the Rules.
4          On objections, would you guys agree that it is
5   sufficient for us just to state "Objection; form" or
6   "Objection; relevance" without having to give the full
7   reason that the rules would normally require?  Would you
8   guys stipulate to that?
9          MR. HEARN:  That's even better.  That's great.
10   So, yes, I will stipulate to that, although I believe,
11   under Idaho Rules, you just need to say "Form" or
12   "Objection; form."  The others are preserved.
13         Anyway, that's great.  I appreciate it.  Okay?
14         MR. CHURCH:  Thank you.  I appreciate it, Rick.
15      Q.   BY MR. HEARN:  All right.  So, Mr. Jeppesen, my
16   name is Rick Hearn.  I represent Keeva Rossow.  I will
17   be taking your deposition today.
18         Hopefully, it will be a pleasant experience for
19   both of us.  I am not a mean guy.  I am from the South.
20   So, anyway, everything should be fine.  Okay?
21      A.   Perfect.
22      Q.   If you don't understand any of my questions,
23   which is common, just say so.  You are welcome to ask me
24   to clarify or explain or whatever you want to say.
25   Okay?

Page 7

1          None of the two lawyers here want you to be
2   guessing at what I mean or guessing at an answer.  Make
3   sense?
4      A.   Yes.
5      Q.   You already know to answer "yes" or "no" rather
6   than shake your head or "uh-huh" and "huh-uh."  Okay?
7      A.   I may need a reminder; but, yes, I will do
8   that.
9      Q.   Your lawyers will do that, or maybe I will even
10   do that.  They may be reminding me not to do that.
11   Okay?
12         Have you had your deposition taken before?
13      A.   I have.
14      Q.   So a lot of these kind of rules you already
15   know.
16         Did you have your deposition taken in your
17   employment or in your employment as the Director of
18   Health and Welfare?
19      A.   No.
20      Q.   Were they all in personal or business matters?
21      A.   Business.
22      Q.   I am not going to ask you anything about that
23   subject or those depositions.  Okay?
24      A.   Okay.
25      Q.   Could you just review for me your education

Page 8

1   after high school, briefly?
2      A.   Sure.  I went to a two-year junior college
3   called Ricks College in Rexburg, Idaho.  Then I did a
4   brief semester at BYU in Provo and then transferred to
5   Idaho State University in Pocatello.  I graduated from
6   there in 1994.
7      Q.   '84?
8      A.   '94.
9      Q.   Oh, '94.  Okay.  What was your degree in?
10      A.   My degree was in mathematics.
11      Q.   That shouldn't come up much in this deposition.
12         When did you first have any connection with
13   Idaho Health and Welfare, or how did that come about?
14   Not so much exactly when but --
15      A.   Yes.  In December of 2018, the Governor's --
16   Governor Little's search committee for directors reached
17   out to see if I was interested in the Department of
18   Health and Welfare role.
19      Q.   Generally, do you know why they reached out to
20   you?  Had you been involved with Health and Welfare
21   before?  Had you studied that subject?  Were you close
22   friends with people in Health and Welfare?  Had you had
23   business relationships with Health and Welfare?
24      A.   I honestly actually know why they reached out
25   to me.

Page 9

1   Q.  Okay.
2   A.  My previous employment was with BlueCross of
3   Idaho, and I suspect that might have been part of the
4   reason.  I also had had several interactions with then
5   Lieutenant Governor Brad Little.
6   Q.  All right.  When did you join or become
7   appointed at Health and Welfare?
8   A.  Early January 2019.
9   Q.  When did you cease to be associated with Health
10  and Welfare?
11  A.  I retired on January 5, 2024.
12  Q.  Okay.  If it is not stated, my questions will
13  all be dealing with that time period.  So just assume
14  that.  If you want to, clarify it on the record.
15      I am not asking for anything that you have done
16  after January 5th of '24 or before -- was it January of
17  '19?
18  A.  That is correct.
19  Q.  Is that an appointed position, Director?
20  A.  Yes.
21  Q.  Was there any particular reason for your
22  retirement?  Did you just want to spend time with your
23  family or whatever?  Is there a particular reason that
24  you chose to retire?  You seem like a young man,
25  healthy.  I can imagine you could go further.

Page 10

1   MR. CHURCH:  Objection.  Relevance.
2   You can answer the question.
3   THE WITNESS:  I retired because I was ready to
4   spend the vast majority of my time with my three
5   grandkids.
6   Q.  BY MR. HEARN:  Perfect.
7   Were you Director on December 7, 2023, when you
8   signed the Final Decision and Order on Keeva Rossow?
9   A.  Yes.
10  Q.  Do you have a memory of signing that?
11  A.  Yes.
12  Q.  In your time as Director, can you estimate
13  approximately how many times you signed final orders?
14  Is it tens?  Hundreds?  Can we count them on one hand?
15  Just a general estimate.
16  MR. CHURCH:  Objection to form.  Vague as to
17  "final orders."
18  You may answer the question.
19  Q.  BY MR. HEARN:  Do you understand?
20  A.  Can you clarify?
21  Q.  Yes.  Are there different kinds -- I can't
22  clarify.  I am going to ask you to help me.
23  Can you clarify?  Are there different kinds of
24  final orders, other than the final order you did sign on
25  December 7th with Ms. Rossow?

Page 11

1   A.  I'm not sure how to answer that.
2   Q.  That is always an appropriate answer.  Don't
3   guess.  Okay?
4   How would you characterize the final order that
5   you signed on Ms. Rossow?  What kind was it?
6   A.  That order was one that had come -- there was a
7   Fair Hearing decision as part of the appeals process.
8   That Fair Hearing decision was appealed by Ms. Rossow.
9   When that happens, those decisions then come to the
10  Director for review and decision.
11  Q.  So now, with Brian's help, let me reformulate
12  that original question.
13  Approximately -- and I know it would be an
14  estimate -- how many final orders, after review of Fair
15  Hearings, do you believe you signed in your time as
16  Director?
17  A.  I don't know the specific number.  It was -- it
18  was probably somewhere -- let's see if I can have some
19  way to estimate.  It was probably somewhere between
20  fifty to one hundred.  That is an estimate.
21  Q.  Were you Director for -- was it five years?
22  A.  Yes.
23  Q.  So fifty to one hundred would be -- okay.
24  Fifty to one hundred during those five years.
25  Was there someone who reported directly to you,

Page 12

1   a direct report, when you were Director?  If there were
2   different people, let's just refer to the last year.
3   A.  Yes.
4   Q.  Who was that?  Who were the people who reported
5   directly to you?
6   A.  Yes.  I had the following direct reports:
7   Three Deputy Directors --
8   Q.  Okay.
9   A.  -- Director of Communications -- or Manager of
10  Communications, Special Assistant to the Director.
11  Q.  Who was the Special Assistant to the Director?
12  And this is in December of 2023.
13  A.  An individual named Matt -- or Matthew --
14  Mallard.  He goes by Matt.
15  Q.  Those were the direct reports?  Take your time.
16  Are there some others?
17  A.  Yes.  There were some other individuals who
18  were not direct reports but were part of my leadership
19  team but reported to other agencies, such as the head of
20  HR, for example.  Actually, that would be the only
21  example.
22  Q.  And who, if anyone, other than the Governor,
23  did you report to?
24  A.  Just the Governor.
25  Q.  In those fifty to one hundred reviews of Fair

**Deposition of Dave Jeppesen**                    **March 7, 2024**

Page 13

1  Hearing results, do you recall if you ever overruled the
2  Preliminary Order of the Fair Hearing result?
3       A.  Yes.
4       Q.  And I know you can't remember exactly how many
5  times that would be, but do you have an estimate?  Is
6  it, like, one?  Is it, like, ten?  Every time?  What is
7  your general estimate of how many times you may have
8  overruled -- your estimate -- of the Fair Hearing
9  results?
10      MR. CHURCH:  Objection.  The question assumes
11 facts not in evidence.
12      You may answer.
13      MR. CORKERY:  Join.
14      THE WITNESS:  I would just have to estimate.
15 It's probably somewhere between five to ten.  I am going
16 to emphasize that that is an estimate.
17      Q.  BY MR. HEARN:  Understood.
18      Was there -- again, everything is going back to
19 December 2023 or while you were Director.  Was there a
20 Family and Community Services Administration within your
21 Department?
22      A.  Yes.  It was the Family and Community Services
23 Division, yes.
24      Q.  Could you tell us what, generally, the Family
25 and Community Services Division was responsible for --

Page 14

1       A.  Yes.
2       Q.  -- as you understand it, of course?
3       A.  Yes.
4       Q.  Please.
5       A.  Family and Community Services had,
6  fundamentally, two large areas of responsibility.
7       One is referred to as Child Welfare, and that
8  is everything from child protection cases through to
9  foster care, to adoptions.  That was one.
10      The other is around administering programs for
11 individuals with intellectual and developmental
12 disabilities.
13      There is a third function in there, as well.
14 It is smaller.  That was also programs that helped
15 coordinate services across programs that existed.  For
16 example, the 2-1-1 CareLine is part of that.
17      Q.  And what is the 2-1-1 CareLine?
18      A.  The 2-1-1 CareLine is a number mandated in
19 federal code.  That is a number an individual can call
20 to understand what services are available, both from the
21 Department and in the community, for an individual in
22 need.
23      (Exhibit A was marked.)
24      Q.  BY MR. HEARN:  I am going to give you what is
25 already premarked Plaintiff's Exhibit A and ask if you

Page 15

1  can identify it.
2       MR. CHURCH:  Before you do that, are you going
3  to have the court reporter mark that?
4       MR. HEARN:  I have marked it.  I am going to
5  give the court reporter the originals.  We have them
6  here.  I have a copy for the attorneys and one for me.
7  Sometimes I forget the "me" part.
8       THE WITNESS:  Is this for me?
9       Q.  BY MR. HEARN:  Yes.
10      Can you identify what that appears to you to
11 be, if anything?
12      A.  Yes.  This is an organizational chart of the
13 Division of Family and Community Services.
14      Q.  In December of 2023, was Cameron Gilliland the
15 Division Administrator?
16      A.  Yes.
17      Q.  Is that a he or a she?
18      A.  He.
19      Q.  He.  Did you work with Mr. Gilliland?
20      A.  Yes.
21      Q.  Did he report to you directly?
22      A.  No.
23      Q.  Who did he report to, if you know?
24      A.  Yes.  Deputy Director Miren Unsworth.
25      Q.  How do you spell her last name?  Unsworth?

Page 16

1       A.  Unsworth, U-n-s-w-o-r-t-h.
2       Q.  And did she report to you?
3       A.  Yes.
4       Q.  Directly?
5       A.  Yes.
6       Q.  I want to go back to the preliminary -- we will
7  stay right here for a minute.
8       MR. CHURCH:  Are we done with the exhibit?
9       MR. HEARN:  Yes.  For now, yes.
10      MR. CHURCH:  I appreciate it.
11      MR. HEARN:  I mean, we could go back to it;
12 but, yes, just sort of put it to the side for now.
13 That's fine.
14      Q.  BY MR. HEARN:  I want to go back just for a
15 moment to reviewing Preliminary Orders, like you did.
16 Appropriately, I want to narrow it to Ms. Rassow's
17 Preliminary Order.  Okay?
18      Can you walk me through what you did when you
19 got Ms. Rossow's Preliminary Order?  I presume that
20 somehow it came to you?
21      A.  (Nods head affirmatively.)
22      Q.  Just walk me through that.  How did you review
23 it?
24      A.  Sure.
25      Q.  Take your time.

**Deposition of Dave Jeppesen**                    **March 7, 2024**

Page 17

1    A.    When a Preliminary Order came to me, as the
2  Director, it came with the preliminary hearing from the
3  Fair Hearing Officer.
4        It came within -- and this may not be the right
5  term -- filings that either the person appealing or the
6  Department had produced since the Fair Hearing, sort of
7  arguing their case.
8        With the draft decision -- that would have been
9  drafted by someone at the AG's Office assigned to the
10  Department.
11    Q.    Who was that on Ms. Rossow's case, if you know?
12    A.    I don't recall, actually.
13        MR. CHURCH:  Objection.  Vague as to who.  I
14  don't know what you mean by that, Rick.
15        MR. CORKERY:  Join.
16        MR. HEARN:  Oh, okay.  I am going to try to
17  clarify.
18    Q.  BY MR. HEARN:  I believe you testified, when it
19  came, someone had drafted something for you.  What did
20  you call it?  You got a draft of what?
21    A.    A draft decision.
22    Q.    A draft decision.  That came from the Attorney
23  General's Office, you understood?
24    A.    Yes.  There are multiple Attorney Generals --
25  Deputy Attorney Generals assigned to the Department.

Page 18

1  That draft would come from one of those Deputy Attorney
2  Generals.
3    Q.    What would you do once you got those things?
4    A.    I would read those documents and review the
5  facts of the case and then decide if I agreed with the
6  draft decision or not and if I wanted any changes --
7  even if I agreed with the draft decision, if there were
8  any changes that needed to be made to the way it was
9  drafted.
10    Q.    Do you know if you agreed with Ms. Rossow's
11  draft opinion or if you suggested any changes?
12    A.    Yes.
13    Q.    You do know.  Okay.
14        Did you suggest changes?
15    A.    To the best of my recollection, I did not.
16    Q.    Do you recall if you personally met with the
17  Deputy AG assigned that drafted it and discussed it --
18  in person -- the draft -- with that person?
19    A.    No, I did not.
20    Q.    This is in Ms. Rossow's case, to make it clear.
21  We are only dealing with that.
22        That leads to me to ask:  In some of the other
23  cases, the fifty to one hundred, did you on occasion
24  meet with the drafters of those preliminary opinions
25  that were sent to you?

Page 19

1        MR. CHURCH:  Objection.  Relevance.  Vague.
2  You may answer.
3        MR. CORKERY:  Join.
4        THE WITNESS:  Maybe a handful of times.
5    Q.  BY MR. HEARN:  I am referring you to your
6  previous answer that you, as I recall it -- and I don't
7  want to misstate it -- correct me if I am wrong -- five
8  to ten times you came to a different opinion than the
9  Fair Hearing.
10        Do you think you would have met with the Deputy
11  that wrote the draft in those cases?
12        MR. CHURCH:  Objection.  States facts not in
13  the record.
14        You may answer.
15        MR. CORKERY:  Join.
16        THE WITNESS:  Could you say that again?
17    Q.  BY MR. HEARN:  Probably not.  I will try to
18  make it clearer.  Usually making it shorter will work.
19        Did you testify that you probably -- you
20  estimate that five to ten times you did not affirm the
21  Preliminary Order from the Fair Hearing?
22    A.    Yes.
23    Q.    In those five to ten cases, do you recall
24  whether, in any of them, you ever met with the Deputy
25  Attorney General to discuss it?

Page 20

1    A.    No.
2    Q.    You don't recall?
3    A.    I do recall.  And, no, I did not.
4    Q.    In those five to ten cases, would it be correct
5  to say that, in those five to ten cases that you believe
6  you did not affirm the Preliminary Order from the Fair
7  Hearing -- did the draft state that it should not be
8  affirmed?
9        MR. CHURCH:  Objection.
10        MR. CORKERY:  Objection.  Vague.
11        MR. CHURCH:  I think it also calls for,
12  potentially, attorney-client communication and attorney
13  work product.
14        Jack, are you in agreement with that?
15        MR. CORKERY:  Join.
16        MR. CHURCH:  I think I am worried about the
17  scope of the question.  I think you can re-ask the
18  question, Rick, to avoid that.
19        Otherwise, I will instruct him not to answer
20  part of the question.
21        MR. HEARN:  Surprisingly, Brian, I agree with
22  that being general, because it was not the particulars
23  in Ms. Rossow's case.
24    Q.  BY MR. HEARN:  I want to just confirm that you
25  did not change the draft.

Page 25

1  Program ran.
2      Q.  Did you discuss, during your tenure as
3  Director, policy issues with Ms. Blackwood?
4      A.  Not that I recall.
5      Q.  And did she report to Mr. Gilliland?
6      A.  Gilliland.  Yes.
7      Q.  Did you discuss any policy issues with Mr.
8  Gilliland?
9      A.  Can you clarify the scope of that?
10     Q.  Sure.
11         During your tenure -- and if the answer is
12  "yes," I will break it down.  I am not going to ask you
13  to try to remember every conversation.
14         Anyway, do you think you ever discussed policy
15  with Mr. Gilliland during your tenure?
16     A.  I don't believe so.
17     Q.  And just in case it might have slipped,
18  particularly, did you ever discuss policy dealing with
19  Child Welfare?  Would the answer still be, no, you never
20  discussed Child Welfare Policy with Mr. Gilliland?
21     A.  Not that I recall.
22     Q.  Not that you recall?
23     A.  I want to clarify that I am using the
24  definition of the "policy" in terms of the operational
25  limitation of the program here.

Page 26

1      MR. HEARN:  All right.
2         (Exhibit B was marked.)
3      Q.  BY MR. HEARN:  Do you recognize Exhibit B?
4      A.  Can you give me just a second?
5      Q.  Sure.
6      A.  I need to ask what you mean by "policy" on the
7  last question.
8      Q.  I asked you to ask me.  That's very good.  We
9  can certainly go back.
10         I meant what -- I was trying to parrot back
11  what you meant by "policy" when you said that Andie
12  Blackwood did policy in Child Welfare, if I understood
13  it correctly.
14     A.  Then my answer was correct.  Okay.
15     Q.  All right.  So would you look at Exhibit B and
16  see if you can identify Exhibit B?
17     A.  Yes.
18     Q.  What is it?
19     A.  This is an organizational chart for Andie
20  Blackwood's bureau.
21     Q.  As a clarification for the record -- and for
22  you -- if something is incorrect in one little thing
23  somewhere, I am not holding you responsible.  Just
24  generally, that looks like what it is?  That is all I am
25  asking you.  Do you understand?

Page 27

1      A.  I do.  There are 3,000 people at the
2  department.  I do not remember where all of them worked.
3      Q.  Right.  I wouldn't expect that.
4         For purposes of this deposition, I am going to
5  just refer to this as the organizational chart for the
6  bureau of Andie Blackwood.  Okay.
7         In that, across the top, there are four boxes.
8  There is something with Laura Pape.  Is that how to
9  correctly pronounce her name?
10     A.  I actually don't know.
11     Q.  There is nothing underneath it.  Do you have
12  any idea -- do you know -- forget that.  That's the
13  wrong question.
14         Do you know what Laura Pape's role was, if any,
15  back in 2023?
16     A.  I did not work with Laura.  I am not familiar
17  with her role.
18     Q.  It doesn't look like it's so big.
19         Anyway, what about Misty Myatt, over on the
20  other end, a program manager?  Do you know anything
21  about her or what she was supposed to be doing -- or
22  doing?
23     A.  Yes.
24     Q.  What is she responsible for -- or was she?
25     A.  This was Central Intake.  So when somebody --

Page 28

1  Idaho Code requires all of us, as mandatory reporters,
2  for any suspected abuse, neglect, or abandonment of a
3  child -- and when that happens, the reporter will reach
4  out to the Department -- phone call, online, et cetera.
5  Those all go into Central Intake to be processed.
6      MR. CHURCH:  Rick, do you need Mr. Jeppesen to
7  slow down in some of his answers?
8         Are you keeping up okay?
9      THE STENOGRAPHER:  I will speak up, if
10  necessary.
11     THE WITNESS:  I should have been -- I have been
12  given feedback.  I am very coachable.  So if I am going
13  too fast, please let know.
14     Q.  BY MR. HEARN:  There are two boxes under "Misty
15  Myatt."  One is called Centralized Intake.  The other
16  one is called Centralized Safety Consultation.
17         Which, if either of those, deals with reports
18  of child abuse or neglect or suspected child abuse or
19  whatever you are referring to?  Which of those or do
20  both?
21     A.  Both.
22     Q.  What is the difference, if you know, between
23  those two lines?
24     A.  Central Intake is where the reports are
25  received.  Centralized Safety Consultation is there to

Page 29

1  consult either with Central Intake or the field workers
2  who have gone out to visit the child or family, to
3  really assess what they're learning and how that stacks
4  up against the criteria for a child protection case.
5      Q.  In Misty Myatt's division, with Centralized
6  Safety Consultation and Centralized Intake, do either of
7  those have any role in determining what is child abuse,
8  neglect, or abandonment?
9      Do they make any determinations of what
10 qualifies as child abuse, neglect, or abandonment?
11     MR. CORKERY:  Objection.  Ambiguous.
12     You can answer.
13     THE WITNESS:  We are reaching the edge of my
14 knowledge of the process.  I am kind of right at the
15 edge of my knowledge of the process.
16     Q.  BY MR. HEARN:  I should have said that.  I
17 apologize.  That is the best answer for everybody here.
18 If you don't know, just say, "It's outside my thing."
19 That's fine.  Okay?
20     A.  Okay.
21     Q.  One way I would like -- the way I am going to
22 try to get that is:  If we look at the other people, the
23 other boxes, those four under Andie Blackwood -- we have
24 Misty Myatt, Family First Clinical, Program and Policy
25 Development, and Laura Pape.

Page 30

1      We are going to take Laura Pape because there
2  is nothing under her, and you don't know anything about
3  her.
4      Which of those three remaining do you believe
5  would be involved in determining -- if any of them --
6  determining what is child abuse, neglect, or
7  abandonment?
8      A.  Perhaps I will walk through them.
9      Q.  Sure.
10     A.  So Policy Program and Development under Julie
11 Sevcik -- and I am not sure how to say her name
12 correctly -- is really not dealing with individual
13 cases.  That is dealing with the overall policy, case
14 review -- et cetera -- support.
15     Family First, under Sharon, is actually the
16 implementation of the Family First Act that was passed
17 by Congress.  Gosh.  I don't remember what year that
18 was.  So that program is actually not dealing with
19 specific cases.
20     Q.  Before you go to the next one -- and I hate to
21 do it -- you said "Sharon."  I am just looking at this.
22 Which Sharon are you referring to?  Where is Sharon?
23     A.  I am referring to the box that says "Family
24 First Clinical."  The first name under that is Sharon
25 Campbell.  Am I misreading that?

Page 31

1      Q.  Family First?
2      A.  Do you want me to physically point?
3      Q.  Yes.
4      A.  Right there.
5      Q.  Oh, okay.  Yes.  I see.  All right.  Thank you.
6      A.  The only -- the third -- Misty Myatt -- and,
7  again, I also don't know how to properly say her name --
8  is the only portion of this team that I know of that
9  deals directly with individual cases.
10     Q.  So if I wanted to find out whether some conduct
11 was considered by the Department to be abuse, neglect,
12 or abandonment of a child -- if I wanted to find that
13 out and I wanted to talk to somebody, which of these
14 different people would be most knowledgeable -- do you
15 believe -- in helping me figure that out?
16     MR. CHURCH:  Objection.  Speculation.
17     You can answer.
18     MR. CORKERY:  Join.
19     THE WITNESS:  The one that is -- the one that
20 is the most closely tied to that is the safety -- this
21 is all the -- this last area -- sorry.
22     Sorry, Lori.
23     This last area we are talking about, under
24 Misty Myatt --
25     Q.  BY MR. HEARN:  Yes.

Page 32

1      A.  -- is the one that deals with when cases first
2  come in.  The very first phase in a child protection
3  case is the safety assessment, the safety -- is there a
4  problem or not?
5      The ones that would have knowledge about how to
6  determine that would be, certainly, the Centralized
7  Safety Consultants.
8      Their role is to work with the field staff, the
9  person in the field that is actually visiting with the
10 child and the family to help determine if there is a
11 safety concern or not and to what level.
12     The other branch here is Central Intake.  Their
13 role is to gather the information from the reporter, the
14 mandatory reporter.  Somebody is calling in to say that
15 they suspected them.  They then assign a priority as to
16 when that case should be followed up on.
17     Q.  Would it be fair to say that, in your last
18 answer, you are talking about rules that they have about
19 what is or is not child abuse that they are applying to
20 the situation -- child abuse, neglect, or abandonment?
21     A.  Can you clarify what you mean by "rules"?
22     Q.  IDAPA Rules, definitions, and what those things
23 are -- or maybe statutory.  Rules that are already in
24 place?
25     A.  Yes.

Page 33

1    Q.  They are not creating the rules?
2    A.  That is correct.
3    Q.  Would it be fair to say that the rules, at some
4  point, got created within the Department -- or some of
5  the rules did; right?
6    A.  Yes.
7      MR. CHURCH:  Objection.  Vague.
8      You can answer.
9      THE WITNESS:  Sorry.
10    Q.  BY MR. HEARN:  For purposes of the deposition,
11  when we say -- when I say "created," would you -- would
12  "promulgated" make more sense to you than "created"?
13    A.  Yes.
14    Q.  Okay.  Promulgated.
15      Now, which, if any, of the people in Andie
16  Blackwood's bureau would be involved in creating a rule
17  and then promulgating it?  Where does that happen in
18  this flow sheet, if it happens?
19    A.  Generally speaking, rules for the Child Welfare
20  Program would be originating out of this Bureau,
21  although not always.  Generally.
22    Q.  Which subsection of those four or five we have
23  been dealing with would they be coming out of?
24    A.  We are getting into a level of detail where I
25  don't know the exact answer.  Generally, it would have

Page 34

1  come out of the policy function.
2    Q.  Are you referring to the policy which is on the
3  far, left-hand side of this organizational chart?  It
4  has Stephanie Miller, Kaela Whitehead, JoLyn Sellin,
5  Autum Ferris, and Elsa Ottander.
6    A.  Yes, generally.  Generally, it could come out
7  of any of the functions under Julie Sevcik, the one
8  above that.
9      The people -- again, generally -- and we are
10  getting right at the edge of my knowledge here -- that
11  would actually put pen to paper would be in that
12  "Policy" column that you just enumerated.
13    Q.  Did you ever take policy proposals to the Idaho
14  legislature to get them to be accepted?  In your role,
15  have you actually had them given to you and then gone
16  and said, "Will you pass this or that policy having to
17  do with Child Welfare?"
18      MR. CHURCH:  Objection to the form.  Vague.
19      You can answer.
20      THE WITNESS:  Personally, I never testified
21  before the legislature on any rules.
22    Q.  BY MR. HEARN:  Did you have any role in passing
23  rules during your five-year tenure -- or "promulgating
24  rules," if that would be more appropriate?
25      MR. CORKERY:  Objection.  Form.

Page 35

1      MR. CHURCH:  Same.  Join.
2      You can answer.
3      THE WITNESS:  Yes.
4    Q.  BY MR. HEARN:  What was that?  What was your
5  role in that?
6    A.  Generally, my role was -- for rules that needed
7  to be approved and reviewed by the Director, I was the
8  last step of review and approval before they would be
9  moved to the next step to be finalized and reviewed by
10  the legislature.
11    Q.  Did you review rules having to do with what is
12  child abuse, neglect, or abandonment during your
13  five-year tenure?
14    A.  Not from a perspective of a fundamental change
15  in those rules.
16    Q.  Did you review rules as routine, that are
17  already there, and just repromulgate them during your
18  five-year tenure -- having to do with abuse, neglect, or
19  abandonment?
20    A.  Yes.
21    Q.  I am just going to put this out here to see if
22  it helps you.  It looks like maybe some of the rules
23  that I am most interested in were repromulgated in March
24  of 2022.  At least, there's parentheses on that.
25      Is it probable, sometime in 2022, that you

Page 36

1  repromulgated rules having to do with Child Welfare?
2      MR. CHURCH:  Objection.  Assumes facts not in
3  evidence.
4      You can answer.
5      MR. CORKERY:  Join.
6      THE WITNESS:  Yes.  I need to put a
7  qualification on that.
8    Q.  BY MR. HEARN:  Please.
9    A.  Some rules in the Department are approved by
10  the Director.  Some are approved by the Department of
11  Health and Welfare Board.  Some by both.
12      I think I know if the Child Welfare ones were
13  director-only or not, but I don't recall explicitly.
14  So, yes.  As part of my function, I believe that I would
15  have approved those as a repromulgation.
16      I also want to clarify that that was abnormal
17  for that repromulgation because the legislature normally
18  reenacts the rules in each session.  For a couple of
19  sessions, they did not do that.
20      So we were in a position of repromulgating
21  every rule in the Department.  I think it was over
22  seventy -- probably over eighty chapters.  So we were
23  repromulgating everything.
24    Q.  Don't answer this until your attorneys have had
25  a chance to object.

Page 49

1    Q.  BY MR. HEARN:  Without naming the person or
2  giving any identifying information, the case you are
3  referring to and we are discussing did deal with
4  prenatal use of some drugs?
5    A.  Again, I don't remember the specifics of that
6  case.  But, yes.
7    Q.  Is that how you first came to know -- whenever
8  that was -- about this rule?
9    A.  Yes.
10    Q.  What about the rule did you learn from -- I am
11  going to call her Miren --
12    A.  Miren.
13    Q.  -- Miren in this first instance of discussing
14  it?
15    A.  Well, to the best of my recollection, it was
16  simply that if there was prenatal use of a controlled
17  substance that, after the child was born, could be
18  confirmed, that would fall under this particular -- it
19  would fall under a case that would be investigated and
20  potentially substantiated.
21    Q.  When you were discussing it, which category, if
22  you remember, did it involve?  The extreme kind or the
23  kind that was going to hit the newspaper?
24    MR. CHURCH:  Object to the form.
25    MR. CORKERY:  Join.

Page 50

1    THE WITNESS:  I don't remember.
2    Q.  BY MR. HEARN:  Did you have an opportunity to
3  revisit Rule 02(a) with anyone in the Department between
4  the time you had that conversation with Miren and
5  Ms. Rossow's case?
6    A.  Can you clarify that just a little bit?
7    Q.  Sure.  We talked a little bit about a case
8  where you and Miren had a discussion and you came to
9  realize what I am calling 02(a), about prenatal use.
10    A.  Mm-hmm.
11    Q.  Did you have any other opportunities to discuss
12  02(a), that rule, between then and Ms. Rossow's case?
13    A.  None that I recall.
14    Q.  Would I be correct that Rule 02(a), in your
15  experience, during your time there, only came up
16  twice -- once with Ms. Rossow and once with this case
17  that you discussed with Miren?
18    MR. CHURCH:  Objection.  Assumes facts not in
19  evidence.  Speculation.
20    MR. CORKERY:  Join.
21    THE WITNESS:  In the context of conversations
22  with me, I don't recall any.  I am not recalling any
23  others.
24    Q.  BY MR. HEARN:  It is kind of ambiguous what
25  e-mails and briefs and memos would be.  Do you recall

Page 51

1  ever seeing any correspondence, like e-mails or briefs
2  or memos, pass by your desk referring directly to 02(a),
3  other than in the context of that original case and the
4  Ms. Rossow case?
5    A.  I am not able to recall any specifics in that
6  way.  There are a few cases that will always stand out
7  to me.  I don't have any that fall in this category.
8    Q.  I am not going to ask you about particular
9  cases at all.
10    Do you recall ever having a discussion with
11  anyone in the Department -- and I am not asking you what
12  the content was but just a discussion about the
13  constitutionality of any of the IDAPA 563 rules --
14  yes -- 563 rules?
15    A.  No.
16    Q.  Specifically, would the "no" still apply -- did
17  you ever have a conversation with regard to 02(a), the
18  prenatal use and its constitutionality?  Do you ever
19  recall any discussion about that?
20    A.  No.
21    (Exhibit G was marked.)
22    Q.  BY MR. HEARN:  Take a look through Exhibit G.
23  This is a longer thing we need to do.  Can you identify
24  Exhibit G for the record, please?
25    MR. CHURCH:  Can you allow the witness to look

Page 52

1  through the document first, please?
2    THE WITNESS:  Okay.
3    MR. HEARN:  Excuse me?
4    MR. CHURCH:  Can you allow the witness to look
5  through the document first, please?
6    MR. HEARN:  Yes.  I just said that.  Please
7  look through it, for the record.  Anyway, if I didn't
8  say to look at it before you identify it, in a
9  deposition, that is always wise.
10    (Witness reviews Exhibit G.)
11    Q.  BY MR. HEARN:  So can you identify, for the
12  record, Exhibit G?
13    A.  This is the Fair Hearings Unit of the Attorney
14  General's Office, the Preliminary Order in the Rossow
15  case, the Rossow appeal.
16    Q.  And did you review this before signing the
17  final order on Ms. Rossow's case?
18    A.  Yes.
19    Q.  Did you review it with anyone else, or was it
20  just you?
21    A.  Just me.
22    Q.  On page two and three, there is something
23  called "Findings of Fact."  Do you see that?
24    A.  I do.
25    Q.  Did you rely upon the Findings of Fact from the

**March 7, 2024**

Page 53

1 Preliminary Order when you affirmed this decision in
2 your final decision?
3    A. Yes.
4    Q. And you found the Findings of Fact by the Fair
5 Hearing to be correct? Did you find these facts to be
6 correct?
7    A. Yes.
8    Q. Was there anything that you found to be
9 incorrect when you reviewed the Preliminary Order?
10    A. Can you clarify that?
11    Q. Yes. Either just now or when you reviewed it
12 while you were deciding whether to approve it, did you
13 find anything that you disagreed with in the Preliminary
14 Order?
15    A. No.
16        (Exhibit H was marked.)
17    Q. BY MR. HEARN: Finally, we get to something
18 that you signed. Would you look at Exhibit H and
19 identify it for the record, please?
20    A. I am going to read it real quick, and then I
21 will be happy to do that.
22    MR. HEARN: That would be very helpful.
23        (Witness reviews Exhibit H.)
24    Q. BY MR. HEARN: You were waiting for me. So did
25 you have a chance to read it, to look through it?

Page 54

1    A. I did.
2    Q. Can you identify it for the record, please?
3    A. Yes. This is the Final Decision and Order in
4 the appeal by Ms. Rossow.
5    Q. And did you sign it?
6    A. I did.
7    Q. Is that your signature at the end of it?
8    A. It is.
9    Q. Some of this I have asked you more generally.
10 Just relative to this Final Decision and Order, Exhibit
11 H, prior to signing it, did you discuss this with any
12 human being?
13    MR. CORKERY: Objection. Asked and answered.
14    THE WITNESS: No.
15    Q. BY MR. HEARN: Did you correspond, discuss --
16 not discuss.
17        Did you correspond by e-mail or memo, or in any
18 other way, with anyone else within the Department, about
19 this, before you signed it?
20    A. Not that I recall.
21    Q. I believe you have a degree in math from ISU?
22    A. Mm-hmm.
23    Q. As I see this, there is a lot of legal stuff in
24 that. Did you feel you were capable of reviewing and
25 deciding the legal matters in this without any help?

Page 55

1    MR. CHURCH: Objection. Relevance.
2    MR. CORKERY: Join.
3    THE WITNESS: The draft came from the Deputy
4 Attorney General assigned to do so. I felt that was
5 sufficient to stand on.
6    Q. BY MR. HEARN: I am sure you know -- and I am
7 not criticizing you for that. A lot of people sign
8 things from people they trust.
9        Would it be correct to say that, when you
10 signed this, you signed it trusting that whoever drafted
11 it knew what they were doing?
12    MR. CHURCH: Objection. Relevance.
13    MR. CORKERY: Join.
14    THE WITNESS: Yes. I definitely had confidence
15 in the Deputy Attorney General that was assigned.
16        It also matched my reading of, particularly,
17 the requirements that the Director has when he reviews
18 appeals.
19    Q. BY MR. HEARN: What are those?
20    A. That I can't -- the Director cannot -- they are
21 stated in here very well. Maybe I should read them.
22        The Director can't invalidate federal or state
23 rules or laws and needs to defer to the interpretation
24 of the Department, where reasonable. I believe, in this
25 case -- and I would need to go check -- I just read

Page 56

1 it --
2    Q. Please, check.
3    A. The burden of proof is on the Appellant in this
4 case. That's not always the case with all appeals from
5 varying offices, but that's the case in this one.
6        So that's the standard, in all the ones I have
7 signed, that I have looked to. They are documented
8 extremely well in here.
9    Q. Did you believe that the DAG who drafted this
10 had it reviewed, prior to you getting it, by other
11 members of the Attorney General's Office for its legal
12 analysis; or was it simply that DAG, which we don't know
13 who it is?
14    MR. CORKERY: Objection. Form. Calls for
15 speculation.
16    MR. CHURCH: And relevance.
17    Q. BY MR. HEARN: You may answer.
18    A. Thank you.
19        The standard practice for these types of drafts
20 is that it's drafted by a Deputy Attorney General and
21 then reviewed by the Division Chief who -- and I may
22 need to explain that if -- I am happy to explain it, if
23 you need it -- the Division Chief is the head of the
24 DAGS over there that are assigned to the Department.
25    Q. Do you know who the Division Chief was back in

**Deposition of Dave Jeppesen**                    **March 7, 2024**

Page 57

1   December of 2023?
2       A.  Yes.
3       Q.  Who was that?
4       A.  Tom -- I just totally blanked on his name.
5       Q.  Is it --
6       A.  I can't --
7       Q.  I don't know -- is it Donovan?
8       A.  Donovan.  Yes.  That's it.  Thank you.  Yes.
9   Thank you.  Tom Donovan.  I just saw him yesterday.
10  Please don't tell him I forgot his name.
11      Q.  We won't tell.  I have those all the time.
12      All right.  Now that we have a name, did you
13  ever discuss this decision with Tom Donovan?
14      MR. CORKERY:  I am going to object here.  I
15  think this is attorney-client privilege.
16      MR. HEARN:  I will accept -- or withdraw.
17      Q.  BY MR. HEARN:  Did you discuss this opinion,
18  during the time you were Director, with Tom Donovan?
19      A.  No.
20      Q.  There are cites to legal authority throughout
21  this.  Did you review any of the legal authority?
22      MR. CHURCH:  Objection.  Relevance.
23      I am also worried we are starting to get into
24  the deliberative process privilege here, privileged
25  materials.

Page 58

1       MR. CORKERY:  Join.
2       MR. CHURCH:  And mental privilege process, as
3   well.
4       MS. MacMASTER:  I'm sorry.  Can you read back
5   his objections -- the question and the objections,
6   please?
7       MR. CHURCH:  Actually, I think Mr. Hearn needs
8   to ask for that.
9       MR. HEARN:  It's okay.  I will ask for it.
10      So would you please read back the question and
11  the objections?
12      (The requested record was read.)
13      MR. CHURCH:  It's deliberative process and
14  mental deliberative process.  Deliberative.
15      THE STENOGRAPHER:  "Deliberative."  Thank you.
16      MR. HEARN:  Objections noted.
17      Q.  BY MR. HEARN:  I don't believe you have been
18  instructed not to answer.  So you can answer.
19      A.  I am going to -- sorry.  Can you read the
20  question back?
21      MR. HEARN:  Please read just the question this
22  time.
23      (The pending question was read.)
24      MR. CHURCH:  Same objections.
25      THE WITNESS:  Can you clarify?

Page 59

1       Q.  BY MR. HEARN:  Sure.  There are references on
2   page five to the 1991 Idaho Opinion Attorney General.
3   That same reference occurs again on page eleven, as well
4   as some case citations to Matter of Doe and Idaho Code
5   Section.
6       Anyway, those are citations to legal authority.
7   I am just asking:  Did you review those legal
8   authorities yourself?
9       MR. CORKERY:  You know, I am going to ask you
10  not to answer.  This seems deliberative.  I believe the
11  paper speaks for itself.
12      MR. CHURCH:  I would also object on the grounds
13  of relevance here.  That question is also compound.
14      Q.  BY MR. HEARN:  Let me ask you to look on page
15  eleven.  I am going to refer your attention to the
16  middle paragraph, beginning, "Appellant asks..."
17      Do you see that?
18      A.  I do.
19      Q.  The second sentence in that says:
20          "I find these two types of persons are not
21          the same, and are not being unequally treated
22          in an Equal Protection analysis."
23      When you signed this, did you mean that "I" to
24  refer to you or to the Deputy Attorney General?
25      MR. CHURCH:  Objection.  Relevance.

Page 60

1       MR. CORKERY:  Join.
2       THE WITNESS:  As written, I meant that to be
3   for me.
4       Q.  BY MR. HEARN:  In the very next sentence, you
5   say:
6           "As outlined in an earlier Attorney General
7           Opinion, there is a compelling state interest
8           in protecting the health of an unborn child
9           from harmful substance use by the child's
10          mother," citing to the opinion.
11      Did you mean to be citing that as the reason
12  why you find what you did in this final decision?
13      MR. CHURCH:  Object to relevance.  Also calling
14  for the mental deliberative process of the Director as
15  he is considering this final order.  Also subject to
16  deliberative process privilege, as well.
17      MR. HEARN:  I am going to just ask another
18  question.  I will withdraw that question.
19      Q.  BY MR. HEARN:  Have you ever read Idaho Opinion
20  Attorney General 91-1?
21      MR. CHURCH:  Objection.  Relevance.
22      Q.  BY MR. HEARN:  You may answer.
23      A.  No.
24      Q.  Was what it said or did not say important to
25  you in determining your Final Decision and Order -- the

**Deposition of Dave Jeppesen**                    **March 7, 2024**

Page 61

1  **Idaho Opinion 91-1?  Was that important to you?**
2       MR. CHURCH:  Again, objection.  Relevance.
3  Also calls for the mental deliberative process of the
4  Director as he is considering a final order, which is a
5  privilege process, as well as the deliberative process
6  privilege that also applies.
7       MR. CORKERY:  I instruct him not to answer.
8       MR. HEARN:  Off the record, please.
9  Just one second.
10            (Break taken.)
11            (Exhibit I was marked.)
12      **Q.  BY MR. HEARN:  Please review Exhibit I and see**
13  **if you can identify it.  I believe it was in the record**
14  **you reviewed in the Rossow case; but that is for you to**
15  **decide, if you can.  Can you identify Exhibit I?**
16      A.  Yes.  This is a notification letter that was
17  actually addressed to Ms. Rossow but was sent to you,
18  actually.
19      Q.  Yes.
20      A.  This is letting her know the decision to put
21  her on the Child Protection Registry was upheld after
22  administrative review and that she can apply for a Fair
23  Hearing, if she would like.
24      **Q.  Do you know, based upon being the Director,**
25  **what the administrative review was that is referred to**

Page 62

1  **in Exhibit I?**
2       A.  Just generally, yes.
3       **Q.  What, generally, was it -- or is it?**
4       A.  What is it?  Yes.  If a person has been
5  substantiated, which means they are going to be put on
6  the Child Protection Registry -- I think I am leaving a
7  word out of that, but you know what I am talking about.
8       **Q.  Yes.**
9       A.  They have a chance to, essentially, contest
10  that.  They can appeal that decision.  That might be a
11  better word.
12           The way that they can do that is give
13  notification that they are going to be -- that they have
14  been substantiated; and if they disagree with that,
15  they are to provide the reasons why they disagree with
16  that.
17           That can be reviewed at an administrative
18  review.  An administrative review is done internally by
19  Department staff who are not involved in the case and in
20  a leadership position.
21      **Q.  Can you tell, from this letter, who did the**
22  **administrative review?**
23      A.  I did not see -- I cannot tell from this letter
24  who did the administrative review.
25      **Q.  Based upon your knowledge of how the Department**

Page 63

1  **worked, is there any relevance to who signed the letter?**
2       I will clarify that.
3       A.  Thank you.
4       **Q.  Do you know what role in the administrative**
5  **review process, if any, Julie Sevcik has?**
6       A.  That is a level of detail I am not familiar
7  with.
8       **Q.  Do you know when Ms. Rossow -- do you know if**
9  **Ms. Rossow was on the Central Registry when you signed**
10  **your Final Decision in December of '23?**
11      A.  Yes.
12      **Q.  When would she have -- was she?**
13      A.  Yes.
14      **Q.  And when would she have been put on, based upon**
15  **your understanding of how things work?**
16      A.  Based on my understanding, it is that she --
17  after the administrative review is when she would have
18  been placed on the Child Protection Central Registry.
19      **Q.  Based upon your understanding, if you had not**
20  **affirmed the Preliminary Order, would her name have been**
21  **removed?**
22      A.  The Director's decisions -- the decisions that
23  the Director can make on appeal are to affirm -- I am
24  going to get these words wrong -- reverse, or remand.
25      **Q.  What would have happened to Ms. Rossow and her**

Page 64

1  **name on the Central Registry if you reversed or**
2  **remanded, if you know?**
3       MR. CHURCH:  Objection.  Assumes facts not in
4  evidence.  Misstates prior testimony.
5       MR. CORKERY:  Join.
6       **Q.  BY MR. HEARN:  You may answer.**
7       A.  A reverse would have had the effect of removing
8  Ms. Rossow's name from the Central Protection Registry.
9           A remand -- I actually don't know, but it's my
10  belief that a remand would be sending it back to -- the
11  Director can remand it back to the Fair Hearing Officer
12  and say, "I think you missed something; take a look
13  again."
14           In that case, it is my understanding she would
15  remain on the Registry until that was remanded and
16  carried out.  I am a little fuzzy on that one.
17      **Q.  When you were the Director, were you ever**
18  **involved in the administrative reviews?  Were you**
19  **personally ever involved in them?**
20      A.  No, for the reason that, if they ever came to
21  me, I needed to be in a position of independence.
22           (Exhibit J was marked.)
23      **Q.  BY MR. HEARN:  This one is a little different.**
24  **I am not going to ask you to identify it.  I am going to**
25  **tell you what I am purporting it to be and then ask**

**Deposition of Dave Jeppesen**                    **March 7, 2024**

20 (Pages 65 to 67)

Page 65

1   questions about it.
2          This is a copy of Attorney General Opinion No.
3   91-1. I am reminding you or telling you that was cited
4   in the Final Decision that you signed. Okay?
5       A.  (Nods head affirmatively.)
6       Q.  Please take a look at it and tell me if you
7   have ever seen it before.
8       A.  I have not.
9       Q.  You can already tell?
10      A.  Yeah.
11      Q.  Just one second. Let me ask you to turn to
12  what is marked at the top, right-hand corner as "Page 3
13  of 11." Do you see where it says page three, four,
14  five? It is in the top, right-hand corner.
15      A.  I do.
16      Q.  Okay. Good.
17         I want to draw your attention to the third
18  paragraph, beginning "In summary..." Do you see
19  that paragraph?
20      A.  I do.
21      Q.  I am going to read the first sentence into the
22  record. It states:
23         "In summary, the present Idaho Child
24         Protective Act does not provide protection for
25         the unborn."

Page 66

1          Do you agree with that statement?
2       MR. CHURCH:  Objection. Relevancy.
3       MR. CORKERY:  Calls for a legal conclusion.
4       Q.  BY MR. HEARN:  Those are all -- okay. You may
5   answer.
6       A.  Actually, I think that was addressed in my
7   decision. But, yes, that is --
8       Q.  That is correct?
9       A.  That is my understanding.
10      MR. HEARN:  If we could have a moment, I think
11  we are very near the end. Is that okay?
12         We will go off the record.
13         (Break taken.)
14      MR. HEARN:  I have no further questions.
15         We reserve the right to seek answers to
16  the questions when there were instructions not to
17  answer, which I am not going to argue here. If that is
18  found to not be a valid instruction, we will have to
19  reconvene.
20         Otherwise, I have no further questions.
21      MR. CHURCH:  I appreciate it, Rick.
22         I think we were clear on the record. If I
23  instructed the witness not to answer -- or if
24  Jack did -- I think it was clear on the record in that
25  situation. I understand your position.

Page 67

1       MR. HEARN:  Any questions?
2   I guess it goes to him.
3       MR. CORKERY:  I have no questions.
4       MR. HEARN:  No questions?
5       MR. CHURCH:  None.
6       MR. HEARN:  Thank you, gentlemen.
7         (The foregoing deposition concluded at 3:14
8   p.m. Mountain Standard Time.)
9            (Signature requested.)
10                . . .
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Family & Community Services
Administration
12/21/2023



EXHIBIT A
NAME: Jeppesen
DATE: 03-07-24
QnA Court Reporting, LLC

IDHW_00000247



IDHW_00000248

# EXHIBIT G

# FILED UNDER SEAL

# <u>EXHIBIT H</u>
# FILED UNDER SEAL

# **EXHIBIT I**

# **FILED UNDER SEAL**

## *1991 Ida. AG LEXIS 1*

Office of the Attorney General of the State of Idaho

1991 Idaho Op. Att'y Gen. 5



### *ID Attorney General Opinions*

**Reporter**
1991 Ida. AG LEXIS 1 *; 1991 Idaho Op. Att'y Gen. 5

# ATTORNEY GENERAL OPINION No. 91-1

February 1, 1991

## Core Terms

fetus, pregnancy, has, woman, viability, pregnant woman, privacy, drug abuse, gestational, unborn child, human life, birth, unborn, was, compelling interest, cause of action, prenatal injury, women's rights, drug use, intervene, section, fundamental rights, blood transfusion, right to privacy, state interest, sound mind, intrusion, religious, abortion, mother's

**Request By: [*1]** The Honorable Cecil D. Andrus

Governor, State of Idaho

Statehouse

Boise, Idaho 83720

Per Request for Attorney General's Opinion

**Opinion By:** LARRY ECHOHAWK, Attorney General State of Idaho (Analysis by: Francis P. Walker Deputy Attorney General)

## Opinion

QUESTION PRESENTED:

Does the State of Idaho have the authority to intervene into the pregnancy of a woman suspected of using illegal drugs in an effort to control the woman's conduct and protect the health of the fetus?

CONCLUSION:

The state does have a compelling interest in protecting potential human life from gestational drug abuse and in further protecting a child's right to be born with a sound mind and body. In the instance of known gestational drug abuse the state's compelling interest will override the woman's interest in personal privacy, bodily integrity and parental autonomy and permit some degree of state intervention.

Emily MacMaster

ANALYSIS:

Minnesota is the only state in the nation which has enacted legislation permitting intervention into the pregnancy of a woman suspected of using illegal drugs. *Minn. Stat. § 626.5561* (1990). The constitutionality of that statute has not been tested, nor are there any judicial decisions defining the state's **[\*2]** interest in protecting the fetus from gestational drug abuse. The following analysis, therefore, draws upon case law and statutes in related fields of law and represents this office's best attempt to determine the probable judicial reaction to legislation permitting the state to intervene into a woman's pregnancy in order to protect a fetus.

1. Protection of Fetus Under Current Idaho Law

Idaho's Child Protective Act, *Idaho Code § 16-1601*, et seq., presently would not permit the state to intervene in the case of gestational drug abuse in order to protect the fetus. *Idaho Code § 16-1602(e)* defines a child as "an individual who is under the age of eighteen (18) years." This definition does not extend to the unborn.

Attempts to intervene under similar child protection statutes on behalf of the fetus have failed in other jurisdictions. In In *Re Dittrick, 80 Mich.App. 219, 263 N.W.2d 37 (1977)*, the Bay County Department of Social Services petitioned for and received a probate court order granting temporary custody of an unborn child. The Department argued that the parents' parental rights over another child had been permanently terminated earlier in the year and the parents **[\*3]** were not fit to care for the unborn child. The court of appeals reversed, holding that the probate court lacked jurisdiction over an unborn fetus:

We recognize that the word "child" could be read as applying even to unborn persons. However, our reading of other sections of Chapter XIIA of the Probate Code convinces us that the Legislature did not intend application of these provisions to unborn children. . . .

The Legislature may wish to consider appropriate amendments to the Probate Code. Indeed, the background of the present case has convinced us that such amendments would be desirable. However, the Code as now written did not give the probate court jurisdiction to enter its original order in the present case.

*263 N.W.2d at 39.*

Similarly, in In *Re Steven S., 126 Cal.App.3d 23, 178 Cal.Rptr. 525 (1981)*, the State of California, under provisions similar to the Idaho Child Protective Act, filed a petition to detain a pregnant woman who allegedly suffered from an undiagnosed psychiatric illness and was viewed as a threat to her unborn child. The trial court entered an order of detention, and the child was born approximately two months later. The Court of Appeals of California **[\*4]** dismissed the mother's appeal for mootness, but took the opportunity to rule that a fetus did not come within the definition of "child" for purposes of the Act:

*[W]hen the Legislature determines to confer legal personality on unborn fetuses for certain limited purposes, it expresses that intent in specific and appropriate terms; the corollary, of course, is that when the Legislature speaks generally of a 'person,' as in section 377, it impliedly but plainly excludes such fetuses. . . .* (Emphasis in original.)

Accordingly, we strictly construe the language of this section and find the order of the juvenile court sustaining jurisdiction over the unborn fetus lacking in statutory authority.

*178 Cal.Rptr. at 527-28.*

Idaho's Child Protective Act could be amended by the Idaho Legislature to provide specific legal rights and protections for the unborn. New Jersey, for instance, has incorporated the unborn into its child protection statutes. N.J.S.A. § 30:4C-11 provides:

Whenever it shall appear that any child within this State is of such circumstances that his welfare will be endangered unless proper care or custody is provided, an application setting forth the facts in the case **[\*5]** may be filed with the Bureau of Childrens Services by a parent or other relative of such child, by a person standing in loco

Emily MacMaster

parentis to such child, by a person or association or agency or public official having a special interest in such child or by the child himself, seeking that the Bureau of Childrens Services accept and provide such care or custody of such child as the circumstances may require. Such application shall be in writing, and shall contain a statement of the relationship to or special interest in such child which justifies the filing of such application. The provisions of this section shall be deemed to include an application on behalf of an unborn child when the prospective mother is within this State at the time of application for such services. (Emphasis added.)

It has been argued that this statute empowers the state to intervene into a pregnancy on behalf of the fetus. Note, *Fetal Rights Proposal*, 21 St. Mary's L.J., 259, 292 (1989). However, there have been no reported cases showing that New Jersey has in fact used this provision to intervene during pregnancy.

In summary, the present Idaho Child Protective Act does not provide protection for the **[*6]** unborn. An action brought under the Act on behalf of a fetus would in all likelihood be dismissed for lack of jurisdiction. The Act could be amended, as done in New Jersey, to provide for the unborn. However, the procedural structure of the Child Protection Act as presently structured comes into play only after the birth of the child and would require significant amendment to cover this situation.

2. Fetal Rights - the Abortion Case Law

In *Roe v. Wade, 410 U.S. 113 (1973)*, the United States Supreme Court held the State of Texas' anti-abortion statutes unconstitutional. In doing so the Court addressed the conflict between the state's interest in potential life (a fetus) and a woman's right to terminate the pregnancy as a right of personal privacy protected by the fourteenth amendment. After detailed discussion regarding the judicial evolution of a person's right to privacy, the Court held:

This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass **[*7]** a woman's decision whether or not to terminate her pregnancy.

*410 U.S. at 153*. The Court further stated that this fundamental right to privacy, although broad enough to encompass the decision to terminate a pregnancy, was not absolute or unqualified. The state may limit this fundamental right to privacy when the state's interest becomes "compelling." *410 U.S. at 155*. Further, the Court held that the state's interest in potential life becomes compelling at viability. *410 U.S. at 163*.

The Court's opinion in Roe v. Wade, however, does not stand for the proposition that a state's interest in potential life does not begin until the fetus reaches viability. Declining to resolve the question of when life begins, the Court stated:

Logically, of course, a legitimate state interest in this area need not stand or fall on acceptance of the belief that life begins at conception or at some other point prior to live birth. In assessing the State's interest, recognition may be given to the less rigid claim that as long as at least potential life is involved, the State may assert interests beyond the protection of the pregnant woman alone.

*410 U.S. at 150* (emphasis original).

In **[*8]** the recent U.S. Supreme Court opinion in *Webster v. Reproductive Health Services, 492 U.S. , 106* L.Ed. 2d 410, 109 S.Ct. (1989), a three-justice plurality (Rehnquist, White, Kennedy) effectively eliminated viability as the point when the state's interest is deemed compelling:

[W]e do not see why the State's interest in protecting potential human life should come into existence only at the point of viability, and that there should therefore be a rigid line allowing state regulation after viability but prohibiting it before viability. The dissenters in Thornburgh, writing in the context of the Roe trimester analysis, would have recognized this fact by posting against the "fundamental right" recognized in Roe the State's "compelling interest" in protecting potential human life throughout pregnancy. "[T]he State's interest, if compelling after viability, is equally compelling before viability. " *Thornburgh, 476 US, at 795, 90 L. Ed 2d 779, 106 S Ct 2169*

(White, J., dissenting); see *id., at 828, 90 L. Ed 2d 779, 106 S Ct 2169* (O'Connor, J., dissenting) ("State has compelling interests in ensuring maternal health and in protecting potential human life, and these **[\*9]** interests exist 'throughout pregnancy' ").

*106 L Ed.2d at 436.*

Justice O'Connor, in a separate opinion, refused to join the plurality opinion in overturning the Roe trimester framework because the issue presented in Webster did not warrant reexamination of Roe v. Wade or its trimester analysis. Nonetheless, Justice O'Connor noted in her separate opinion a previous dissent in which she criticized the trimester framework:

The state interest in potential human life is likewise extant throughout pregnancy. In Roe, the Court held that although the State had an important and legitimate interest in protecting potential life, that interest could not become compelling until the point at which the fetus was viable. The difficulty with this analysis is clear: *potential* life is no less potential in the first weeks of pregnancy than it is at viability or afterward. At any stage in pregnancy, there is the *potential* for human life. . . . The choice of viability as the point at which the state interest in *potential* life becomes compelling is no less arbitrary than choosing any point before viability or any point afterward. Accordingly, I believe that the State's **[\*10]** interest in protecting potential human life exists throughout the pregnancy. (Emphasis added.)

*Akron v. Akron Center for Reproductive Health, 462 U.S. 416, 460 (1983).* See also, *Thornburgh v. American College of Obstetrics and Gynecology, 476 U.S. 747, 828 (1986).*

Justice Scalia in a separate opinion in Webster was prepared to overrule Roe v. Wade. Thus, Justice Scalia assuredly would join Justices Rehnquist, White, Kennedy and O'Connor in the view that the state's interest in potential life is compelling at all stages of pregnancy.

In the context of personal privacy and the freedom to choose whether to carry a fetus to term, five justices presently on the United States Supreme Court have rejected the view that fetal viability is the benchmark for establishing a "compelling" state interest in potential life. The impact of this change in the abortion context remains to be seen. However, in the instance of gestational drug abuse the state is faced with a completely different issue: the live birth of a child intentionally carried to term by its mother. The impact of the Webster decision is dramatic in that it eliminates fetal "viability" as the threshold **[\*11]** for state assertion of a compelling interest and therefore makes possible intervention into the early stages of fetal development.

3. Fetal Rights in Other Contexts

Although the *United States Supreme Court in Roe v. Wade, 410 U.S. 113 (1973),* held that a fetus is not considered a person for purposes of the fourteenth amendment, *id. at 158,* the Court expressly recognized that in certain areas of the law a fetus does possess legal rights. *Id. at 161.* Roe does not prohibit the state from extending to the fetus legal benefits and protection in these other areas.

In Idaho, for example, the Probate Code recognizes children conceived before yet born subsequent to a decedent's death. *Idaho Code §§ 15-2-108, 15-2-302.* Idaho's Worker's Compensation Law similarly includes posthumously-born children as dependents under the Act. *Idaho Code § 72-102(8)(c).* For purposes of domestic relations, *Idaho Code § 32-102* provides: "A child conceived, but not yet born, is to be deemed an existing person so far as may be necessary for its interests in the event of its subsequent birth."

Dramatic changes toward the legal status of the fetus have likewise occurred in tort law. A century **[\*12]** ago a fetus in this country possessed no legal rights that would enable it upon birth to seek damages for injuries sustained while in its mother's womb. *Dietrich v. Inhabitants of Northhampton, 138 Mass. 14 (1884).* Justice Holmes reasoned that a fetus was merely a part of the mother and, as such, possessed no independent cause of action for prenatal injury. Similarly, until recent years wrongful death statutes were held inapplicable to the death of a fetus and provided no cause of action for the surviving parents. W. Prosser, Handbook of the Law of Torts, § 55 (4th ed. 1971).

The common law perception that the fetus is a legal nonentity for tort purposes has now been thoroughly rejected. In regard to a child's cause of action for prenatal injuries, *§ 869(1) of the Restatement of Torts (Second)* states:

One who tortiously causes harm to an unborn child is subject to liability to the child for the harm if the child is born alive.

The drafter's comment to this section provides:

The rule stated in Subsection (1) is not limited to unborn children who are "viable" at the time of the original injury, that is, capable of independent life, if only in an incubator. If the **[\*13]** tortious conduct and the legal causation of the harm can be satisfactorily established, there may be recovery for any injury occurring at any time after conception.

In *Volk v. Baldazo, 103 Idaho 570, 651 P.2d 11 (1982)*, the Idaho Supreme Court rejected the common law legal status of the fetus and held that a cause of action can be brought for the death of a viable fetus under Idaho's wrongful death statutes. *Idaho Code §§ 5-310, 5-311.* The court expressly declined to address whether a wrongful death action could be based upon the death of a non-viable fetus. In regard to prenatal injury to a child, the court stated:

Based on what we deem to be the modern trend and the clear weight of authority, we hold that in Idaho a cause of action will lie on behalf of a viable child who sustains prenatal injuries, but is subsequently born alive. Our holding is limited to the instant circumstances where it is alleged that the fetus was viable at the time of injury. We intimate no view, and reserve for another time any view, on whether such a cause of action will lie on behalf of a child for such negligence committed prior to its conception. *See, e.g., Jorgensen v. Meade-Johnson Laboratories, Inc., 483 F.2d 287 (10th Cir. 1973)* (a cause of action for prenatal injuries held to be stated when mother took birth control pills prior to conception of mongoloid twins, and pills caused chromosomal abnormalities in mother's womb). Likewise we state no opinion today as to the existence of a cause of action for injuries to a fetus subsequent to conception but prior to viability. *See e.g., Bennett v. Hymers, 101 N.H. 483, 147 A.2d 108, 110 (1958)* (fetus is a separate organism from the time of conception).

Hence we hold that if the Volk child had survived the injuries, it would have been able to pursue a cause of action on its own behalf for any injury sustained subsequent to viability.

*103 Idaho at 572-73.*

As the law evolved toward recognizing legal remedies for prenatal injuries, the right to recover was premised upon the strong principle that <u>a child had a right to be born with a sound mind and body.</u> The Supreme Court of New Jersey articulated this principle in *Smith v. Brennan, 157 A.2d 497, 503 (1960)*:

The semantic argument whether an unborn child is a "person in being" seems to us to be beside the point. There is no question that conception sets in motion **[\*15]** biological processes which if undisturbed will produce what everyone will concede to be a person in being. If in the meanwhile those processes can be disrupted resulting in harm to the child when born, it is immaterial whether before birth the child is considered a person in being. And regardless of analogies to other areas of the law, justice requires that the principle be recognized that a child has a legal right to begin life with a sound mind and body. If the wrongful conduct of another interferes with that right, and it can be established by competent proof that there is a causal connection between the wrongful interference and the harm suffered by the child when born, damages for such harm should be recoverable by the child. (Emphasis added.)

See also, *Womack v. Buckhorn, 187 N.W. 2d 218 (Mich. 1971)* (child recovered for prenatal injury sustained as result of automobile accident during fourth month of pregnancy) ; *Gordon v. Gordon, 301 N.W. 2d 869 (Mich.App. 1981)* (child held to have right to bring action against his mother for prenatal injury sustained as result of negligent use of prescription drug).

Thus, we conclude that in the case of gestational drug abuse **[*16]** the child's right to be born with a sound mind and body is further enhanced by the state's compelling interest as parens patriae in protecting potential human life from unwarranted harm or birth defects.

4. A Woman's Right to Privacy and Bodily Integrity Does Not Encompass Gestational Drug Abuse

The pregnant woman who is abusing drugs has several legal interests of her own at stake. The woman has a fundamental right to privacy, which incorporates the right to be free from unwarranted governmental intrusion into her personal life. Similarly, she has the right to her own bodily integrity. _Griswold v. Connecticut, 381 U.S. 479 (1965)_; _Eisenstadt v. Baird, 405 U.S. 438 (1972)_; _Schmerber v. California, 384 U.S. 757 (1966)_. This right to privacy includes the right to make decisions which will impact her and the fetus she is carrying, _Roe v. Wade, supra._ (Like the U.S. Constitution, the Constitution of Idaho does not specifically provide a personal "right to privacy. " There is no case law in Idaho which would afford citizens of Idaho greater protection in their right to privacy than afforded by the U.S. Constitution and federal case law enunciating that right.) **[*17]**

The woman's right to privacy in this instance differs from the conduct in question in Griswold, Eisenstadt, and Roe. A woman's right to privacy does not include the right to use illegal drugs. _State v. Kelly, 106 Idaho 268, 678 P.2d 60 (App. 1984)_, cert. denied, 469 U.S. 918; _State v. Kincaid, 98 Idaho 440, 566 P.2d 763 (1977)_; _State v. O'Bryan, 96 Idaho 548, 531 P.2d 1193 (1975)_; _State v. Erikson, 574 P.2d 1 (Alaska 1978)_. The Supreme Court of Alaska stated in _Ravin v. State, supra_:

[W]e think this right [privacy] must yield when it interferes in a serious manner with the health, safety, rights and privileges of others or with the public welfare. No one has an absolute right to do things in the privacy of his own home which will affect himself or others adversely. Indeed, one aspect of a private matter is that it _is_ private, that is, that it does not adversely affect persons beyond the actor, and hence is none of their business. When a matter does affect the public, directly or indirectly, it loses its wholly private character, and can be made to yield when an appropriate public need is demonstrated. (Emphasis original.)

_537 P.2d at 504._ **[*18]** Here there can be no serious argument that the use of illegal drugs which can badly damage a fetus is protected under the fourteenth amendment. To the extent that intervention into a woman's pregnancy involves her right to privacy, the state does have a compelling state interest throughout the pregnancy to ensure the health of potential human life and ensure that a fetus is born drug-free and free from the birth defects associated with gestational drug use.

This office perceives no contradiction between a woman's right to an abortion during the early stages of pregnancy and the right of the state during those same stages of pregnancy to require a certain degree of prenatal care once the woman elects not to have an abortion and to carry the child to full term. Alan M. Dershowitz, a professor of law at Harvard University, explains this distinction:

Now, I am not a "fetal-rights" advocate. I favor Roe v. Wade. I believe that a pregnant woman should have the right to choose between giving birth or having an abortion. But I am a human-rights advocate, and I believe that no woman who has chosen to give birth should have the right to neglect or injure that child by abusing their **[*19]** collective body during pregnancy.

Once a woman has made the decision to bear a child, the rights of that child should be taken into consideration. What happens to the child in the womb may have significant impact on his or her entire life. . . .

There is a principled distinction between totalitarian intrusions into the way a woman treats her body, and civil-libertarian concerns for the way a woman treats the body of the child she has decided to bear. That principled distinction goes back to the philosophy of John Stuart Mill and is reflected in the creed that "your right to swing your fist ends at the tip of my nose." In the context of a pregnant woman's rights and responsibilities in relation to the child she has decided to bear, the expression might be: "Your right to abuse your own body stops at the border of your womb."

A principled person can fully support a woman's right to choose between abortion or birth, without supporting the very different view that the state should have no power to protect the health of a future child.

Congressional Record, Senate, August 1, 1989, S 9323.

5. The Woman's Right to Parental Autonomy Does Not Encompass Gestational Drug Use

The final **[*20]** right the woman may assert is her right to parental autonomy. This right is also not absolute. The state, acting in the capacity as parens patriae, has the right to intervene to protect innocent children from harmful decisions of their parents and has exercised that right even when such intervention subordinates the fundamental right to freedom of religion.

Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves.

Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 170 (1944). See also, Jehovah's Witnesses v. King County Hospital Unit No. 1, 278 F.Supp. 488 (W.D. Wash. 1977), aff'd, 390 U.S. 598 (1968); In Re Clark, 185 N.E.2d 128 (Ohio 1962); Hoener v. Bertinato, 171 A.2d 140 (N.J. 1961).

The Supreme Courts of New Jersey and Georgia have, in fact, ordered medical treatment for pregnant women in the final stages of pregnancy in order to save the life of the fetus. In Raleigh Fitkin-Paul Morgan Memorial Hospitals v. Anderson, supra, a pregnant woman **[*21]** was at high risk of hemorrhaging, which if left untreated would probably result in her death and the death of the unborn child. Based upon her religious beliefs, the woman would not consent to a blood transfusion. The Supreme Court of New Jersey reversed the trial court's refusal to enter an order requiring such medical treatment, and held:

We are satisfied that the unborn child is entitled to the law's protection and that an appropriate order should be made to insure blood transfusions to the mother in the event that they are necessary in the opinion of the physician in charge at the time.

We have no difficulty in deciding with respect to the infant child. The more difficult question is whether an adult may be compelled to submit to such medical procedures when necessary to save his life. Here we think it is unnecessary to decide that question in broad terms because the welfare of the child and the mother are so intertwined and inseparable that it would be impracticable to attempt to distinguish between them with respect to the sundry factual patterns which may develop. The blood transfusions (including transfusions made necessary by the delivery) may be administered if necessary **[*22]** to save her life or the life of her child, as the physician in charge at the time may determine.

201 A.2d at 538.

In Jefferson v. Griffin Spalding County Hospital, 274 S.E.2d 457 (1981), the Supreme Court of Georgia ordered a Caesarian section as well as all necessary blood transfusions to be performed upon a woman who refused the operation due to her religious beliefs. The medical evidence showed that the woman had complete placenta previa which indicated a 99% certainty that the child would not survive natural childbirth. The Georgia Supreme Court held per curiam:

The Court finds that the State has an interest in the life of this unborn, living human being. The Court finds that the intrusion involved into the life of Jessie Mae Jefferson and her husband, John W. Jefferson, is outweighed by the duty of the State to protect a living, unborn human being from meeting his or her death before being given the opportunity to live.

274 S.E 2d at 460. Justice Smith stated in his concurring opinion:

In the instant case, it appears that there is no less burdensome alternative for preserving the life of a fully developed fetus than requiring its mother to undergo surgery against **[*23]** her religious convictions. Such an intrusion by the state would be extraordinary, presenting some medical risk to both the mother and the fetus. However, the state's compelling interest in preserving the life of this fetus is beyond dispute. See _Roe v. Wade, supra_; Code § 26-1202 et seq. Moreover, the medical evidence indicates that the risk to the fetus _and_ the mother presented by a Caesarean section would be minimal, whereas, in the absence of surgery, the fetus would almost certainly die and the mother's chance of survival would be no better than 50 per cent. Under these circumstances, I must conclude that the trial court's order is not violative of the First Amendment, notwithstanding that it may require the mother to submit to surgery against her religious beliefs.

_274 S.E.2d at 461_. See also, _Application of Jamaica Hospital, 491 N.Y.Supp.2d 898 (Sup.Ct. 1985)_ (physician appointed as guardian of unborn child and ordered to do all necessary to save life of eighteen-week-old fetus, including administering blood transfusions to the mother over her objections); _Crouse Irving Memorial Hospital, Inc., v. Paddock, 485 N.Y.Supp.2d 443 (Sup.Ct. 1985)_ (court ordered **[*24]** pregnant woman to receive blood transfusions to protect the welfare of fetus that was to be prematurely delivered).

It must be noted that the conflict between the mother and the fetus in the preceding cases involved a basic fundamental right enumerated in the _First Amendment to the U.S. Constitution_. The mother's right to religious freedom was nonetheless overridden by the state's interest in protecting potential human life. An individual's penumbral right to privacy, in the context of illegal drug use, cannot logically ascend to so heightened a level of protection as religious freedom. It follows that if a state has the right to intervene and order drastically intrusive medical treatment for a pregnant woman over her objections in an effort to save the life of an unborn child, the state also has the ability to regulate the conduct of pregnant women shown to be abusing illegal drugs. The harm prevented by intervention is great, and the intrusion into the mother's life, forced abstinence, is minimal in comparison.

6. The State's Interest Justifies Intervention

Idaho's present interest in the context of gestational drug abuse is in protecting potential human life, _Webster, supra_, and protecting a child's right to be born with a sound mind and body. _Raleigh Fitkin-Paul Morgan Memorial Hospital v. Anderson, 201 A.2d 537 (N.J. 1964)_; _Jefferson v. Griffin Spalding County Hospital, 274 S.E.2d 457 (Ga. 1981)_. Further, the state has an interest in protecting society from long-term financial burdens associated with gestational child abuse. "The state is under no obligation to allow otherwise 'private' activity which will result in numbers of people becoming public charges or otherwise burdening the public welfare." _Ravin v. State, 537 P.2d 494, 509 (Alaska 1975)_. See also _State v. Albertson, 93 Idaho 640, 470 P.2d 300 (1970)_. (Idaho statute requiring use of a helmet when operating a motorcycle held to be a permissible infringement upon an individual's right to privacy due, in part, to the public expense of providing health care for injuries sustained as a result of improper safety equipment.); _State v. Laitinen, 459 P.2d 789 (Wash. 1969)_.

The effects of cocaine and narcotic drug use upon fetal development have come under increasing scrutiny within the medical profession in the last five years. Recent studies indicate that **[*26]** the use of illegal drugs, especially cocaine, can have devastating effects upon a developing fetus. Cocaine has been scientifically linked to perinatal strokes, myocardial infarctions, intrauterine growth retardation, kidney and genitourinary tract malformation, and significantly reduced head circumference. Cocaine use at all stages of pregnancy is linked to a higher incidence of abruptio placenta and neurobehavioral deficiencies. The instances of newborn infants with cocaine or narcotics in their systems are well documented, and the physical difficulties they face are dramatic and heartbreaking. In addition, infants born to drug-addicted mothers face a much higher risk of hepatitis and human immunodeficiency virus (HIV). Chasnoff, _Temporal Patterns of Cocaine Use in Pregnancy: Perinatal Outcome_, 261 JAMA 1741 (1989); Chasnoff, _Drug Use in Pregnancy: Parameters of Risk_, 35 Pediatric Clinics of North America 1403 (1988); Lynch, _Cocaine Use During Pregnancy_, 19:4 JOGNN 285 (1990); Keith, _Substance Abuse in Pregnant Women_, 73 Obstetrics and Gynecology 715 (1989).

The medical evidence indicates that drug use at all stages of pregnancy places the fetus at risk of significant **[*27]** damage. The evidence further indicates that intervention into the first trimester of the pregnancy

will significantly improve the chances of normal development and childbirth. Chasnoff, *Temporal Patterns of Cocaine Use in Pregnancy: Perinatal Outcome*, 261 JAMA 1741 (1989).

An informal survey performed by the State of Idaho Department of Health and Welfare indicates there were seventeen documented cases of prenatal illegal drug use in the year 1990. A national survey estimates that the frequency of drug use by pregnant women is one in ten. Chasnoff, 1986-1987, *Cocaine and Pregnancy*, Childbirth Educator, Winter: 34-12. Drug abuse is more concentrated in the urban areas of the country, but nonetheless there is no reason to assume the problem does not exist in Idaho and that a significant risk of harm exists for a significant number of children to be born in Idaho in the future.

## CONCLUSION

The state does have a compelling interest in protecting potential human life from gestational drug abuse and in further protecting a child's right to be born with a sound mind and body. In the instance of known gestational drug abuse the state's compelling interest will override the **[*28]** woman's interest in personal privacy, bodily integrity and parental autonomy and permit some degree of state intervention.

The prospect of state intervention on behalf of the fetus and the newborn has brought a wide variety of suggested remedies. Such suggestions include criminal prosecution for gestational drug abuse, mandatory drug testing for all pregnant women, civil commitment for pregnant women shown to be using drugs, mandatory reporting requirements for medical providers in instances of gestational drug abuse, postnatal reporting requirements of medical providers for newborns showing symptoms of withdrawal, state child protective actions on behalf of newborns showing symptoms of withdrawal, and finally, educational and prenatal care programs for pregnant women known to be using illegal drugs or with past histories of drug use. Each proposal for state intervention carries policy and cost considerations as well as legal parameters limiting state action. Once the focus for state intervention has been determined this office will be readily available to assist in further legal analysis and preparing appropriate legislation.

AUTHORITIES CONSIDERED:

1. *Constitutions* **[*29]**

*First Amendment, U.S. Constitution*.

*Fourth Amendment, U.S. Constitution*.

2. *Idaho Statutes*

*Idaho Code §§ 5-310, 5-311*.

*Idaho Code §§ 15-2-108, 15-2-302*.

Idaho's Child Protective Act, *Idaho Code § 16-1601*, et seq.

*Idaho Code § 16-1602(e)*.

*Idaho Code § 32-102*.

*Idaho Code § 72-102(8)(c)*.

3. *Other State Statutes*

*Minn. Stat. § 626.5561* (1990).

N.J.S.A. § 30:4C-11.

4. *United States Supreme Court Cases*

*Akron v. Akron Center for Reproductive Health, 462 U.S. 416 (1983).*

*Eisenstadt v. Baird, 405 U.S. 438 (1972).*

*Griswold v. Connecticut, 381 U.S. 479 (1965).*

*Prince v. Commonwealth of Massachusetts, 321 U.S. 158 (1944).*

*Roe v. Wade, 410 U.S. 113 (1973).*

*Schmerber v. California, 384 U.S. 757 (1966).*

*Thornburgh v. American College of Obstetrics and Gynecology, 476 U.S. 747 (1986).*

*Webster v. Reproductive Health Services, 492 U.S. , 106* L.Ed. 2d 410, 109 S.Ct. (1989).

5. *Federal Cases*

*Jehovah's Witnesses v. King County Hospital Unit No. 1, 278 F.Supp. 488 (W.D. Wash. 1977).*

6. *Idaho Cases*

*State v. Albertson, 93 Idaho 640, 470 P.2d 300 (1970).*

*State v. Kelly, 106 Idaho 268, 678 P.2d 60 (App. 1984).* **[*30]**

*State v. Kincaid, 98 Idaho 440, 566 P.2d 763 (1977).*

*State v. O'Bryan, 96 Idaho 548, 531 P.2d 1193 (1975).*

*Volk v. Baldazo, 103 Idaho 570, 651 P.2d 11 (1982).*

7. *Other State Cases*

*Application of Jamaica Hospital, 491 N.Y.Supp.2d 898 (Sup.Ct. 1985).*

In *Re Clark, 185 N.E.2d 128 (Ohio 1962).*

*Crouse Irving Memorial Hospital, Inc., v. Paddock, 485 N.Y.Supp.2d 443 (Sup.Ct. 1985).*

*Dietrich v. Inhabitants of Northhampton, 138 Mass. 14 (1884).*

In *Re Dittrick, 80 Mich.App. 219, 263 N.W.2d 37 (1977).*

*Gordon v. Gordon, 301 N.W.2d 869 (Mich.App. 1981).*

*Hoener v. Bertinato, 171 A.2d 140 (N.J. 1961).*

*Jefferson v. Griffin Spalding County Hospital, 274 S.E.2d 457 (1981).*

*Raleigh Fitkin-Paul Morgan Memorial Hospital v. Anderson, 201 A.2d 537 (N.J. 1964).*

*Ravin v. State, 537 P.2d 494 (Alaska 1975).*

*Smith v. Brennan, 157 A.2d 497 (1960).*

*State v. Erikson, 574 P.2d 1 (Alaska 1978).*

*State v. Laitinen, 459 P.2d 789 (Wash. 1969).*

In *Re Steven S., 126 Cal. App.3d 23, 178 Cal.Rptr. 525 (1981).*

*Womack v. Buckhorn, 187 N.W.2d 218 (Mich. 1971).*

8. *Publications*

Note, Fetal Rights Proposal, 21 St. Mary's L.J., 259, 292 (1989).

W. Prosser, Handbook of the Law of Torts, § 55 (4th ed. 1971).

9. *Other Authorities*

Statement of Torts (Second) § 869(1).

261 JAMA 1741 (1989).

35 Pediatric Clinics of North America 1403 (1988).

19:4 JOGNN 285 (1990).

Childbirth Educator, Winter: 34-12.

Congressional Record, Senate, August 1, 1989, S.9323.

73 Obstetrics and Gynecology 715 (1989).

**Load Date:** 2014-06-29

ID Attorney General Opinions

_____

End of Document

**EXHIBIT B**

| From: | Brian Church |
|---|---|
| To: | Emily MacMaster; Richard Hearn |
| Cc: | Alexis Kovacs; Jack Corkery |
| Subject: | Rossow - Defendants" First Supplemental Discovery Responses |
| Date: | Friday, July 26, 2024 6:03:29 PM |
| Attachments: | image001.png |
| | Defendant"s 1st Supp Responses to Plaintiff"s 1st Discovery Requests.pdf |

Counsel:

I've attached Defendant's First Supplemental Responses to Plaintiff's First Set of Discovery Requests to Defendant. You are also receiving two links to download files for today's production. I will transmit the passwords via a separate email.

VOL004

VOL005

Files within this production have been marked as confidential in accordance with the parties' protective order. Additionally, certain documents have been redacted in accordance with the Court's Memorandum Decision and Order, dated June 11, 2024.

--

 **Brian V. Church | Lead Deputy Attorney General**
Civil Litigation and Constitutional Defense Division
Office of the Attorney General | State of Idaho
Phone: (208) 334-2400

**NOTICE:** This message, including any attachments, is intended only for the individual(s) or entity(ies) named above and may contain information that is confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law. If you are not the intended recipient, please reply to the sender that you have received this transmission in error, and then please delete this email.

RAÚL R. LABRADOR
ATTORNEY GENERAL

JAMES E. M. CRAIG, ISB #6365
Division Chief, Civil Litigation and
Constitutional Defense

BRIAN V. CHURCH, ISB #9391
Lead Deputy Attorney General
SEAN M. CORKERY, ISB # 12350
Assistant Solicitor General
Office of the Attorney General
P. O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
james.craig@ag.idaho.gov
brian.church@ag.idaho.gov
jack.corkery@ag.idaho.gov

*Attorneys for Defendant Dean Cameron*

## UNITED STATE DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| KEEVA ROSSOW, | Case No. 1:23-cv-00131-BLW |
| Plaintiff, | |
| v. | **DEFENDANT'S FIRST SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF DISCOVERY REQUESTS TO DEFENDANT** |
| DAVE JEPPESEN, Director, Idaho Health and Welfare, in his official capacity, | |
| Defendant. | |

Defendant Alex J. Adams, Director, Idaho Department of Health and Welfare, by and through his counsel of record, Brian V. Church, Lead Deputy Attorney General, and Jack Corkery, Assistant Solicitor General, offers this first supplemental response to Plaintiff's First Set of Discovery to Defendants. Discovery in this lawsuit is ongoing and pursuant to Federal Rules of Civil Procedure of 26 and 34, Defendant will supplement its Answers and Responses accordingly. Defendant has made a diligent search for the documents and information requested. Subject to the foregoing, Defendant responds to Plaintiff's First Set of Discovery to Defendant follows:

## <u>GENERAL OBJECTIONS</u>

1.      Plaintiff's discovery defines You or Your to include parties who are not before the Court. *See* Federal Rules of Civil Procedure 33(a)(1) ("a party may serve on any other party"); 34(a) ("A party may serve on any other party"); 36(a)(1) ("A party may serve on any other party a written request to admit."). The discovery will be answered by Defendant, the (interim) Director of the Idaho Department of Health and Welfare. Defendant objects to Plaintiff's discovery to the extent it attempts to seek discovery from non-parties. Defendant further notes that a request to provide discovery from "all employees of the State of Idaho Risk Management program" is inappropriate, and is factually incorrect, as the Idaho's Risk Management Program is not acting as a surety for this lawsuit. This objection is a general objection applicable to each interrogatory, request for production, and request for admission, in which "You" or "Your" is used.

2.      Plaintiff's interrogatories currently exceed the permissible number due to an interrogatory that is treated as having multiple subparts. Fed. R. Civ. P. 33(a)(1). Plaintiff's discovery purports to list 20 interrogatories. However, Interrogatory No. 9 states, "Please describe the full factual basis for each of Plaintiff's Requests for Admissions which You fail to unequivocally admit."

Plaintiff's 12 requests for admission cover 12 separate subjects: (1) IDHW's presentation of evidence to the Legislature when IDAPA 16.06.01.563.02 was adopted; (2) IDHW's determination of legal age; (3) placement of men on the registry related to 563.02(a); (4) AG Opinion 91-1; (5) the purpose of the rule and whether it controls the conduct of women; (6) the Idaho Child Protective Act; (7) impact on the fetus by the woman's use of alcohol; (8) whether it is legal to use alcohol; (9) whether use of alcohol is a ground for placement on the Idaho Child Protection Central Registry; (10) whether use of alcohol violates 563.02(a); (11) whether Defendant is immune; and (12) whether Defendant is a statutory person under 42 U.S.C. § 1983.

Accordingly, Interrogatory No. 9 has 12 discrete subparts. As such, Interrogatory No. 9 is treated as 12 separate interrogatories, and this brings Plaintiff's total number of interrogatories to 31 (replacing one interrogatory with 12 results in a net gain of 11). *See, e.g., Valcor Eng'g Corp. v. Parker Hannifin Corp.*, No. 8:16-cv-00909-JVS (KESx), 2017 WL 10440700, at *2 (C.D. Cal. Aug. 28, 2017) ("Where a party serves a Rog requesting disclosure of all information on which the opposing party's denials of multiple RFAs are based, this 'essentially transforms each [RFA] into' a separate Rog for purposes of FRCP 33(a)(1), at least '[w]here

the underlying [RFAs] concern different, separate, or discrete matters....'") (citations omitted); *see also Jovanovich v. Redden Marine Supply, Inc.*, No. C10-924-RSM, 2011 WL4459171, at \*2 (W.D. Wash. Sept. 26, 2011).

Defendant therefore objects to Plaintiff's exceeding the permissible number of interrogatories without leave of the Court.

3.      Defendant objects to any request that seeks information protected by the attorney-client privilege, the work product doctrine, the legislative privilege, trial-preparation material. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case...."). Where applicable, Defendant will follow Rule 26(b)(5).

## INTERROGATORIES

**INTERROGATORY NO. 1:**  Please identify each and every person known to You to have factual knowledge and/or information concerning the subject matter of this litigation and, for each such person, please describe the nature and substance of the person's knowledge and/or information.

### RESPONSE TO INTERROGATORY NO. 1:

Defendant objects to the overbroad nature of this interrogatory, requiring disclosure of "each and every person known to you have factual knowledge." Without waiving the foregoing objection, Defendant has exercised his diligence in attempting to identify persons and the substance of their knowledge, and has arrived at the following list.

1.  Keeva Rossow, Plaintiff.

2. Ryan Blaski, Plaintiff's husband and father of R.B.

3. Baby R.B., Plaintiff's child who suffered an incident of abuse, neglect, or abandonment.

4. Richard Hearn, Attorney for Plaintiff in the Administrative Proceedings, and Attorney for Plaintiff in this proceeding.

5. Emily MacMaster, Attorney for Plaintiff.

Theses persons may have knowledge regarding Plaintiff's pregnancy; her use of marijuana or other controlled substances during the pregnancy; the birth of her child; the THC-positive test results on her and the umbilical cord blood; the child protective process, including notification by the Department, interviews, provision of information, substantiation; the administrative appeal process; and this lawsuit.

6. Members of a putative class.

7. Children subject to incidents of abuse, neglect, or abandonment.

8. Department staff, police, hospitals, medical providers, who worked on substantiated cases.

Theses persons may have knowledge regarding substantiated incidents of abuse, neglect, or abandonment, involving "Prenatal use of any controlled substance as defined under Section 37-2701(e), Idaho Code, except as prescribed by a medical professional."

9. Kootenai Health, including doctors, nurses, employees, and its agents.

10. Coeur d'Alene Police Department, including its officers and detectives.

Theses persons may have knowledge regarding Plaintiff's pregnancy; her use of marijuana or other controlled substances during the pregnancy; the birth of her child; the THC-positive test results on her and the umbilical cord blood; the child protective process, including notification by the Department, interviews, provision of information, substantiation.

11. Dean Cameron, Defendant and Interim Director of the Idaho Department of Health and Welfare;

Interim Director Cameron recently assumed the role of Interim Director for the Department. He has general knowledge of this lawsuit.

12. Miren Unsworth, Deputy Director, Idaho Department of Health and Welfare;

13. Roxanne Printz, Deputy Administrator, Family and Community Services Division, Idaho Department of Health and Welfare;

14. Andie Blackwood, Bureau Chief, Bureau of Child Welfare, Family and Community Services Division, Idaho Department of Health and Welfare;

15. Julie Sevcik, Program Manager, Human Services Field, Bureau of Child Welfare, Family and Community Services Division, Idaho Department of Health and Welfare;

16. Karla Kinzel, Program Specialist, Bureau of Child Welfare, Family and Community Services Division, Idaho Department of Health and Welfare;

17. Autum Ferris, Program Specialist, Human Services Field, Bureau of Child Welfare, Family and Community Services Division, Idaho Department of Health and Welfare.

Theses persons may have general knowledge regarding Plaintiff's pregnancy; her use of marijuana or other controlled substances during the pregnancy; the birth of her child; the THC-positive test results on her and the umbilical cord blood; the child protective process, including notification by the Department, interviews, provision of information, substantiation; the administrative appeal process; and this lawsuit. These individuals also have information regarding the operation of the Idaho Child Protection Central Registry.

18. Colleen Villegas, Automated Systems Manager, Family and Community Services Division, Idaho Department of Health and Welfare;

This person has general knowledge regarding the operation of the Idaho Child Protection Central Registry, including the databases used to maintain the registry.

19. Kayla Ellis, former safety assessment worker, Family and Community Services Division, Idaho Department of Health and Welfare;

20. Brandi Barklow, Program Specialist, Bureau of Child Welfare, Family and Community Services Division, Idaho Department of Health and Welfare;

These persons may have knowledge regarding Plaintiff's pregnancy; her use of

marijuana or other controlled substances during the pregnancy; the birth of her child; the THC-positive test results on her and the umbilical cord blood; the child protective process, including notification by the Department, interviews, provision of information, substantiation; the administrative appeal process; and this lawsuit.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1 (7/26/2024):

21. Alex Adams, Defendant and Director of the Idaho Department of Health and Welfare;

Director Adams recently assumed the role of Director for the Department of Health and Welfare. He has general knowledge of this lawsuit and the subject matter of this lawsuit.

22. Monty Prow, Deputy Director of the Idaho Department of Health and Welfare;

Mr. Prow may have general knowledge of this lawsuit and the subject matter of this lawsuit.

23. David Jeppesen, former Defendant and former Director of the Idaho Department of Health and Welfare.

Former Director Jeppesen previously served as the Director for the Department. He has general knowledge of this lawsuit and the subject matter of this lawsuit, and he conducted the Director's review for Ms. Rossow's case.

24. Office of the Attorney General, its staff, staff of the Department of Health and Welfare who provide legal support to Deputy Attorneys General.

The Office of the Attorney General, its staff, and staff of the Department of Health and Welfare who provide legal support to Deputy Attorneys General, may have general knowledge of this lawsuit and the subject matter of this lawsuit. These persons, however, received this information in their capacity as attorneys or staff to attorneys for the Department or for Defendant, and as such have and will assert the attorney-client privilege, or other applicable privilege. This response is not a waiver of any such privilege, and Defendant and the Department of Health and Welfare retain all such privileges.

**INTERROGATORY NO. 2:** Please identify each and every person whom You may call as a witness at the time of trial, and please set forth the subject matter and substance of the facts to which each such person will testify.

**RESPONSE TO INTERROGATORY NO. 2:**

Defendant has not yet identified who he will call as a witness at trial. Defendant will provide a trial witness list in accordance with a trial scheduling order. Defendant may call any person identified in the response to Interrogatory No.1. The substance of the information is set forth in response to Interrogatory No. 1. Defendant also notes that it may call any person identified in any other interrogatory response or identified in any document produced in response to Plaintiff's discovery. The substance of the person's information will be shown

through the context of the documents identifying such person. Defendant, however, objects to any part of this request that seeks trial-preparation material.

**INTERROGATORY NO. 3:**   Please identify each and every person whom you expect to or otherwise may call as an expert witness in the trial of this matter and, for each such person, state the following:

(a)   A complete statement of all opinions to be expressed by the expert and the basis and reasons therefore;

(b)   The data or information considered by the expert in forming the opinions;

(c)   The expert witnesses' qualifications, including a list of all publications authored by the expert within the preceding ten years;

(d)   The compensation to be paid for the expert witness' testimony; and

(e)   A listing of any other cases in which the expert has testified as an expert at trial or by deposition within the preceding four years.

**RESPONSE TO INTERROGATORY NO. 3:**

Defendant has not yet identified if he will present expert testimony at trial. Defendant will provide expert information in accordance with the scheduling order and the Federal Rules of Civil Procedure. Defendant, however, objects to any part of this request that seeks trial-preparation material.

**INTERROGATORY NO. 4:**  Please describe with particularity the factual and legal

reasons for Your contention that, prior to birth, a fetus is a child as "child" is defined for purposes of the Child Protective Act, at title 16, Chapter 16, Idaho Code, or otherwise under Idaho law to the extent relevant to the subject matter of this lawsuit.

**RESPONSE TO INTERROGATORY NO. 4:**

Defendant objects to this interrogatory, intends to seek a protective order as to this interrogatory, and will not answer this interrogatory at this time. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies the concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This interrogatory is not relevant to any claim or defense at issue in this lawsuit. Plaintiff has not raised a claim that IDAPA 16.06.01.563.02.a is an invalid promulgation; such a claim would fail in this case, even if pursued, because a state official sued in his official capacity has Eleventh Amendment immunity in federal court from pendent state law claims. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984).[1] Instead, Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood— violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. &*

---

[1] It is well established that section 1983 cannot be used to test whether something violates non-federal law. *See Collins v. City of Harker Heights, Tx.,* 503 U.S. 115, 119 (1992).

*Hosp. v. Halderman*, 465 U.S. 89, 121 (1984).

Further, Plaintiff's substantiation related to the child's THC-positive state at birth (given that Plaintiff and the umbilical cord blood tested positive) and hence why IDAPA 16.06.01.563.02.a was the basis for the substantiation.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4 (7/26/2024):**

Per the Court's Memorandum Decision and Order, dated June 11, 2024, the Court sustained the Defendant's objection to this interrogatory, and no further response is required.

**INTERROGATORY 5:**  Please identify any and all documents upon which You rely, or to which You refer, in answering these Interrogatories.

**RESPONSE TO INTERROGATORY NO. 5:**

Defendant objects to this interrogatory to the extent it seeks documents covered by the attorney-client privilege, the attorney work product doctrine, the joint defense and common interest doctrine, legislative privilege, and trial preparation material.

Without waiving the foregoing, please see documents produced with this response.

**INTERROGATORY NO. 6:**  Please identify all documents in Your possession, custody or control, including but not limited to reports made or statements taken or received by any person, pertaining to interactions with Plaintiff or any other person listed on the Central Registry pursuant to IDAPA 16.06.01.563.02(a).

**RESPONSE TO INTERROGATORY NO. 6:**

Defendant objects to this interrogatory, intends to seek a protective order as to this interrogatory, and will not answer this interrogatory at this time. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This interrogatory (1) is massively overbroad, (2) would be unduly burdensome for the Defendant to answer, (3) does not seek relevant information, (4) is not proportional to the needs of the case; (5) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the persons listed on the registry.

Overbroad: This interrogatory would require Defendant to search for and identify any vital records (marriage, divorce, birth, death), disease records (all reportable diseases, including sexually transmitted diseases), immunization records, mental health treatment records, welfare / benefit applications, welfare / benefit claims paid, program documents, *pertaining to* any person listed on the Idaho Child Protection Central Registry who had a substantiated incident of abuse, neglect, or abandonment, for prenatal use of any controlled substance. Further, this interrogatory has no time limitation. This interrogatory is massively overbroad.

Unduly burdensome: This interrogatory would be unduly burdensome on Defendant, because it would require an expansive search of every possible file that "pertain[s] to interactions with Plaintiff or any other person listed on the Central Registry pursuant to IDAPA 16.06.01.563.02(a)." This search is unduly burdensome given the nature of the claims

at issue in this suit, and given the limited temporal nature of any claims that Plaintiff (or any class) could bring.

Not relevant: Plaintiff asks for specific records related to substantiation under IDAPA 16.06.01.563.02.a under Interrogatory No. 8—although that information is not relevant either. Interrogatory No. 6 would cover every other record the Department has access to. Such records are *not* relevant to any claim or defense in this suit, which concerns substantiation of an incident of abuse, neglect, or abandonment due to prenatal use of any controlled substance. This is true for both Plaintiff's individual claims and the putative class.

Not proportional: Producing records about immunizations, mental health treatment, welfare applications, communicable diseases, vital records, etc., is not proportional to this suit's claims, which brings *legal* claims relating to due process, equal protection, and a right to bodily autonomy.

Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of persons listed on the registry: This interrogatory would require Defendant to produce information about sensitive matters, including information about communicable diseases, mental health records, etc. of non-parties to this litigation. This information could embarrass the persons whose information is being requested, and could lead to harassment, annoyance, or oppression of those persons.

## **FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6 (7/26/2024):**

Per the Court's Memorandum Decision and Order, dated June 11, 2024, the Court

ordered Defendant to produce certain information to Plaintiff's counsel. The Court noted that because it adopted Defendant's "proposal to produce this deidentified information instead of responding to several of Ms. Rossow's discovery requests, the Court will deny Ms. Rossow's motion to compel responses to Interrogatories Nos. 6 and 8 as well as Request for Production No. 5." Without waving Defendant's objections, Plaintiff should see the information produced in accordance with the Court's order.

**INTERROGATORY NO. 7:**  Please identify any and all exhibits that You may introduce or otherwise utilize at the trial in this action.

**RESPONSE TO INTERROGATORY NO. 7:**

Defendant has not yet determined what exhibits it may or will utilize at trial. Defendant may utilize any document in its possession (or custody or control), any document in Plaintiff's possession (or custody or control), including any documents produced in response to discovery. Defendant will provide exhibits in accordance with the trial scheduling order. Defendant, however, objects to any part of this request that seeks trial-preparation material.

**INTERROGATORY NO. 8:**  Please identify each and every person who is currently, or was ever, on the Central Registry pursuant to IDAPA 16.06.01.563.02(a), by stating for each such person the following:

(a)    the person's name, address, e-mail address, phone number and occupation;

(b)    the person's gender;

(c)       a detailed description of their placement on the Central Registry, including but not limited to the reason for their placement on the Central Registry, each controlled substance used as defined under Idaho Code § 37-2701(e) for which they were placed on the Central Registry, and the date(s) of their placement on the Central Registry; and

(d)       the name and location of all documents in Your custody or control regarding each such person's placement on the Central Registry, including the custodian of such documents.

**<u>RESPONSE TO INTERROGATORY NO. 8</u>:**

Defendant objects to this interrogatory, intends to seek a protective order as to this interrogatory, and will not answer this interrogatory at this time. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This interrogatory (1) is overbroad, (2) does not seek relevant information, (3) is not proportional to the needs of the case, (4) is unduly burdensome; (5) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and the persons listed on the registry; and (6) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the reporting parties.

<u>Overbroad:</u> This interrogatory is overbroad, requiring disclosure of every person who has ever had a substantiated incident of abuse, neglect, or abandonment, involving prenatal

exposure to a controlled substance, and "the name and location of all documents…regarding each such person's placement."

The interrogatory is also overbroad because it is not time limited. Idaho has specifically enumerated prenatal exposure as a form of abuse, neglect, or abandonment, since 2007. Any claim at issue here is limited to a two-year statute of limitations.

Not relevant: Other persons' information is not relevant to Plaintiff's individual claims. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, other persons' information is not relevant.

With respect to the putative class action, the lawsuit is based on legal claims relating to a regulatory scheme. Underlying information about the specific form of abuse, neglect, or abandonment, such as the type of controlled substance, children involved, etc., and the documents containing that information, is not relevant to the legal claims at issue here. Likewise, a person's occupation—which the Department of Health and Welfare is unlikely to maintain, except as disclosed by the person involved—has no relevancy to any of the claims here.

Not proportional: As to Plaintiff's individual claims, other persons' information is not proportional to the needs of the case. As to the putative class action, again, this is a case with legal claims based on a regulatory scheme. Producing information about other persons' substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure of controlled substances, is not proportional to the needs of the case. Moreover, the interrogatory is not time limited, and it is not proportional to provide broad swaths of information about substantiated incidents that occurred as early as 2007. And as noted above, there is a two-year statute of limitations.

Unduly burdensome: To identify the location of all documents would be unduly burdensome on the Department.

Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry: This interrogatory would require Defendant to produce information about substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure to controlled substances of non-parties to this litigation. This information could embarrass or lead to harassment, annoyance, or oppression, of the children involved in the abuse. Additionally, this information could embarrass those persons on the registry whose information is being requested, and could lead to harassment, annoyance, or oppression of those persons.

Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of reporting parties: Idaho requires certain parties to report suspected abuse, neglect, or abandonment, and protects good faith reporters from civil and

criminal liability. Idaho Code §§ 16-1605, 16-1606. Producing information about the reporting party may subject that person to harassment, annoyance, oppression, or embarrassment. Such information is also not relevant to any claim in this case.

<u>Defendant is producing:</u> a copy of Plaintiff's case file to counsel for Plaintiff. Defendant is redacting the name of the reporting party for the reasons identified above.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8 (7/26/2024):

Per the Court's Memorandum Decision and Order, dated June 11, 2024, the Court ordered Defendant to produce certain information to Plaintiff's counsel. The Court noted that because it adopted Defendant's "proposal to produce this deidentified information instead of responding to several of Ms. Rossow's discovery requests, the Court will deny Ms. Rossow's motion to compel responses to Interrogatories Nos. 6 and 8 as well as Request for Production No. 5." Without waving Defendant's objections, Plaintiff should see the information produced in accordance with the Court's order.

**INTERROGATORY NO. 9:** Please describe the full factual basis for each of Plaintiff's Requests for Admissions which You fail to unequivocally admit.

**RESPONSE TO INTERROGATORY NO. 9:**

Defendant has raised a general objection, and reasserts that objection here, that this interrogatory, coupled with 12 requests for admission on 12 discrete topics, creates 12 discrete subparts. *See, e.g., Valcor Eng'g Corp. v. Parker Hannifin Corp.*, No. 8:16-cv-00909-JVS (KESx),

2017 WL 10440700, at *2 (C.D. Cal. Aug. 28, 2017) ("Where a party serves a Rog requesting disclosure of all information on which the opposing party's denials of multiple RFAs are based, this 'essentially transforms each [RFA] into' a separate Rog for purposes of FRCP 33(a)(1), at least '[w]here the underlying [RFAs] concern different, separate, or discrete matters....'") (citations omitted); *see also Jovanovich v. Redden Marine Supply, Inc.*, No. C10-924-RSM, 2011 WL 4459171, at *2 (W.D. Wash. Sept. 26, 2011). Thus, Plaintiff's interrogatories exceed the number permitted (31 instead of 25), and have been submitted to Defendant without leave of Court.

Defendant further objects to the vague or overbroad request for the "full factual basis" for any request for admission that Defendant does not "unequivocally admit." As noted by the *Valcor Engineering* court, this interrogatory transforms each request for admission into an interrogatory.

Without waiving the foregoing objections, Plaintiff should see Defendant's answers.

**INTERROGATORY NO. 10**:  Please identify each and every person who, after being placed on the Central Registry pursuant to IDAPA 16.06.01.563.02(a), has been removed from the Central Registry, by stating for each such person the following:

(a)      the person's name and last known address, phone number, e-mail address, and occupation;

(b)      a detailed description of their placement on the Central Registry including but not limited to, the reason for their placement on the Central Registry, each controlled

substance used as defined under Idaho Code § 37-2701(e) for which they were placed on the Central Registry, and the date(s) of their placement on the Central Registry;

(c)     a detailed description of the reason for their removal from the Central Registry and the date(s) of their removal from the Central Registry; and

(d)     the name and location of all documents in Your custody or control regarding each such person's placement on and/or or removal from the Central Registry, including the custodians of such documents.

### **RESPONSE TO INTERROGATORY NO. 10:**

Defendant objects to this interrogatory, intends to seek a protective order as to this interrogatory, and will not answer this interrogatory at this time. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This interrogatory (1) does not seek relevant information; (2) is not proportional to the needs of the case; (3) is overbroad; (4) is unduly burdensome; (5) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and the persons listed on the registry; and (6) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the reporting parties.

Not relevant: Other persons' information is not relevant to Plaintiff's individual claims. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using

marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, other persons' information is not relevant.

For a person who has an incident of abuse, neglect, or abandonment that was substantiated under IDAPA 16.06.01.563.02(a), that person must petition for removal from the Child Protection Central Registry at least 10 years *after* the substantiation. No person in a potential class, which would only cover those individuals whose substantiation arose in the two years preceding the complaint, would have a right to petition for removal under IDAPA 16.06.01.563.02. Therefore, there is no information in any response that Defendant would give to this interrogatory that is relevant to any claim asserted by Plaintiff, or that could be asserted under the two-year statute of limitations applicable to this type of claim.

Underlying information about the specific form of abuse, neglect, or abandonment, such as the type of controlled substance, children involved, etc., and the documents containing that information, is not relevant to the legal claims at issue here. Likewise, a person's occupation—which the Department of Health and Welfare is unlikely to maintain, except as disclosed by the person involved—has no relevancy to any of the claims here.

Not proportional: As to Plaintiff's individual claims, other persons' information is not proportional to the needs of the case. As to the putative class action, again, this is a case with

legal claims based on a regulatory scheme. Producing information about other persons'
substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure
of controlled substances, is not proportional to the needs of the case. Persons removed from the
registry and information about them would not assist Plaintiff in any of the claims she asserts
or with regard to a motion for class certification. Again, such persons would have had a
substantiated incident of abuse, neglect, or abandonment that was substantiated under IDAPA
16.06.01.563.02.a, from March 2013 or earlier, and these persons have no viable claim given
the statute of limitations. Requiring Defendant to search for and provide this information
would not be proportional to the needs of the case.

Overbroad: This interrogatory is overbroad requiring disclosure of every person who
has ever had a substantiated incident of abuse, neglect, or abandonment, involving prenatal
exposure to a controlled substance, and who has had their name removed from the Idaho
Child Protection Central Registry and "the name and location of all documents…regarding
each such person's placement."

The interrogatory is also overbroad because it is not time limited. Idaho has specifically
enumerated prenatal exposure as a form of abuse, neglect, or abandonment, since 2007. Any
claim at issue here is limited to a two-year statute of limitations.

Unduly burdensome: To identify the location of all documents would be unduly
burdensome on the department.

Would require production of information that could embarrass, lead to harassment,
annoyance, or oppression of the children involved and persons listed on the registry: This

interrogatory would require Defendant to produce information about substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure to controlled substances of non-parties to this litigation. This information could embarrass or lead to harassment, annoyance, or oppression, of the children involved in the abuse. Additionally, this information could embarrass those persons on the registry whose information is being requested, and could lead to harassment, annoyance, or oppression of those persons. This is especially so, given that these persons have had their names removed from the registry, after successfully petitioning for removal—and showing the lack of other substantiated incidents and the lack of certain criminal history.

Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of reporting parties: Idaho requires certain parties to report suspected abuse, neglect, or abandonment, and protects good faith reporters from civil and criminal liability. Idaho Code §§ 16-1605, 16-1606. Producing information about the reporting party may subject that person to harassment, annoyance, oppression, or embarrassment. Such information is also not relevant to any claim in this case.

**INTERROGATORY NO. 11:**  Please identify by name and position all persons involved in answering these First Set of Discovery Requests to Defendant.

**RESPONSE TO INTERROGATORY NO. 11:**

1.  Dean Cameron, Defendant and Interim Director of the Idaho Department of Health and Welfare;

2.  Miren Unsworth, Deputy Director, Idaho Department of Health and Welfare;

3.  Roxanne Printz, Deputy Administrator, Family and Community Services Division, Idaho Department of Health and Welfare;

4.  Andie Blackwood, Bureau Chief, Bureau of Child Welfare, Family and Community Services Division, Idaho Department of Health and Welfare;

5.  Julie Sevcik, Program Manager, Human Services Field, Bureau of Child Welfare, Family and Community Services Division, Idaho Department of Health and Welfare;

6.  Karla Kinzel, Program Specialist, Bureau of Child Welfare, Family and Community Services Division, Idaho Department of Health and Welfare;

7.  Autum Ferris, Program Specialist, Human Services Field, Bureau of Child Welfare, Family and Community Services Division, Idaho Department of Health and Welfare;

8.  Brandi Barklow, Program Specialist, Bureau of Child Welfare, Family and Community Services Division, Idaho Department of Health and Welfare;

9.  Colleen Villegas, Automated Systems Manager, Family and Community Services Division, Idaho Department of Health and Welfare;

10. Brian V. Church, Deputy Attorney General, Civil Litigation and Constitutional Defense Division, Idaho Office of the Attorney General;

11. James E. M. Craig, Chief, Civil Litigation and Constitutional Defense Division, Idaho Office of the Attorney General;

12. John Spalding, Deputy Attorney General, Health and Human Services Division, Idaho Office of the Attorney General; *and*

13. Tom Donovan, Chief, Health and Human Services Division, Idaho Office of the Attorney General.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11 (7/26/2024):**

14. Alex Adams, Defendant and Director of the Idaho Department of Health and Welfare;

15. Staci Phelan, Administrator, Division of Management Services, Idaho Department of Health and Welfare; *and*

16. Daniel Asbury, Bureau Chief, Division of Management Services, Idaho Department of Health and Welfare.

**INTERROGATORY NO. 12:**  If You contend that certification of a class action should not be granted in this lawsuit, in whole or in part, identify all reasons in support of Your position, including, but not limited to, by identifying all facts and law which support Your contention, as well as all persons (by name, address, telephone number, occupation, and e-mail address) with knowledge of relevant facts which support Your contention.

**RESPONSE TO INTERROGATORY NO. 12:**

Defendant will ask that the Court to permit it to answer this interrogatory at a later time, given that the interrogatory is premature. Defendant should be permitted to answer this

interrogatory at a later time, reserving any objections to this interrogatory. *See* Fed. R. Civ. P. 33(a)(2) ("An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time.").

Plaintiff has not yet moved for class certification. She must do so by April 3, 2024. *See* Dkt. 21 ¶ 7(a). Defendant must respond on June 3, 2024. *Id.* This interrogatory is premature until, at the very least, Defendant has responded to Plaintiff's motion. There is no harm to Plaintiff in delaying Defendant's response to this interrogatory until after Defendant files his response to Plaintiff's motion for class certification.

Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12 (7/26/2024):**

Per the Court's Memorandum Decision and Order, dated June 11, 2024, Defendant's objection to this interrogatory was sustained. "The Court will permit the Department to respond to this request after it responds to Ms. Rossow's motion for class certification." Dkt. 52 at 15.

**INTERROGATORY NO. 13:** For every calendar year from 2013 to today's date,

identify the number of all individuals on the Central Registry pursuant to IDAPA 16.06.01.56302(a) as of March 30 of each such year, further identifying all such individuals by names, addresses and phone numbers.

**RESPONSE TO INTERROGATORY NO. 13:**

Defendant objects to this interrogatory, intends to seek a protective order as to this interrogatory, and will not answer this interrogatory at this time. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This interrogatory asks Defendant to identify all individuals on the Idaho Child Protection Central Registry for substantiated incidents of prenatal exposure to controlled substances as of March 30, 2013, March 30, 2014, March 30, 2015, March 30, 2016, March 30, 2017, March 30, 2018, March 30, 2019, March 30, 2020, March 30, 2021, March 30, 2022, and March 30, 2023.

This interrogatory (1) does not seek relevant information; (2) is not proportional to the needs of the case; (3) is overbroad; (4) would be unduly burdensome for Defendant to answer; and (5) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and the persons listed on the registry.

Not relevant: Other persons' information is not relevant to Plaintiff's individual claims. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the

umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, other persons' information is not relevant.

With respect to the putative class action, the lawsuit is based on legal claims relating to a regulatory scheme. The number of persons and their identity on the registry as of March 30 for each year from 2013 to 2023 is not relevant to any of the claims.

Not proportional: As to Plaintiff's individual claims, other persons' information is not proportional to the needs of the case. As to the putative class action, again, this is a case with legal claims based on a regulatory scheme. There is no need to know the identities of persons on the registry as of March 30 each year since 2013. Moreover, as discussed below, there would be a burden on the Department to manually compile identities of persons on the database as of March 30 each year.

Any putative class here could only involve individuals who had a substantiated incident of abuse on or after March 30, 2021. Requiring Defendant to produce information from 2013 forward is not proportional to the needs of the case.

Overbroad: This interrogatory is overbroad because it requires the Department to identify *every* person on the registry as of March 30, 2013, March 30, 2014, etc. through March 30, 2023, who had a substantiation under IDAPA 16.06.01.563.02.a.

Unduly burdensome: The database on which substantiations are maintained is a live database, such that the Idaho Child Protection Central Registry maintains the persons then-existing on the database. Although the Department of Health and Welfare maintains files of persons removed from the Idaho Child Protection Central Registry, it would have to manually examine those files to determine when those persons were removed from the registry in order to address this interrogatory.

Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and the persons listed on the registry: This interrogatory would require Defendant to produce information about substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure to controlled substances of non-parties to this litigation. This information could embarrass or lead to harassment, annoyance, or oppression, of the children involved in the abuse. Additionally, this information could embarrass those persons on the registry whose information is being requested, and could lead to harassment, annoyance, or oppression of those persons.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13 (7/26/2024):

Per the Memorandum Decision and Order of the Court, dated June 11, 2024, Defendant is required "to disclose the total number of individuals listed on the Central Registry for a violation of IDAPA 16.06.01.563.02a as of March 30 for the years 2021, 2022, 2023, and 2024." Dkt. 52 at 16. Without waiving his objections, Defendant answers as follows.

The following table lists the number of individuals listed on the Child Protection

Central Registry, as of March 30, 2021, 2022, 2023, and 2024, *and* who were substantiated for an incident of abuse, neglect, or abandonment, for Level Two, "Prenatal use of any controlled substance as defined under Section 37-2701(e), Idaho Code, except as prescribed by a medical professional." IDAPA 16.06.01.563.02.a.

| Date | # of Persons on the Registry |
|------|------------------------------|
| March 30, 2021 | 1,955 |
| March 30, 2022 | 2,295 |
| March 30, 2023 | 2,550 |
| March 30, 2024 | 2,843 |

**INTERROGATORY NO. 14:**  For every calendar year from 2013 to today's date, identify the number of all individuals previously placed on the Central Registry pursuant to IDAPA 16.06.01.563.02(a) who were removed from the Central Registry at any time during the twelve (12) months prior to March 30 of each such year, further identifying all such individuals by names, addresses, e-mail addresses, and phone numbers.

**RESPONSE TO INTERROGATORY NO. 14:**

Defendant objects to this interrogatory, intends to seek a protective order as to this interrogatory, and will not answer this interrogatory at this time. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This interrogatory asks for Defendant to identify all persons who had a substantiated incident of abuse, neglect, or abandonment under IDAPA 16.06.01.563.02.a, and who were

removed from the Idaho Child Protection Central Registry from March 30, 2012 to March 30, 2013; March 30, 2013 to March 30, 2014; March 30, 2014 to March 30, 2015; March 30, 2015 to March 30, 2016; March 30, 2016 to March 30, 2017; March 30, 2017 to March 30, 2018; March 30, 2018 to March 30, 2019; March 30, 2019 to March 30, 2020; March 30, 2020 to March 30, 2021; March 30, 2021 to March 30, 2022; March 30, 2022 to March 30, 2023.

This interrogatory (1) does not seek relevant information; (2) is not proportional to the needs of the case; (3) is overbroad; (4) would be unduly burdensome for Defendant to answer; and (5) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and the persons listed on the registry.

Not relevant: Other persons' information is not relevant to Plaintiff's individual claims. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, other persons' information is not relevant.

As to the putative class, again, information persons who were removed from the registry is not relevant to any claim or defense in this lawsuit. For a person who has an incident of abuse, neglect, or abandonment that was substantiated under IDAPA 16.06.01.563.02.a, that person must petition for removal from the Child Protection Central Registry at least 10

years *after* the substantiation. No person in a potential class, which would only cover those individuals whose substantiation arose in the two years preceding the complaint, would have a right to petition for removal under IDAPA 16.06.01.563.02. Therefore, there is no information in any response that Defendant would give to this interrogatory that is relevant to any claim asserted by Plaintiff, or that could be asserted under the two-year statute of limitations applicable to this type of claim.

Not proportional: As to Plaintiff's individual claims, other persons' information is not proportional to the needs of the case. As to the putative class action, again, this is a case with legal claims based on a regulatory scheme. Identifying each person who was removed from the registry during 12-month periods—when those persons would have substantiated incidents dating back to 2007 through March 2013—would not provide any information that would benefit this case. Thus, this interrogatory is not proportional.

Overbroad: This interrogatory is overbroad requiring disclosure of every person who has ever had a substantiated incident of abuse, neglect, or abandonment, involving prenatal exposure to a controlled substance, and who has had their name removed from the Idaho Child Protection Central Registry.

The interrogatory is also overbroad because it does not respect the two-year statute of limitations for any claim challenging substantiation, when this interrogatory would only produce information of persons whose substantiation occurred on or before March 30, 2013.

Unduly burdensome: This interrogatory would be unduly burdensome for Defendant to address. This interrogatory is not time limited. Furthermore, Defendant would have to

manually examine each case file to determine what controlled substance or substances were involved in the prenatal exposure, for persons removed from the registry.

      <u>Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry:</u> This interrogatory would require Defendant to produce information about persons who successfully petitioned and showed no additional substantiated reports of abuse, neglect, or abandonment, and a criminal history check not revealing certain acts or crimes. This information may lead to the persons whose information is disclosed being subject to embarrassment, annoyance, harassment. It may also lead to the embarrassment, annoyance, or harassment of children whose parents, guardians, relatives, or other persons known to them are disclosed to be on the Child Protection Central Registry.

      **INTERROGATORY NO. 15:** Identify with particularity each and every database identified by You in Paragraph 2 of Defendant's Initial Disclosures, dated August 1, 2023, including, but not limited to, by stating for each such database:

      (a)     the name of the database, its operating system(s), and all other information identifying the database and its dates of use;

      (b)     the custodian(s) of the database, by name, job title, employer, phone number, address, and e-mail address;

      (c)     the purposes and Your uses of the database, including, but not limited to a description of the kinds of data maintained in the database;

(d)    Your protocols for backing up, retention of, or destroying information in the database; and

(e)    the names and a description of the nature of reports run by You from the database.

**<u>RESPONSE TO INTERROGATORY NO. 15</u>:**

Defendant objects to this interrogatory because it (1) does not seek relevant information and (2) it is overbroad. Information about databases is not relevant to any claim brought by Plaintiff. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). Information about databases is simply not relevant to Plaintiff's individual claims. The same is true of any putative class action, given the same legal claims are raised.

The interrogatory is also overbroad with respect to the details it seeks on the databases, such as "all other information identifying the database."

Without waiving the foregoing objections,

<u>In response to subpart a</u>: ESPI Production, operates on Microsoft Dynamics 365 Platform hosted on Microsoft Azure cloud platform. Central Registry data has been maintained within this database since 11/16/2020.

ICARE_ESPI_SQL, Child Welfare legacy data is stored in a Microsoft SQL Server database that is hosted on an on-premise IDHW server (SQLPRODl9). This database contains Child Welfare information from 1991 – 2020.

In response to subpart b: Colleen Villegas, Automated Systems Manager, 208-789-4606, 450 W State Boise ID 83702, Colleen.Villegas@dhw.idaho.gov.

In response to subpart c: The ESPI Production database contains the data for Idaho's federally compliant Comprehensive Child Welfare Information System named ESPI, a case management system used to support child welfare program needs. This data is used to respond to Federal and State reporting requirements, guide child welfare decision-making and support social workers' needs to organize and record quality case information about the children and families receiving child welfare services.

The iCARE Legacy database contains information from the departments three legacy Child Welfare applications. The legacy applications were known as FCSIS, FOCUS and iCARE and the years of operation were:  FCSIS (1991 – 1998), FOCUS (1998 – 2012) and iCARE (2012 – 2020). The FCSIS and FOCUS applications were hosted on a mainframe and the data in these systems were migrated to the iCARE SQL database in 2010. With the implementation of the ESPI system, the iCARE database was set to read-only and data is never updated. The information in this database is retained for historical purposes only.

In response to subpart d: The ESPI Production database is backed up continuously instead of a scheduled one a day approach; this allows for a rollback to be executed to any point in time. The system backups are stored for 14 days. Back up and retention of the data is

handled by Microsoft Azure cloud services. See

https://learn.microsoft.com/en-us/power-platform/admin/backup-restore-

environments

The iCare legacy database is backed up once per week and these backups are retained for 60 days. In addition, the database is also backed up once per month and this monthly backup is retained for 380 days.

In response to subpart e: Reports do not use ESPI Production as a direct data source. Reports do not use the iCARE Legacy database as a direct data source.

**INTERROGATORY NO. 16:**  Identify with particularity all databases not included in Your answer to Interrogatory No. 15 above in which You maintain or have maintained data regarding the Central Registry, persons on the Central Registry, and/or the placement or the removal of persons on the Central Registry, including, but not limited to, by stating for each such database:

(a)     the name of the database, its operating system(s), and all other information identifying the database and its dates of use;

(b)     the custodian(s) of the database, by name, job title, employer, phone number, address, and e-mail address;

(c)     the purposes and Your uses of the database;

(d)     Your protocols for backing up or destruction of information in the database; and

(e)     the names and a description of the nature of all database reports run by You

from the database.

**RESPONSE TO INTERROGATORY NO. 16:**

Defendant objects to this interrogatory because it (1) does not seek relevant information and (2) it is overbroad. Information about databases is not relevant to any claim brought by Plaintiff. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). Information about databases is simply not relevant to Plaintiff's individual claims. The same is true of any putative class action, given the same legal claims are raised.

The interrogatory is also overbroad with respect to the details it seeks on the databases, such as "all other information identifying the database."

Without waiving the foregoing objections,

In response to subpart a: ESPI UAT, operates on Microsoft Dynamics 365 Platform hosted on Microsoft Azure cloud platform. Central Registry data has been copied into this database since 11/16/2020. ESPI Data Warehouse, an Azure SQL Reporting database hosted on Microsoft Azure cloud platform. Central Registry data has been copied into this database since 11/16/2020.

In response to subpart b: Colleen Villegas, Automated Systems Manager, 208-789-

4606, 450 W State Boise ID 83702, Colleen.Villegas@dhw.idaho.gov.

In response to subpart c: ESPI UAT is a copy of the ESPI Production database, updated periodically on an undefined schedule. The data in the ESPI UAT database is used for functionality testing purposes, including User Acceptance Testing conducted as part of the release process for system updates. ESPI Data Warehouse is a simplified copy of ESPI Production data, updated nightly. This is used as a data source for the FACS Data Team for reporting purposes.

In response to subpart d: The ESPI UAT database is not backed up; production data is not entered, or maintained, in the ESPI UAT database. It is recorded into the ESPI Production database exclusively. The ESPI Data Warehouse data is not backed up as it is refreshed nightly with data from the ESPI Production database.

In response to subpart e: At this time, we do not have any existing reports regarding Central Registry data.

**INTERROGATORY NO. 17:**  Identify all legal proceedings, whether in judicial, administrative or other forums, in which operations of the Central Registry related in any manner whatsoever to IDPAPA 16.06.01.563.02(a) have been at issue, by stating for each proceeding:

(a)     the name, parties to, and dates of the proceeding;

(b)     the forum, location, and case number of the proceeding;

(c)     a description with particularity of the subject matter of the proceeding; and

(d)     the outcome of the proceeding.

**RESPONSE TO INTERROGATORY NO. 17:**

Defendant objects to this interrogatory, intends to seek a protective order as to this interrogatory, and will not answer this interrogatory at this time. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This interrogatory asks for Defendant to identify all legal proceedings that involved operations of the Idaho Child Protection Central Registry "related in any manner whatsoever to" IDAPA 16.06.01.563.02.a. This interrogatory (1) is overbroad; (2) does not seek relevant information; (3) is not proportional to the needs of the case; (4) would be unduly burdensome for Defendant to answer; and (5) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and the persons listed on the registry.

Overbroad: As it is written, this interrogatory asks Defendant to identify all legal proceedings "related in any manner." This alone is overbroad. Further making this interrogatory overbroad is that is not time limited.

Not relevant: There is no clear relevance to the information requested by this interrogatory. Other persons' information is not relevant to Plaintiff's individual claims. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the

umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, other persons' information is not relevant.

With respect to the putative class action, the lawsuit is based on legal claims relating to a regulatory scheme. Other legal proceedings are simply not relevant to the legal claims here.

Not proportional: Asking the Department to search all its records over an unlimited period of time, to identify legal proceedings, is not proportional to the needs of Plaintiff's case, or for a putative class action.

Unduly burdensome: The Department would have to manually search its records for any administrative review, judicial review, or court case, where operations of the Idaho Child Protection Central Registry "related in any manner whatsoever to" IDAPA 16.06.01.563.02.a. This would place an undue burden on the Department.

Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry: This interrogatory would require Defendant to produce information about persons who successfully petitioned and showed no additional substantiated reports of abuse, neglect, or abandonment, and a criminal history check not revealing certain acts or crimes. This information may lead to the persons whose information is disclosed being subject to embarrassment, annoyance, harassment. It may also lead to the embarrassment, annoyance, or

harassment of children whose parents, guardians, relatives, or other persons known to them are disclosed to be on the Child Protection Central Registry. Defendant would also note that Idaho Court Administrative Rule 32(g)(20) provides protection for certain records in legal proceedings.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17 (7/26/2024):**

Per the Memorandum Decision and Order of the Court, dated June 11, 2024, Defendant is required to respond to this interrogatory for proceedings since 2021. Defendant has searched its records and identified fair hearing decisions and director review decisions, for substantiations of an incident of abuse, neglect, or abandonment, under IDAPA 16.06.01.563.02.a, for cases substantiated since 2021. These cases *may* touch on the "interpretation and constitutionality of" IDAPA 16.06.01.563.02.a. *See* Dkt. 52 at 17.

In response to this interrogatory, without waiving his objections, Defendant refers Plaintiff to the documents transmitted with this supplemental response. Additionally, Defendant notes since no cases were filed in district court, it is redacting the names of the substantiated party and baby in accordance with the Court's footnote 9 of its Memorandum Decision and Order, dated June 11, 2024.

**INTERROGATORY NO. 18:**  Identify all requests seeking removal from the Central Registry submitted by or for any person(s) who was placed on the Central Registry pursuant to IDAPA 16.06.01.563.02(a), including by stating:

(a)     the name and last known addresses, phone numbers, e-mail addresses, and occupations of the requester and the person on the Central Registry;

(b)     a detailed description of the person's placement on the Central Registry including but not limited to, the reason for their placement on the Central Registry, each controlled substance used as defined under Idaho Code § 37-2701(e) for which they were placed on the Central Registry, and the date(s) of their placement on the Central Registry;

(c)     the date of the request to be removed from the Central Registry;

(d)     a detailed description of Your response to the request for removal, including, but not limited to, the date of Your response, whether You granted removal from the Central Registry, and the reasons for Your decision; and

(e)     the name and location of all documents in Your custody or control regarding the request and Your response to it.

**RESPONSE TO INTERROGATORY NO. 18:**

Defendant objects to this interrogatory, intends to seek a protective order as to this interrogatory, and will not answer this interrogatory at this time. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This interrogatory (1) does not seek relevant information, (2) is not proportional to the needs of the case, (3) is overbroad, (4) would be unduly burdensome for the Department to answer; (5) would require production of information that could embarrass, lead to harassment,

annoyance, or oppression of the children involved and the persons listed on the registry; and (6) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of reporting parties.

      <u>Not relevant:</u> Other persons' information is not relevant to Plaintiff's individual claims. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, other persons' information is not relevant.

      For a person who has an incident of abuse, neglect, or abandonment that was substantiated under IDAPA 16.06.01.563.02(a), that person must petition for removal from the Child Protection Central Registry at least 10 years *after* the substantiation. No person in a potential class, which would only cover those individuals whose substantiation arose in the two years preceding the complaint, would have a right to petition for removal under IDAPA 16.06.01.563.02. Therefore, there is no information in any response that Defendant would give to this interrogatory that is relevant to any claim asserted by Plaintiff, or that could be asserted under the two-year statute of limitations applicable to this type of claim.

      Underlying information about the specific form of abuse, neglect, or abandonment, such as the type of controlled substance, children involved, etc., and the documents containing

that information, is not relevant to the legal claims at issue here. Likewise, a person's occupation—which the Department of Health and Welfare is unlikely to maintain, except as disclosed by the person involved—has no relevancy to any of the claims here.

Moreover, the Department of Health and Welfare's response to a request for removal (including the date, the outcome, and reasons) is also not relevant to any claim here.

Not proportional: As to Plaintiff's individual claims, other persons' information is not proportional to the needs of the case. As to the putative class action, again, this is a case with legal claims based on a regulatory scheme. Producing information about other persons' substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure of controlled substances, is not proportional to the needs of the case. Persons removed from the registry and information about them would not assist Plaintiff in any of the claims she asserts or with regard to a motion for class certification. Again, such persons would have had a substantiated incident of abuse, neglect, or abandonment that was substantiated under IDAPA 16.06.01.563.02(a), from March 2013 or earlier, and these persons have no viable claim given the statute of limitations. Requiring Defendant to search for and provide this information would not be proportional to the needs of the case. Moreover, requests for removal, and the Department of Health and Welfare's response to them is not proportional to the nature of the claims at issue in this case.

Overbroad: This interrogatory is overbroad requiring disclosure of every person who has ever had a substantiated incident of abuse, neglect, or abandonment, involving prenatal

exposure to a controlled substance, and who has petitioned for their name to be removed from the Idaho Child Protection Central Registry.

The interrogatory is also overbroad because it is not time limited. Idaho has specifically enumerated prenatal exposure as a form of abuse, neglect, or abandonment, since 2007. Any claim at issue here is limited to a two-year statute of limitations. And as discussed above, a person can only petition for removal at least 10 years after the substantiation.

Unduly burdensome: This interrogatory would be unduly burdensome for Defendant to address. This interrogatory is not time limited, and it requires Defendant to identify the location of all documents.

Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry: This interrogatory would require Defendant to produce information about substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure to controlled substances of non-parties to this litigation. This information could embarrass or lead to harassment, annoyance, or oppression, of the children involved in the abuse. Additionally, this information could embarrass those persons on the registry whose information is being requested, and could lead to harassment, annoyance, or oppression of those persons. This is especially so, given that some of these persons have had their names removed from the registry—others may have had their petitions denied, and this may reveal further information, such as additional substantiated reports, or acts or crimes revealed through a criminal history check.

<u>Would require production of information that could embarrass, lead to harassment,</u> <u>annoyance, or oppression of reporting parties:</u> Idaho requires certain parties to report suspected abuse, neglect, or abandonment, and protects good faith reporters from civil and criminal liability. Idaho Code §§ 16-1605, 16-1606. Producing information about the reporting party may subject that person to harassment, annoyance, oppression, or embarrassment. Such information is also not relevant to any claim in this case.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18 (7/26/2024):**

Per the Memorandum Decision and Order of the Court, dated June 11, 2024, the Court required Defendant to "produce the number of requests for removal by individuals on the Central Registry for violations of IDAPA 16.06.01.563.02a made each year from 2021 to the present and the number of individuals on the Central Registry pursuant to IDAPA 16.06.01.563.02a removed for each of those years." Without waiving his objections, Defendant provides the following information:

| Year | # of Requests for Removal | # of Individuals Removed |
|---|---|---|
| 2021 | 12 | 12 |
| 2022 | 2 | 2 |
| 2023 | 13 | 12 |
| 2024 (through June 3) | 0 | 0 |

**INTERROGATORY NO. 19:**  Describe with particularity Your operation of the Central Registry, including, but not limited to, the nature of the operations, the identities of all IDHW employees and/or contractors who participate in the operations, and the

organization structure/hierarchy of management of such operations within IDHW up to and including Defendant Jeppesen and any board or other elected or appointed officials, and all reports run by You that identify the Central Registry and IDAPA 16.06.01.563.02(a).

**RESPONSE TO INTERROGATORY NO. 19:**

Defendant objects to this interrogatory as seeking information that is not relevant to the claims or defenses at issue in this lawsuit. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, the operations of the central registry are not relevant.

Without waiving the foregoing objection, Defendant responds as follows:

As of December 18, 2023 the agency has approximately 59 safety assessment workers whose primary duties are to receive assignments of allegations of abuse and neglect to children, conduct an assessment of the circumstances of those children and families for the purpose of making a determination of if the children are safe in their homes and if an incident or circumstance of abuse, neglect or abandonment occurred for the purpose of making a disposition of substantiated or unsubstantiated. That assessment involves interviews with children, parents, and collateral contacts. In many cases the agency workers collaborate with

law enforcement and others in the community in the course of the assessment.

The agency also has approximately 17 child welfare supervisors who provide direction and oversight to the above safety assessors. The supervisors' role is to assign the allegations of abuse, neglect and abandonment to the safety assessors and provide oversight in the safety assessors duties. They will provide direction and coaching to workers to ensure the assessments and decision making in the course of the assessments is in alignment with federal law, state statutes, agency policies and agency standards.

There are seven central consultation staff who operate out of a statewide unit who also are in a role to work with safety assessment staff to consult on their cases. They are not in line of supervision of these staff but are in a position to review the work of the safety assessment staff and provide direction, coaching and guidance. They review cases with safety assessors for closure and ensure the assessment was comprehensive and all of the required elements are present to make the safety and disposition decisions on cases.

The agency also has six child welfare chiefs assigned to regions across the state who are a back up to the supervisors and can be used for clinical consultation in case work, including on safety assessments. In some of the areas of the state the chief will also take on the role of assisting in the first level review in the administrative review process when a client requests for their placement on the central registry to be reviewed at the administrative level.

The agency has seven program managers assigned to regions across the state who supervise the safety supervisors and who are a back up to the supervisor and can be used for clinical consultation in safety assessments. In some of the areas of the state the program

manager will also take on the role of assisting in the first level review of the administrative review process when a client requests for their placement on the central registry to be reviewed at the administrative level.

There are two administrative staff at the central office who receive and process requests for administrative review. Central office staff receive the request via mail, fax, or hand delivered. They enter the request information into ESPI, scan a copy of the document into eCabinet, then send to the regional representative for the first level review. They receive notification the first level review is complete then draft the response letter to client, either affirming or reversing the decision. Then they send the draft and notify the central office program specialist the preliminary review is complete ready for their review.

There is a safety program specialist at central office who receives a preliminary administrative review determination and provides a second review prior to finalizing a determination of the initial safety disposition, ensuring compliance with IDAPA. Confirms the disposition type, level, and basis to substantiate is in accordance with IDAPA prior to affirming a preliminary determination to uphold. If the initial safety determination and preliminary administrative review determination to substantiate and uphold is not in line with IDAPA requirements, the safety program specialist will reverse the initial decision and preliminary determination to substantiate.

Once admin staff are notified the central office review is complete, they proofread the draft to make sure additional pieces added during the second level review are included and the letter is ready to send to client. Once ready the letter is printed and mailed certified to the

appellant.

If the decision is to affirm, the appellant then has the opportunity to request a Fair Hearing. The appellant submits a request in writing for a Fair Hearing, which is received by the admin staff in Central Office. Central office enters the information into ESPI, uploads the request to eCabinet, then gathers the appeal documentation to submit to the Fair Hearing Unit (FHU) and prepares the tracking sheet. If the appellant has an attorney or if a CARES report is involved, the Office of the Attorney General will represent the Department. If not, the regional Child Welfare supervisor for the safety case will represent the Department. The packet for FHU includes the tracking sheet (contact information for the appellant, department representative(s), and admin contacts), Fair Hearing request letter from appellant, Administrative Review response letter, request for Administrative Review and the original Notice of Substantiation letter. This packet is sent to FHU via the Department's secure server and a copy is emailed to the Department representative and the regional admin who will be helping with the Fair Hearing process. There is a regional admin identified in each area to assist with scheduling and exhibits for Fair Hearings when a supervisor is representing the department. Then the Fair Hearing Office schedules the hearing and sends a Notice of Scheduling Hearing to all the contacts on the tracking sheet. The notice of scheduling hearing includes instructions regarding the date and time of the hearing, how to connect to the telephonic hearing, and deadlines for submitting exhibits. The Fair Hearing occurs and the Preliminary Order containing the Fair Hearing Officer's decision is sent to all parties on the contact list. The Preliminary Order gives the appellant (or department) 14 days to request an

Agency Review if they do not agree with the Hearing Officer's decision.

An Agency Review (formerly known as a Director's Review) is requested through the Administrative Procedures Section (APS) in the Director's office. A briefing schedule is created and sent to both the appellant and department representative. Briefings are submitted to APS and a report is created for Director review. The director's decision is the Final Decision and Order and is sent to both the appellant and department representative. This decision may be appealed by filing a petition in district court within 28 days of the issuance of the Order.

Please also see the organization chart produced as part of the documents.


**INTERROGATORY NO. 20:**  Please describe with particularity each and every basis for Your contention in Your *Answer to First Amended Complaint*, filed on December 15, 2023, that both men and women are subject to being placed on the Central Registry, under a classification of Child Protection Level Two, pursuant to IDAPA 16.06.01.562.02a.

**RESPONSE TO INTERROGATORY NO. 20:**

Defendant objects to this interrogatory, because it is overbroad requiring a description of "each and every basis" for the contention that men and women may be substantiated for incidents of abuse, neglect, or abandonment involving prenatal exposure to controlled substances. Defendant further objects to the relevance of this interrogatory outside of the context of an equal protection challenge—there is no challenge (and Defendant would have Eleventh Amendment immunity to a challenge) asserting the invalid promulgation of the relevant IDAPA rules under state law.

Without waiving the foregoing objection, Defendant explains that the relevant IDAPA rules provide that the Department investigates reports of alleged abuse, neglect, or abandonment. *See generally* IDAPA 16.06.01.550–16.06.01.571. Individuals (a/k/a persons) may be substantiated for "Prenatal use of any controlled substance as defined under Section 37-2701(e), Idaho Code, except as prescribed by a medical professional." An automatic consequence of the substantiation is that a person is placed on the registry, and IDAPA 16.06.01.563.02.a specifies that this is a level two designation. Nowhere in the rules is the prenatal-exposure-to-controlled-substances substantiation limited to women—and persons include both men and women. The Department has substantiated incidents of neglect and abuse involving prenatal use of a controlled substance where the substantiated person is a man.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1:**  Produce any document relevant to Your answer to the interrogatories.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Defendant incorporates its objections to the above interrogatories. Defendant further objects that this request seeks documents covered by the attorney-client privilege or work product doctrine, and Defendant will prepare a privilege log.

Please see the documents produced with this response.

**FIRST SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 1 (7/26/2024):**

Without waiving Defendant's objections, which are incorporated from each of the interrogatories, Plaintiff should see the documents produced with this response.

**REQUEST FOR PRODUCTION NO. 2:**  Produce make and produce a pdf copy of the current and all previous iterations of the Idaho Child Protection Central Registry (Central Registry) going back to March 30, 2013.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Defendant objects to this request for production, intends to seek a protective order as to this request for production, and is not providing records in response to this request for production. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This request for production (1) is massively overbroad; (2) asks for non-relevant information; (3) is not proportional to the needs of the case; and (4) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry.

Overbroad: This request for production would require Defendant to produce a copy of the Idaho Child Protection Central Registry *for all persons* regardless of the *type of* substantiated incident of abuse, neglect, or abandonment. For example, Plaintiff's request would require Defendant to produce information about people with substantiated incidents of sexual abuse, sexual exploitation, torture, physical abuse, malnutrition, lack of supervision,

etc. As discussed below, none of this information is relevant. This request is massively overbroad, especially where it seeks information dating back 10+ years.

Not relevant: Records relating to incidents not involving pre-natal use of controlled substances are *not* relevant to any claim or defense in this suit, which concerns substantiation of an incident of abuse, neglect, or abandonment due to prenatal use of any controlled substance.

Further, other persons' information is not relevant to Plaintiff's individual claims. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, other persons' information is not relevant.

With respect to the putative class action, the lawsuit is based on legal claims relating to a regulatory scheme. A copy of the entire registry will not be relevant to any of these claims.

Not proportional: Producing a copy of the registry with information about sexual abuse, sexual exploitation, torture, malnutrition, physical abuse, etc. are not proportional to this case that focuses on a specific type of substantiated incident. It is also not proportion to produce 10 years' worth of a database.

<u>Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry:</u> This request for production would require Defendant to produce information about substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure to controlled substances of non-parties to this litigation. This information could embarrass or lead to harassment, annoyance, or oppression, of the children involved in the abuse. Additionally, this information could embarrass those persons on the registry whose information is being requested, and could lead to harassment, annoyance, or oppression of those persons.

**REQUEST FOR PRODUCTION NO. 3:**  Produce all documents constituting or relating to the administrative record regarding the adoption of IDAPA 16.06.01.563.02(a), proposed amendments to IDAPA 16.06.01.563.02(a) whether or not adopted, and/or reauthorizations of IDAPA 16.06.01.563.02(a) in the Idaho Administrative Code.

**<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 3:</u>**

Defendant objects to the relevancy of this request for production. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, the administrative record,

proposed amendments, and reauthorizations of IDAPA 16.06.01.563.02.a are not relevant. Defendant further objects that this request for productions is overbroad, as it is not time limited.

Without waiving the foregoing objections, please see the produced documents with this response.


**REQUEST FOR PRODUCTION NO. 4**:  Produce all policies and procedures relating To the Central Registry and/or IDAPA 16.06.01.563.02(a).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Defendant objects to the relevancy of this request for production. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, the polices and procedures relating to IDAPA 16.06.01.563.02.a are not relevant. Defendant further objects that this request for productions is overbroad, as it is not time limited.

Without waiving the foregoing objections, please see the produced documents produced with this response.

**REQUEST FOR PRODUCTION NO. 5:** Produce all contested case files, reports and other documents identifying each and every person who is currently on, or who has ever been on, the Central Registry pursuant to IDAPA 16.06.01.563.02(a).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Defendant objects to this request for production, intends to seek a protective order as to this request for production, and is not providing records in response to this request for production. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This request for production (1) is overbroad; (2) asks for non-relevant information; (3) is not proportional to the needs of the case; (4) would be unduly burdensome to respond to; (5) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry; and (6) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the reporting parties.

<u>Overbroad:</u> This request for production would require Defendant to produce all documents that "identify each and every person who is currently on, or who has ever been on" the Idaho Child Protection Central Registry for a substantiated incident of pre-natal use of controlled substances. There is no time limitation. It requests every single document—and arguably could be read to encompass all documents about the person, regardless if they relate to the child abuse substantiation. (See issued raised to Interrogatory No. 6 above.)

Not relevant: Other persons' information is not relevant to Plaintiff's individual claims. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, other persons' information is not relevant.

With respect to the putative class action, the lawsuit is based on legal claims relating to a regulatory scheme. Underlying information about the specific form of abuse, neglect, or abandonment, such as the type of controlled substance, children involved, etc., and the documents containing that information, is not relevant to the legal claims at issue here.

Not proportional: As to Plaintiff's individual claims, other persons' information is not proportional to the needs of the case. As to the putative class action, again, this is a case with legal claims based on a regulatory scheme. Producing information about other persons' substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure of controlled substances, is not proportional to the needs of the case. Moreover, the request for production is not time limited, and it is not proportional to provide broad swaths of information about substantiated incidents that occurred as early as 2007. And as noted above, there is a two-year statute of limitations.

Unduly burdensome: This request for production would be unduly burdensome on Defendant because it would require an expansive search of every possible file "identifying each and every person who is currently on, or who has ever been on" the Child Protection Central Registry for a substantiated incident of abuse, neglect, or abandonment, involving prenatal exposure to a controlled search. Such a search would also be required to go back to at least 2007.

Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry: This request for production would require Defendant to produce information about substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure to controlled substances of non-parties to this litigation. This information could embarrass or lead to harassment, annoyance, or oppression, of the children involved in the abuse. Additionally, this information could embarrass those persons on the registry whose information is being requested, and could lead to harassment, annoyance, or oppression of those persons. This is especially so, given that some of these persons have had their names removed from the registry—others may have had their petitions denied, and this may reveal further information, such as additional substantiated reports, or acts or crimes revealed through a criminal history check.

Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of reporting parties: Idaho requires certain parties to report suspected abuse, neglect, or abandonment, and protects good faith reporters from civil and

criminal liability. Idaho Code §§ 16-1605, 16-1606. Producing information about the reporting party may subject that person to harassment, annoyance, oppression, or embarrassment. Such information is also not relevant to any claim in this case.

## FIRST SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 5 (7/26/2024):

Per the Court's Memorandum Decision and Order, dated June 11, 2024, the Court ordered Defendant to produce certain information to Plaintiff's counsel. The Court noted that because it adopted Defendant's "proposal to produce this deidentified information instead of responding to several of Ms. Rossow's discovery requests, the Court will deny Ms. Rossow's motion to compel responses to Interrogatories Nos. 6 and 8 as well as Request for Production No. 5." Without waving Defendant's objections, Plaintiff should see the information produced in accordance with the Court's order.

**REQUEST FOR PRODUCTION NO. 6:**   Produce all documents identifying persons who have been removed from the Central Registry after being placed on it pursuant to IDAPA 16.06.01.56302(a).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

This request for production (1) is not relevant; (2) is not proportional to the needs of the case; (3) is overbroad; (4) would be unduly burdensome for the Defendant to answer; (4) would be unduly burdensome to respond to; (5) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and

persons listed on the registry; and (6) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the reporting parties.

<u>Not relevant:</u> Other persons' information is not relevant to Plaintiff's individual claims. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, other persons' information is not relevant.

For a person who has an incident of abuse, neglect, or abandonment that was substantiated under IDAPA 16.06.01.563.02(a), that person must petition for removal from the Child Protection Central Registry at least 10 years *after* the substantiation. No person in a potential class, which would only cover those individuals whose substantiation arose in the two years preceding the complaint, would have a right to petition for removal under IDAPA 16.06.01.563.02. Therefore, there is no information in any response that Defendant would give to this request for production that is relevant to any claim asserted by Plaintiff, or that could be asserted under the two-year statute of limitations applicable to this type of claim.

Moreover, underlying information about the specific form of abuse, neglect, or abandonment, such as the type of controlled substance, children involved, etc., and the documents containing that information, is not relevant to the legal claims at issue here.

<u>Not proportional:</u> As to Plaintiff's individual claims, other persons' information is not proportional to the needs of the case. As to the putative class action, again, this is a case with legal claims based on a regulatory scheme. Producing information about other persons' substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure of controlled substances, is not proportional to the needs of the case. Persons removed from the registry and information about them would not assist Plaintiff in any of the claims she asserts or with regard to a motion for class certification. Again, such persons would have had a substantiated incident of abuse, neglect, or abandonment that was substantiated under IDAPA 16.06.01.563.02(a), from March 2013 or earlier, and these persons have no viable claim given the statute of limitations. Requiring Defendant to search for and provide this information would not be proportional to the needs of the case.

<u>Overbroad:</u> This request for production is overbroad requiring disclosure of all documents for every person who has ever had a substantiated incident of abuse, neglect, or abandonment, involving prenatal exposure to a controlled substance, and who has had their name removed from the Idaho Child Protection Central Registry and "the name and location of all documents…regarding each such person's placement."

The request for production is also overbroad because it is not time limited. Idaho has specifically enumerated prenatal exposure as a form of abuse, neglect, or abandonment, since 2007. Any claim at issue here is limited to a two-year statute of limitations.

<u>Unduly burdensome:</u> This request for production would be unduly burdensome for Defendant to address. This request for production is not time limited. Furthermore,

Defendant would have to manually examine each case file to determine whether the removed person had been substantiated for an incident of abuse, neglect, or abandonment.

 _Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry:_ This request for production would require Defendant to produce information about substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure to controlled substances of non-parties to this litigation. This information could embarrass or lead to harassment, annoyance, or oppression, of the children involved in the abuse. Additionally, this information could embarrass those persons on the registry whose information is being requested, and could lead to harassment, annoyance, or oppression of those persons. This is especially so, given that these persons have had their names removed from the registry.

 _Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of reporting parties:_ Idaho requires certain parties to report suspected abuse, neglect, or abandonment, and protects good faith reporters from civil and criminal liability. Idaho Code §§ 16-1605, 16-1606. Producing information about the reporting party may subject that person to harassment, annoyance, oppression, or embarrassment. Such information is also not relevant to any claim in this case.

 **REQUEST FOR PRODUCTION NO.** 7:  Produce all reports, memoranda, and other documents identifying the numbers of persons who been on the Central Registry pursuant to IDAPA 16.06.01.56302(a) or for any other reason at any time.

**<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 7</u>:**

Defendant objects to this request for production, intends to seek a protective order as to this request for production, and is not providing records in response to this request for production. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

Defendant interprets this request to seek a copy of the entire Idaho Child Protection Central Registry, as it "identifies the number of persons who [have] been on the Central Registry pursuant to IDAPA 16.06.01.56302(a) [sic] or for any other reason at any time." This request for production (1) is massively overbroad; (2) asks for non-relevant information; (3) is not proportional to the needs of the case; and (4) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry.

<u>Overbroad:</u> This request for production would require Defendant to produce a copy of the Idaho Child Protection Central Registry *for all persons* regardless of the *type of* substantiated incident of abuse, neglect, or abandonment. For example, Plaintiff's request would require Defendant to produce information about people with substantiated incidents of sexual abuse, sexual exploitation, torture, physical abuse, malnutrition, lack of supervision, etc. As discussed below, none of this information is relevant. This request is massively overbroad, especially where it seeks information dating back 10+ years.

<u>Not relevant:</u> Records relating to incidents not involving prenatal use of controlled substances are *not* relevant to any claim or defense in this suit, which concerns substantiation of an incident of abuse, neglect, or abandonment due to prenatal use of any controlled substance.

Further, other persons' information is not relevant to Plaintiff's individual claims. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, other persons' information is not relevant.

With respect to the putative class action, the lawsuit is based on legal claims relating to a regulatory scheme. A copy of the entire registry will not be relevant to any of these claims.

<u>Not proportional</u>: Producing a copy of the registry with information about sexual abuse, sexual exploitation, torture, malnutrition, physical abuse, etc. are not proportional to this case that focuses on a specific type of substantiated incident. It is also not proportion to produce 10 years' worth of a database.

<u>Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry:</u> This request for production would require Defendant to produce information about substantiated

incidents of abuse, neglect, or abandonment, involving prenatal exposure to controlled substances of non-parties to this litigation. This information could embarrass or lead to harassment, annoyance, or oppression, of the children involved in the abuse. Additionally, this information could embarrass those persons on the registry whose information is being requested, and could lead to harassment, annoyance, or oppression of those persons.

**FIRST SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 7 (7/26/2024):**

Per the Court's Memorandum Decision and Order, dated June 11, 2024, the Court sustained the Defendant's objection to this requestion for production, and no further response is required.


**REQUEST FOR PRODUCTION NO. 8:**   Produce all communications about IDAPA 16.06.01.563.02(a) with Idaho legislators, their staff, the Governor's office or his staff, or any agency, officer or employee of the federal government.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Defendant objects to this request for production. Communications about IDAPA 16.06.01.563.02.a with the Idaho legislators, legislative staff, the Governor or his staff, or federal officials, are not relevant to any of the constitutional claims at issue in this case. Such request is also overbroad in that it is not time limited, and is covers a large swath of possible recipients. Defendant further incorporates objections stated in response to Requests for Productions 5 and 6, to the extent there are any records regarding substantiated incidents of

abuse, neglect, or abandonment related to prenatal exposure to a controlled substance.

Without waiving the foregoing objections, see response to Request for Production No. 3. Defendant has conducted an email and document search as described the in response to Request for Production No. 13. Defendant believes this email and document search is reasonable and should capture responsive emails—subject to the objections above. Defendant will engage in a rolling review and production of those emails and documents, with the first production occurring approximately two weeks from today.

**REQUEST FOR PRODUCTION NO. 9:** Produce all communications with Idaho legislators, their staff, the Governor's office or his staff, or any agency, officer or employee of the federal government, regarding alleged child abuse, neglect, or abandonment relating to conduct allegedly regulated by IDAPA 16.06.01.563.02(a), Central Registry operations, or persons listed on the Central Registry pursuant to IDAPA 16.06.01.563.02(a).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Defendant objects to this request for production, intends to seek a protective order as to this request for production, and is not providing records in response to this request for production. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This request for production (1) is overbroad; (2) asks for non-relevant information; (3) is not proportional to the needs of the case; (4) would be unduly burdensome to respond to; (5) may require production of information that could embarrass, lead to harassment,

annoyance, or oppression of the children involved and persons listed on the registry; and (6) may require production of information that could embarrass, lead to harassment, annoyance, or oppression of the reporting parties.

Overbroad: This request for production would require Defendant to produce all communications with certain government officials, employees, or staff, that relate to prenatal exposure of controlled substances, "Central Registry operations," the rule itself, or persons listed on the registry due to a substantiated incident of prenatal exposure involving controlled substances. There is no time limitation. It requests every single document—and arguably could be read to encompass all documents about the person, regardless if they relate to the child abuse substantiation. (See issued raised to Interrogatory No. 6 above.)

Not relevant: Other persons' information is not relevant to Plaintiff's individual claims. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, other persons' information is not relevant.

With respect to the putative class action, the lawsuit is based on legal claims relating to a regulatory scheme. Underlying information, even in communications to certain government officials or employees, about the specific form of abuse, neglect, or abandonment, such as the

type of controlled substance, children involved, etc., and the documents containing that information, is not relevant to the legal claims at issue here.

<u>Not proportional:</u> As to Plaintiff's individual claims, other persons' information is not proportional to the needs of the case. As to the putative class action, again, this is a case with legal claims based on a regulatory scheme. Producing communications about other persons' substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure of controlled substances, is not proportional to the needs of the case. Moreover, the request for production is not time limited, and it is not proportional to provide broad swaths of information about substantiated incidents that occurred as early as 2007. And as noted above, there is a two-year statute of limitations.

<u>Unduly burdensome:</u> This request for production would be unduly burdensome on Defendant because it would require an expansive search about any person listed on the registry who has a substantiated incident of abuse, neglect, or abandonment, involving controlled substances. Such a search would also be required to go back to at least 2007.

<u>May require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry:</u> This request for production may require Defendant to produce information about substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure to controlled substances of non-parties to this litigation. This information could embarrass or lead to harassment, annoyance, or oppression, of the children involved in the abuse. Additionally, this information could embarrass those persons on the registry whose information is being

requested, and could lead to harassment, annoyance, or oppression of those persons. This is especially so, given that these persons have had their names removed from the registry.

   May require production of information that could embarrass, lead to harassment, annoyance, or oppression of reporting parties: Idaho requires certain parties to report suspected abuse, neglect, or abandonment, and protects good faith reporters from civil and criminal liability. Idaho Code §§ 16-1605, 16-1606. Producing information about the reporting party may subject that person to harassment, annoyance, oppression, or embarrassment. Such information is also not relevant to any claim in this case.

   **REQUEST FOR PRODUCTION NO. 10:**   Produce all communications with hospitals, medical providers, and other reporters regarding alleged child abuse, neglect, or abandonment relating to conduct allegedly regulated by IDAPA 16.06.01.563.02(a), Central Registry operations, IDAPA 16.06.01.563.02(a), or persons listed on the Central Registry pursuant to IDAPA 16.06.01.563.02(a);.

   **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

   Defendant objects to this request for production, intends to seek a protective order as to this request for production, and is not providing records in response to this request for production. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This request for production (1) seeks non-relevant information; (2) is overbroad; and (3) is not proportional to the needs of the case; (4) would be unduly burdensome to respond to; (5) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry; and (6) would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the reporting parties.

Overbroad: This request for production would require Defendant to produce all communications about alleged prenatal exposure of controlled substances, with hospitals, medical providers, and reporters of alleged abuse, neglect, or abandonment. There is no time limitation. This request for production arguably could be read to request every other communication between hospitals, medical, providers, and persons who could report child abuse, about persons who have substantiated incidents of abuse, neglect, or abandonment involving prenatal exposure to controlled substances—regardless of whether the communication relates to the substantiated incident of abuse. (See also issues raised to Interrogatory No. 6 above.)

Not relevant: Communications with hospitals, medical providers, and other reporters, are not relevant to Plaintiff's individual claims. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims

fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, communications are not relevant.

With respect to the putative class action, the lawsuit is based on legal claims relating to a regulatory scheme. Communications with reporters, with information that would likely reveal the type of abuse, neglect, abandonment, and the children involved, is not relevant to the legal claims at issue here.

Not proportional: As to Plaintiff's individual claims, communications containing her or other persons' information is not proportional to the needs of the case. As to the putative class action, again, this is a case with legal claims based on a regulatory scheme. Producing information about communications related to other persons' substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure of controlled substances, is not proportional to the needs of the case. Moreover, the request for production is not time limited, and it is not proportional to provide broad swaths of information about substantiated incidents that occurred as early as 2007. And as noted above, there is a two-year statute of limitations.

Unduly burdensome: This request for production would be unduly burdensome on Defendant, because it would require an expansive search of every possible file "identifying each and every person who is currently on, or who has ever been on" the Child Protection Central Registry for a substantiated incident of abuse, neglect, or abandonment, involving prenatal exposure to a controlled search. Such a search would also be required to go back to at least 2007.

      <u>Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry:</u> This request for production would require Defendant to produce information about substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure to controlled substances of non-parties to this litigation. This information could embarrass or lead to harassment, annoyance, or oppression, of the children involved in the abuse. Additionally, this information could embarrass those persons on the registry whose information is being requested, and could lead to harassment, annoyance, or oppression of those persons.

      <u>Would require production of information that could embarrass, lead to harassment, annoyance, or oppression of reporting parties:</u> Idaho requires certain parties to report suspected abuse, neglect, or abandonment, and protects good faith reporters from civil and criminal liability. Idaho Code §§ 16-1605, 16-1606. Producing information about the reporting party may subject that person to harassment, annoyance, oppression, or embarrassment. Such information is also not relevant to any claim in this case.

      **REQUEST FOR PRODUCTION NO. 11:**  Produce all accounting records and other documents identifying fees collected for inquiries about the Central Registry pursuant to IDAPA 16.06.01.562.02.

      **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

      Defendant objects to this request for production, intends to seek a protective order as to this request for production, and is not providing records in response to this request for

production. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This request for production (1) is massively overbroad, (2) asks for non-relevant information, (3) and is not proportional to the needs of the case.

<u>Overbroad:</u> This request for production would require Defendant to produce any document identifying fees it collected for the "name-based check" of the Child Protection Central Registry. This request is overbroad because it requests all records, is not time limited, is not limited to the type of substantiation at issue in this case (prenatal exposure to controlled substances), and as discussed below, has no relevance whatsoever to any claim or defense in this case.

<u>Not relevant:</u> Records relating to fees collected have *no* relevance to any claim or defense in this case. This case is about due process, equal protection, and a right to bodily autonomy, according to Plaintiff. No fees are at issue. Accounting or other records have no basis in any of the claims. Plus, any record checks unrelated to the type of substantiation at issue in this case are irrelevant.

<u>Not proportional:</u> Producing accounting or other records in this case with constitutional law claims is nowhere near proportional to the needs of case.

**REQUEST FOR PRODUCTION NO. 12:** Produce all reports and other documents regarding inquiries received, access granted to, and/or the release of names or

other information about persons listed on the Central Registry pursuant to IDAPA 160.60.01.562.02.

**<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 12</u>:**

Defendant objects to this request for production, intends to seek a protective order as to this request for production, and is not providing records in response to this request for production. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This request for production (1) is overbroad, (2) asks for non-relevant information, and (3) is not proportional to the needs of the case.

<u>Overbroad</u>: This request for production would require Defendant to produce all documents that concern name-check inquiries "or other information." There is no time limitation. It requests every single document—and arguably could be read to encompass all documents about the person (see also issues raised with Interrogatory No. 6). As discussed below, none of this is relevant to any claim or defense in this lawsuit.

<u>Not relevant</u>: Any "name-based check" or information about a "name-based check" is not relevant to any claim or defense in this case. Unless otherwise required by federal or state law, a name-based check requires written consent of the individual on whom a criminal history and background check is being conducted. "No information is released regarding the severity or type of child abuse, neglect, or abandonment" when there is a "name-based check." The name-based check has nothing to do with the due process, equal protection, and substantive

due process / right to bodily autonomy claims (as characterized by Plaintiff) that are at issue in this case.

Not proportional: Producing records about "name-based checks" is not proportional to the needs of this case, as there are no claims that are related to, based on, or dependent on the "name-based checks" that the Idaho Department of Health and Welfare conducts.

**FIRST SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 12 (7/26/2024):**

Per the Court's Memorandum Decision and Order, dated June 11, 2024, the Court required Defendant to respond to this request for production. Defendant raised concerns regarding what Plaintiff was seeking with this request in a letter dated July 18, 2024. The parties met via a conference call on July 24, 2024, and were able to discuss a possible resolution. Without waving Defendant's objections, Defendant is still considering the possible resolution and should be able to inform Plaintiff's counsel next week on Defendant's position.

Without waiving any objections, Defendant is producing records for this request.

**REQUEST FOR PRODUCTION NO. 13:**   Produce all reports, e-mails, memoranda, communications, and other documents in the possession or control of Defendant Dave Jeppesen, Andie Blackwood, Julie Sevcik, Karla Kinzell, Autum Ferris, Michelle Weir, Kayla Ellis, Brandi Barklow or otherwise by You, concerning IDAPA 16.06.01.01.563.02(a), Plaintiff Rossow, or any other person(s) listed on the Central Registry

pursuant to IDAPA 16.06.01.01.563.02(a).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

Defendant objects to this request for production, intends to seek a protective order as to this request for production, and is not providing all records in response to this request for production. The basis of this objection is as follows. Defendant's counsel has sent a separate letter to Plaintiff's counsel that identifies these concerns, offers a suggested course of action, and invites a meet-and-confer process. Fed. R. Civ. P. 37; D. Id. Loc. Civ. R. 37.1.

This request for production (1) is overbroad; (2) it asks for non-relevant information; (3) it is not proportional to the needs of the case; (4) would be unduly burdensome to respond to; (5) may require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry; and (6) may require production of information that could embarrass, lead to harassment, annoyance, or oppression of the reporting parties.

Overbroad: This request for production would require Defendant to produce all documents about any person who has a substantiated incident of abuse, neglect, or abandonment, related to prenatal exposure to controlled substances, and is listed on the Idaho Child Protection Central Registry. There is no time limitation. It requests every single document—and arguably could be read to encompass all documents about the person, regardless if they relate to the child abuse substantiation. (See issued raised to Interrogatory No. 6 above.)

Not relevant: Other persons' information is not relevant to Plaintiff's individual claims. Plaintiff asserts that the Department's substantiation of her incident of neglect—for using marijuana while pregnant, resulting in a positive THC test result at her child's birth and in the umbilical cord blood—violates due process, equal protection, and the right to bodily autonomy, in the federal constitution. Although Plaintiff also asserts one or more claims under the Idaho Constitution, such claims fail due to Defendant's Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). For these legal claims, other persons' information is not relevant.

With respect to the putative class action, the lawsuit is based on legal claims relating to a regulatory scheme. Underlying information about the specific form of abuse, neglect, or abandonment, such as the type of controlled substance, children involved, etc., and the documents containing that information, is not relevant to the legal claims at issue here.

Not proportional: As to Plaintiff's individual claims, other persons' information is not proportional to the needs of the case. As to the putative class action, again, this is a case with legal claims based on a regulatory scheme. Producing information about other persons' substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure of controlled substances, is not proportional to the needs of the case. Moreover, the request for production is not time limited, and it is not proportional to provide broad swaths of information about substantiated incidents that occurred as early as 2007. And as noted above, there is a two-year statute of limitations.

Unduly burdensome: This request for production would be unduly burdensome on Defendant, because it would require an expansive search of every possible file identifying each and every person who is currently on, or who has ever been on the Child Protection Central Registry for a substantiated incident of abuse, neglect, or abandonment, involving prenatal exposure to a controlled search. Such a search would also be required to go back to at least 2007.

May require production of information that could embarrass, lead to harassment, annoyance, or oppression of the children involved and persons listed on the registry: This request for production may require Defendant to produce information about substantiated incidents of abuse, neglect, or abandonment, involving prenatal exposure to controlled substances of non-parties to this litigation. This information could embarrass or lead to harassment, annoyance, or oppression, of the children involved in the abuse. Additionally, this information could embarrass those persons on the registry whose information is being requested, and could lead to harassment, annoyance, or oppression of those persons.

May require production of information that could embarrass, lead to harassment, annoyance, or oppression of reporting parties: Idaho requires certain parties to report suspected abuse, neglect, or abandonment, and protects good faith reporters from civil and criminal liability. Idaho Code §§ 16-1605, 16-1606. Producing information about the reporting party may subject that person to harassment, annoyance, oppression, or embarrassment. Such information is also not relevant to any claim in this case.

Defendant's email and document search: Defendant has conducted an email and document search from March 30, 2013 until January 19, 2024, using the following custodians:

1. Dave Jeppesen*

2. Andie Blackwood

3. Julie Sevcik

4. Karla Kinzell

5. Autum Ferris

6. Michelle Weir

7. Kayla Ellis*

8. Brandi Barklow*

For those persons with an asterisk, Defendant notes that the parties did not agree to preserve relevant records from them. *See* Dkt. 20 at 2–3. To the extent Defendant has records for these persons, it has searched them.

Defendant has conducted keyword searches for "Rossow", or "563.02.a", or "563.02 a", or "controlled substances" AND "registry", and "controlled substance" AND "registry".

Defendant will engage in a rolling review and production of those emails and documents, with the first production occurring approximately two weeks from today.

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:**  Admit that the IDHW presented no data or evidence to the Idaho Legislature at the time IDAPA 16.06.01.563.02(a) was adopted that all "controlled substances" listed in *Idaho Code 37-2701(e)* were potentially harmful to the fetus if consumed by a woman prenatally.

## RESPONSE TO REQUEST FOR ADMISSION NO. 1:

Defendant objects to this request for admission to the extent it is directed to the Department of Health and Welfare, a non-party. *See* Fed. R. Civ. P. 36(a)(1) ("A party may serve on any other *party*…"). Defendant further objects to this request for admission because it is not relevant to any claim or defense in the lawsuit. *See* Fed. R. Civ. P. 26(b)(1). There is no challenge to the validity of the promulgation of IDAPA 16.06.01.563.02.a, nor could there be with Defendant's immunity. Defendant

Without waiving the foregoing objections, Defendant notes that the Idaho Legislature has determined, in conjunction with the Idaho Board of Pharmacy, the enumeration of substances in the controlled substance schedules. *See* Idaho Code §§ 37-2702–2713A and § 37-2715. The Idaho Legislature has specified mandatory factors for when the Board of Pharmacy considers a substance for listing in the enumerated schedules: "(1) The actual or relative potential for abuse; (2) The scientific evidence of its pharmacological effect, if known; (3) The state of current scientific knowledge regarding the substance; (4) The history and current pattern of abuse; (5) The scope, duration, and significance of abuse; (6) The risk to the public health; (7) The potential of the substance to produce psychic or physiological

dependence liability; and (8) Whether the substance is an immediate precursor of a substance already controlled under this article." Idaho Code § 37-2702. For Schedule I substances, the Idaho Legislature has determined that such substances have a high potential for abuse and have no accepted medical use treatment in the United States or lacks accepted safety for use in treatment under medical supervision. Idaho Code § 37-2704. And so, Defendant denies.

**REQUEST FOR ADMISSION NO. 2:**  Admit that the IDHW uses the date of birth as opposed to the date of conception for purposes of determining the legal age of persons in Idaho.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Defendant objects to this request for admission to the extent it is directed to the Department of Health and Welfare, a non-party. *See* Fed. R. Civ. P. 36(a)(1) ("A party may serve on any other *party*…"). Defendant further objects that this request for admission as it vague as to "determining the legal age of persons in Idaho." Without waiving these objections, Defendant admits only that to the extent the Department of Health Welfare applies any requirement based on age, age is generally measured from the date of the person's birth. The request for admission is otherwise denied.

**REQUEST FOR ADMISSION NO. 3:**  Admit that the IDHW has not placed a male on the Central Registry for violating IDAPA 16.06.01.563.02(a).

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Defendant objects to this request for admission to the extent it is directed to the Department of Health and Welfare, a non-party. *See* Fed. R. Civ. P. 36(a)(1) ("A party may

serve on any other *party*…"). Without waiving the foregoing objection(s), Defendant notes

that the Idaho Department of Health and Welfare has substantiated incidents of abuse,

neglect, or abandonment, involving men, and such abuse, neglect, or abandonment, involved

an incident (or incidents) of prenatal use of any controlled substance as defined under Section

37-2701(e), Idaho Code, except as prescribed by a medical professional. *See* IDAPA

16.06.01.06.563.02.a. Therefore, Defendant denies.

**REQUEST FOR ADMISSION NO. 4:** Admit that the IDHW has known of A.G.

Opinion 91-1 at any point in time after IDAPA 16.06.01.563.02(a) initially took effect.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Defendant objects to this request for admission to the extent it is directed to the

Department of Health and Welfare, a non-party. *See* Fed. R. Civ. P. 36(a)(1) ("A party may

serve on any other *party*…"). Without waiving the foregoing objection(s), Defendant admits

that Plaintiff's amended complaint raised "A.G. Opinion 91-1" and so Defendant technically

"has known of A.G. Opinion 91-1 at any point in time after IDAPA 16.06.01.563.02(a) initially

took effect."

**REQUEST FOR ADMISSION NO. 5:** Admit that the IDHW's purposes of

enforcing IDAPA 16.06.01.563.02(a) includes controlling the conduct of women prenatally.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Defendant objects to this request for admission to the extent it is directed to the

Department of Health and Welfare, a non-party. *See* Fed. R. Civ. P. 36(a)(1) ("A party may

serve on any other *party*…"). Without waiving the foregoing objection(s), the purpose of the

Central Registry is to aid the Idaho Department of Health and Welfare in protecting children from individuals who have previously abused, abandoned, or neglected children. This request for admission is denied.

**REQUEST FOR ADMISSION NO. 6**:  Admit that no statute in the Idaho Child Protective Act, at *Idaho Code § 16-1601, et seq.,* identifies prohibited conduct toward a fetus.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Defendant objects to this request for admission because it is not relevant to any claim or defense in this lawsuit. Without waiving the foregoing objection(s), under the Idaho Child Protective Act, "aggravated circumstances" can have certain impacts on the process and applicable rights. "Aggravated circumstances" includes, but is not limited, where "[t]he parent has committed murder, aided or abetted a murder, solicited a murder or attempted or conspired to commit murder." Idaho Code § 16-1602(6)(b). Murder "is the unlawful killing being including, but not limited to, a human embryo or fetus, with malice aforethought or the intentional application of torture to a human being, which results in the death of a human being." Idaho Code § 18-4001. And so, Defendant denies.

**REQUEST FOR ADMISSION NO. 7:**  Admit that the IDHW is aware that the use of alcohol by pregnant women may be harmful to the fetus.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Defendant objects to this request for admission to the extent it is directed to the Department of Health and Welfare, a non-party. *See* Fed. R. Civ. P. 36(a)(1) ("A party may serve on any other *party*…"). Without waiving the foregoing objection(s), Defendant notes

that the Centers for Disease Control and Prevention says, "There is no known safe amount of alcohol use during pregnancy" and that "Alcohol use during pregnancy can cause miscarriage, stillbirth, and a range of lifelong physical, behavioral, and intellectual disabilities," known as "fetal alcohol spectrum disorders." Centers for Disease Control and Prevention, *Alcohol Use During Pregnancy*.[2]

**REQUEST FOR ADMISSION NO. 8:**  Admit that the IDHW is aware that the use of alcohol by pregnant women is not illegal in Idaho.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Defendant objects to this request for admission to the extent it is directed to the Department of Health and Welfare, a non-party. *See* Fed. R. Civ. P. 36(a)(1) ("A party may serve on any other *party*…"). Without waiving the foregoing objection(s), Idaho's alcohol laws do not permit the selling, giving, or furnishing, of alcohol to a pregnant woman under the age of 21. Nor do Idaho's alcohol laws permit pregnant woman under the age of 21 to purchase, attempt to purchase, or otherwise consume or possess alcohol. And so, given the phrasing of the request for admission, Defendant denies.

**REQUEST FOR ADMISSION NO. 9:**  Admit that the IDHW has not treated the use of alcohol by pregnant women as grounds for listing such women on the Central Registry.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Defendant objects to this request for admission to the extent it is directed to the Department of Health and Welfare, a non-party. *See* Fed. R. Civ. P. 36(a)(1) ("A party may

---

[2] https://www.cdc.gov/ncbddd/fasd/alcohol-use.html

serve on any other *party*…"). Without waiving the foregoing objection(s), Defendant denies.

**REQUEST FOR ADMISSION NO. 10:**  Admit that the use of alcohol by pregnant women in Idaho does not violate IDAPA 16.06.01.563.02(a).

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

In Idaho, incidents of abuse, neglect, or abandonment, are either found substantiated or found unsubstantiated. *See* IDAPA 16.06.01.560. Use of alcohol by pregnant woman, if reported to the Department of Health and Welfare, may be substantiated as an incident of abuse, neglect, or abandonment, following the comprehensive safety assessment, in accordance with IDAPA 16.06.01.560. If substantiated, such conduct would not be "Prenatal use of any controlled substance as defined under Section 37-2701(e), Idaho Code, except as prescribed by a medical professional." IDAPA 16.06.01.563.02.a Defendant otherwise denies this request for admission.

**REQUEST FOR ADMISSION NO. 11:**  Admit that Defendant Jeppesen is not immune from suit in this action.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Dave Jeppesen is no longer the party to this proceeding, and has been substituted for Dean Cameron, Interim Director of the Department of Health and Welfare. *See* Fed. R. Civ. P. 25(d).

Federal law claims: A state official sued in his official capacity generally has Eleventh Amendment Immunity. *E.g., Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989)). Under certain circumstances, the *Ex parte*

*Young*, 209 U.S. 123 (1908), exception to immunity may apply. Without knowing the full extent of Plaintiff's action (which is still a putative class action at this point), Defendant is unable to admit to this request for admission at this time, and so denies, but incorporates the explanation above into the denial.

State law claims: The United States Supreme Court has held that "a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment" and that "this principle applies as well to state-law claims brought into federal court under pendent jurisdiction." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984); *see also Ulaleo v. Paty*, 902 F.2d 1395, 1400 (9th Cir. 1990). On this basis, Defendant denies.

**REQUEST FOR ADMISSION NO. 12:**   Admit that Defendant Jeppesen is a person within the meaning of 42 U.S.C. § 1983 for purposes of injunctive relief under Section 1983.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Dave Jeppesen is no longer the party to this proceeding, and has been substituted for Dean Cameron, Interim Director of the Department of Health and Welfare. *See* Fed. R. Civ. P. 25(d). A state official sued in his official capacity generally has Eleventh Amendment Immunity, and is not a person for purposes of 42 U.S.C. § 1983. *E.g., Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989)). Under certain circumstances, the *Ex parte Young*, 209 U.S. 123 (1908), exception to immunity may apply, and suit may procced under 42 U.S.C. § 1983.

Defendant also notes that 42 U.S.C. § 1983 may not be used to test whether something violates non-federal law. *See Collins v. City of Harker Heights, Tx.,* 503 U.S. 115, 119 (1992).

This request for admission is not limited to this "action," and without knowing the full extent of Plaintiff's action, Defendant is unable to admit to this request for admission at this time, and so denies, but incorporates the explanation above into the denial.

As to the interrogatory objections, request for production responses and objections, and request for admissions response and objections.

DATED:  January 22, 2024

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL


By:   /s/ Brian V. Church
                    BRIAN V. CHURCH
                    Deputy Attorney General

**For the First Supplemental Response (7/26/2024):**


As to the supplemental interrogatory objections and request for production responses and objections.

DATED:  July 26, 2024

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL


By:   /s/ Brian V. Church
                    BRIAN V. CHURCH
                    Lead Deputy Attorney General

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on January 22, 2024, I electronically mailed the foregoing to the following counsel of record:

Richard A. Hearn
hearn@hearnlawyers.com

Emily MacMaster
emily@macmasterlaw.com

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By*:*  /s/ Brian V. Church
BRIAN V. CHURCH
Deputy Attorney General

**For the First Supplemental Response (7/26/2024):**

I Hereby Certify that on July 26, 2024, I electronically mailed the foregoing to the following counsel of record:

Richard A. Hearn
hearn@hearnlawyers.com

Emily MacMaster
emily@macmasterlaw.com

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL


By*:*   _/s/ Brian V. Church_
          Brian V. Church
          Lead Deputy Attorney General

## <u>VERIFICATION</u>

STATE OF IDAHO           )
                         ) ss.
County of Ada            )

I, Dean Cameron, have read the foregoing responses to the Interrogatories on behalf of Defendant contained in Defendant's Responses to Plaintiff's First Set of Discovery Requests to Defendant, and know the contents thereof, and the same are true to the best of my knowledge and belief.

DATED:  1. 26. 24

Dean Cameron
Interim Director
Department of Health and Welfare

## VERIFICATION

STATE OF IDAHO     )
                     ) ss.
County of Ada        )

I, Alex J. Adams, have read the foregoing supplemental responses (dated July 26, 2024) to the Interrogatories on behalf of Defendant contained in Defendant's First Supplemental Responses to Plaintiff's First Set of Discovery Requests to Defendant, and know the contents thereof, and the same are true to the best of my knowledge and belief.

I certify under penalty of perjury that the foregoing is true and correct.

DATED: _7/31/24_____

_____
Alex J. Adams
Director
Department of Health and Welfare

# EXHIBIT C
# FILED UNDER SEAL

**EXHIBIT D**

| | |
|---|---|
| **From:** | Brian Church |
| **To:** | Richard Hearn; Emily MacMaster |
| **Cc:** | James Craig; Tom Donovan; Jack Corkery |
| **Subject:** | Rossow - letter to counsel re: RFP 12 |
| **Date:** | Thursday, July 18, 2024 1:58:03 PM |
| **Attachments:** | image001.png |
| | 2024-07-18 Letter to Counsel.pdf |

Re:   Rossow v. Director Adams
      No. 1:23-cv-00131-BLW
      RFP 12

Rick and Emily:

Please see the attached letter regarding RFP 12.

Brian
--



**Brian V. Church | Lead Deputy Attorney General**
Civil Litigation and Constitutional Defense Division
Office of the Attorney General | State of Idaho
Phone: (208) 334-2400

**NOTICE:** This message, including any attachments, is intended only for the individual(s) or entity(ies) named above and may contain information that is confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law. If you are not the intended recipient, please reply to the sender that you have received this transmission in error, and then please delete this email.



# STATE OF IDAHO

## OFFICE OF THE ATTORNEY GENERAL

### RAÚL R. LABRADOR

July 18, 2024

Rick Hearn
Hearn Law, PLC
        *Via email to hearn@hearnlawyers.com*

Emily MacMaster
MacMaster Law, PLLC
        *Via email to emily@macmasterlaw.com*

Re:    Request for Production No. 12
        *Rossow v. Jeppesen*, No. 1:23-cv-00131-BLW

Dear Rick and Emily:

The Director is currently compiling relevant discovery in accordance with the Court's Memorandum Decision and Order, dated June 11, 2024. There was some confusion, however, in Rossow's reply briefing before the district Court about what Rossow is seeking with respect to Request for Production No. 12. And so, I wanted to make sure we were clear about what information you would be receiving.

Request for Production No. 12 said,

> Produce all reports and other documents regarding inquiries received, access granted to, and/or the release of names or other information about persons listed on the Central Registry pursuant to IDAPA 160.60.01.562.02.

(Error in original.)

R. Hearn, Esq.
E. MacMaster, Esq.
July 18, 2024
Page 2

This request references IDAPA 16.06.01.562.02, which provides,

> **2. Child Protection Central Registry Check Fee.** The fee for request-
> ing a name-based check of the Child Protection Central Registry is twenty
> ($20) dollars. The request must be accompanied with a signed written con-
> sent by the individual whose name is being checked.

Rule 562.02 expressly concerns "name-based check[s] of the Child Protection Central
Registry." The Director and I have carefully referred to these as name-based checks in
our correspondence with you, *e.g.,* Dkt. 43-6 at 32, although I saw in a brief that I de-
scribed these as background checks, which was imprecise wording on my part. We have
done so to differentiate name-based checks *from* Criminal History and Background
Checks, which I'll address below. A copy of the form used for the name-based check is
available publicly at the Department's website, but I'll also produce a copy of it as part
of the discovery response.

One of the concerns I had consistently expressed regarding Request for Production
No. 12 is that it appeared to seek the release of all name-based checks, including the
results. *E.g.,* Dkt. 42 at 3, 26; Dkt. 43-6 at 31–32 (raising overbreadth, proportionality,
and relevancy objections). This is especially worrying because I am informed that the
Department of Health and Welfare processes thousands of name-based checks every
year.

Rossow addressed this concern in her reply brief by telling the Court that the focus of
Request for Production No. 12 was on alleged third-party access to the Child Protection
Central Registry. *See, e.g.,* Dkt. 45 at 10–11 ("The breadth of third-party access….")
("Thus, the scope of third-parties access to Registry disclosures could be very broad."
[*sic*]). I think Rossow also attempted to address this concern in earlier communications.
*E.g.,* Dkt. 43-18 at 5 (discovery request is "about third-party access to the Central Reg-
istry."); Dkt. 43-23 at 5 (same); Dkt. 43-35 (incorporating Dkt. 43-23).

And so, I am going to take Rossow's statements at her word, and trust that she is not
looking for individual copies of the name-based check form submitted to and processed
by the Department, but she is instead looking for documents regarding alleged third-
party access to the Child Protection Central Registry, relating to name-based checks.[1]

---

[1] If Rossow disagrees and contends she is seeking redacted copies of the name-based check form, then there
will be serious issues with overbreadth and proportionality that we will need to take back to the Court. As noted

R. Hearn, Esq.
E. MacMaster, Esq.
July 18, 2024
Page 3

I mention "name-based checks" again because of something that was raised in Rossow's reply brief. This was the first time this issue was raised in the discovery context, as far as I can tell. In the reply brief, Rossow referenced the clearance process, and procedures that apply in IDAPA 16.05.06 to Criminal History and Background Checks. Criminal History and Background Checks are distinct from the name-based checks referenced in IDAPA 16.06.01.562.02.

Criminal History and Background Checks are a separate, statutorily authorized inquiry. *E.g.,* Idaho Code § 56-1004A; *see also* IDAPA 16.05.06.000 (noting state and federal authority). Criminal History and Background Checks have a minimum $65 fee currently and their own form available at the Department of Health and Welfare's website. (Name-based checks have a $20 fee, as referenced in the IDAPA rule cited by Request for Production No. 12, and their own form.) Criminal History and Background Checks also have their own rules applicable to them, IDAPA 16.05.06. The Child and Family Services rules at IDAPA 16.06.01 are distinct.

I raise this point because Request for Production No. 12 only seeks information about alleged third-party access to the Child Protection Central Registry "pursuant to" the name-based check rule, IDAPA 16.06.01.562.02. You did not seek information about the Criminal History and Background Checks, which are conducted "pursuant to" separate authority. Further the Director has not had a chance to address concerns with any request that would cover such a topic, raise objections to such a request, meet-and-confer about such a request, or bring those issues before the Court. Plus, as I noted during the status conference, the Department processes tens of thousands of Criminal History and Background Checks a year. Any discovery request for Criminal History and Background Check results would invite probable relevancy, proportionality, and over-breadth issues, as well as serious privacy and security issues because of the criminal database information at issue.

Again, since Request for Production No. 12 did not seek Criminal History and Background Check information, I only raise the points above to explain why you will not be receiving information on them. Instead, we will focus, as Rossow has identified, on alleged third-party access to the Child Protection Central Registry.

---

above, the Department processes thousands of name-based checks per year. I also fail to see the benefit of receiving thousands of copies of a form, redacted, regarding the Department of Health and Welfare's access to its own registry, when Rossow has communicated she is interested in alleged third-party access.

R. Hearn, Esq.
E. MacMaster, Esq.
July 18, 2024
Page 4

The Director will continue to work on compiling discovery in response to the Court's Memorandum Decision and Order. If there is a need to discuss anything in this letter, please advise as soon as possible.

Respectfully,

/s/ *Brian V. Church*

BRIAN V. CHURCH
Lead Deputy Attorney General

cc:   Jim Craig, Division Chief,
          Civil Litigation and Constitutional Defense
      Tom Donovan, Division Chief,
          Health and Human Services Division
      Jack Corkery, Assistant Solicitor General,
          Office of the Solicitor General

# EXHIBIT E

| From: | Emily MacMaster |
|---|---|
| To: | "Brian Church" |
| Cc: | "Richard Hearn"; "Alexis Kovacs" |
| Subject: | FW: Rossow - Defendants" First Supplemental Discovery Responses |
| Date: | Monday, July 29, 2024 5:30:00 PM |
| Attachments: | image001.png |
| | Defendant"s 1st Supp Responses to Plaintiff"s 1st Discovery Requests.pdf |

Hi Brian,

Thank you for the supplemental response provided this past Friday.  We do have a few questions/concerns, which we hope you can clear up, and we appreciate your quick attention to them, as follows:

1.  <u>Decision and Order (Dkt. 52) pp. 8-12</u>:  Defendant's supplemental responses to Interrogatories 6, 8, 13 and RFP 5 indicate "Plaintiff should see the information produced in accordance with the Court's order," without identifying what the information is or where it is located.  **Is Defendant referring to documents in its supplemental production stamped IDHW_00003609—3725?**

2.  <u>Documents stamped IDHW_00003609—3725</u>:
    a.  Please provide unredacted pages for column "T," which is "assigned worker," (e.g., IDHW_00003725) or identify the grounds in the Court's Order (Dkt. 52) for redacting column T. Such IDHW employees are witnesses in this case.
    b.  It appears that this .pdf report is printed/imaged from an Excel spreadsheet. In so doing, it cuts each row into at least 3 separate pages. If the spreadsheet was produced by IDHW to you in an Excel (e.g., .xlsx format), please provide a copy of the report in that electronic format so neither Plaintiff nor the Court is required to tape 3 pages together to see a single row.

3.  <u>Decision and Order (Dkt. 52) pp. 10-12</u>:  The Order requires Defendant to indicate whether the reporting party is a family member, nurse, doctor, police officer, school official, etc., as well as the name of any reporters that are hospital, police, fire, or emergency services (including city or county of such reporting agency).  This court-ordered information was due to be disclosed last Friday. Please identify where it has been provided for our review.

4.  <u>RFP 12</u>:  We discussed a short extension if needed but did not discuss an extension of a week. Please produce whatever you can produce now without further delay, and we can then discuss further concerns, if any, that you may have.  Defendants' court-ordered supplemental response with documents was due last Friday; while we want to cooperate, it cannot be to Plaintiff's detriment.

5.  Verification: We have not yet received Defendant's verification of these supplemental answers to interrogatories. Please provide it or let me know if I somehow missed it.

Plaintiff's deadline for moving for class certification is 8/16/2024.  The information requested above, if not received promptly, risks prejudicing Plaintiff in being able to meet obligations in this litigation. Hopefully, you can quickly respond to these concerns asap by tomorrow and avoid any further delay. Thank you very much Brian --

Emily

Emily Mac Master
*MacMaster Law, PLLC*
(208) 608-2235

---

**From:** Brian Church <brian.church@ag.idaho.gov>
**Sent:** Friday, July 26, 2024 6:03 PM
**To:** Emily MacMaster <emily@macmasterlaw.com>; Richard Hearn <hearn@hearnlawyers.com>
**Cc:** Alexis Kovacs <Alexis.Kovacs@ag.idaho.gov>; Jack Corkery <Jack.Corkery@ag.idaho.gov>
**Subject:** Rossow - Defendants' First Supplemental Discovery Responses

Counsel:

I've attached Defendant's First Supplemental Responses to Plaintiff's First Set of Discovery Requests to Defendant. You are also receiving two links to download files for today's production. I will transmit the passwords via a separate email.

VOL004

VOL005

Files within this production have been marked as confidential in accordance with the parties' protective order. Additionally, certain documents have been redacted in accordance with the Court's Memorandum Decision and Order, dated June 11, 2024.
--



**Brian V. Church | Lead Deputy Attorney General**
Civil Litigation and Constitutional Defense Division
Office of the Attorney General | State of Idaho
Phone: (208) 334-2400

**NOTICE:** This message, including any attachments, is intended only for the individual(s) or entity(ies) named above and may contain information that is confidential, privileged, attorney work product, or otherwise exempt

from disclosure under applicable law. If you are not the intended recipient, please reply to the sender that you have received this transmission in error, and then please delete this email.

**EXHIBIT F**

| | |
|---|---|
| **From:** | Brian Church |
| **To:** | Emily MacMaster |
| **Cc:** | Richard Hearn; Alexis Kovacs; Jack Corkery; James Craig; Tom Donovan |
| **Subject:** | RE: Rossow - Defendants" First Supplemental Discovery Responses |
| **Date:** | Thursday, August 1, 2024 5:33:10 PM |
| **Attachments:** | image001.png |
| | 2024-08-01 Letter to Counsel.pdf |
| | Verification - Director Adams.pdf |
| | Cameron Verification.pdf |

Emily:

Please see Defendant's response to the questions below in the attached letter to counsel. I am attaching the verifications of Director Adams and Interim Director Cameron. I am also providing you a link to a corrected production, which fixes the redaction of the "assigned worker" column on 3 of the 117 pages of the document.

Here's the link to access the production. I'll send a separate email with the password.
VOL006

Brian
--



**Brian V. Church | Lead Deputy Attorney General**
Civil Litigation and Constitutional Defense Division
Office of the Attorney General | State of Idaho
Phone: (208) 334-2400

---

**From:** Emily MacMaster <emily@macmasterlaw.com>
**Sent:** Monday, July 29, 2024 5:31 PM
**To:** Brian Church <brian.church@ag.idaho.gov>
**Cc:** Richard Hearn <hearn@hearnlawyers.com>; Alexis Kovacs <Alexis.Kovacs@ag.idaho.gov>
**Subject:** FW: Rossow - Defendants' First Supplemental Discovery Responses

Hi Brian,

Thank you for the supplemental response provided this past Friday.  We do have a few questions/concerns, which we hope you can clear up, and we appreciate your quick attention to them, as follows:

1. Decision and Order (Dkt. 52) pp. 8-12:  Defendant's supplemental responses to Interrogatories 6, 8, 13 and RFP 5 indicate "Plaintiff should see the information produced in accordance with the Court's order," without identifying what the information is or where it is located.  **Is Defendant referring to documents in its supplemental production stamped IDHW_00003609—3725?**

2. Documents stamped IDHW_00003609—3725:

    a. Please provide unredacted pages for column "T," which is "assigned worker," (e.g., IDHW_00003725) or identify the grounds in the Court's Order (Dkt. 52) for redacting column T. Such IDHW employees are witnesses in this case.

    b. It appears that this .pdf report is printed/imaged from an Excel spreadsheet. In so doing, it cuts each row into at least 3 separate pages. If the spreadsheet was produced by IDHW to you in an Excel (e.g., .xlsx format), please provide a copy of the report in that electronic format so neither Plaintiff nor the Court is required to tape 3 pages together to see a single row.

3. Decision and Order (Dkt. 52) pp. 10-12:  The Order requires Defendant to indicate whether the reporting party is a family member, nurse, doctor, police officer, school official, etc., as well as the name of any reporters that are hospital, police, fire, or emergency services (including city or county of such reporting agency).  This court-ordered information was due to be disclosed last Friday. Please identify where it has been provided for our review.

4. RFP 12:  We discussed a short extension if needed but did not discuss an extension of a week. Please produce whatever you can produce now without further delay, and we can then discuss further concerns, if any, that you may have.  Defendants' court-ordered supplemental response with documents was due last Friday; while we want to cooperate, it cannot be to Plaintiff's detriment.

5. Verification: We have not yet received Defendant's verification of these supplemental answers to interrogatories. Please provide it or let me know if I somehow missed it.

Plaintiff's deadline for moving for class certification is 8/16/2024.  The information requested above, if not received promptly, risks prejudicing Plaintiff in being able to meet obligations in this litigation. Hopefully, you can quickly respond to these concerns asap by tomorrow and avoid any further delay. Thank you very much Brian --

Emily

Emily Mac Master
*MacMaster Law, PLLC*
(208) 608-2235

---

**From:** Brian Church <brian.church@ag.idaho.gov>
**Sent:** Friday, July 26, 2024 6:03 PM
**To:** Emily MacMaster <emily@macmasterlaw.com>; Richard Hearn <hearn@hearnlawyers.com>
**Cc:** Alexis Kovacs <Alexis.Kovacs@ag.idaho.gov>; Jack Corkery <Jack.Corkery@ag.idaho.gov>
**Subject:** Rossow - Defendants' First Supplemental Discovery Responses

Counsel:

I've attached Defendant's First Supplemental Responses to Plaintiff's First Set of Discovery Requests to Defendant. You are also receiving two links to download files for today's production. I will transmit the passwords via a separate email.

VOL004

VOL005

Files within this production have been marked as confidential in accordance with the parties' protective order. Additionally, certain documents have been redacted in accordance with the Court's Memorandum Decision and Order, dated June 11, 2024.

--



**Brian V. Church | Lead Deputy Attorney General**
Civil Litigation and Constitutional Defense Division
Office of the Attorney General | State of Idaho
Phone: (208) 334-2400

**NOTICE:** This message, including any attachments, is intended only for the individual(s) or entity(ies) named above and may contain information that is confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law. If you are not the intended recipient, please reply to the sender that you have received this transmission in error, and then please delete this email.



## STATE OF IDAHO

### OFFICE OF THE ATTORNEY GENERAL

### RAÚL R. LABRADOR

August 1, 2024

Rick Hearn
Hearn Law, PLC
    *Via email to hearn@hearnlawyers.com*

Emily MacMaster
MacMaster Law, PLLC
    *Via email to emily@macmasterlaw.com*

Re:   *Rossow v. Jeppesen*, No. 1:23-cv-00131-BLW

Dear Emily:

I am responding to your email from the evening of Monday, July 29. A couple of your questions focused on the information the Court ordered us to produce, and so I thought I would start there to help clarify what we were providing.

Back on March 8, 2024, I identified the categories of information viewable within the database containing Idaho's Child Protection Central Registry. *See* Dkt. 43-26 at 2–4. In a March 19, 2024 letter, I specified certain categories of information Defendant was willing to provide. Dkt. 43-39 at 3–4. Defendant noted it would "provide an image of the export." Further, out of concern that the "Disposition Statement" may contain "a name, reporting party, name of any hospital, police, fire, ambulance, emergency service, etc." I suggested "removing identifying information" about that person. *Id.* at 3. Additional information on the categories themselves was provided in the April 5, 2024 letter. Dkt. 43-42 at 2–7.

In the Court's Memorandum Decision and Order, dated June 11, 2024, Dkt. 52, the Court generally agreed with Defendant's proposal outlined in the March 19, 2024 letter, Dkt. 43-26 (cited above). *E.g.,* Dkt. 52 ("The Department shall produce the information identified in its March 19, 2024, letter to Ms. Rossow's counsel."). However, the Court did not agree that I could totally redact any identifying information about the reporting

R. Hearn, Esq.
E. MacMaster, Esq.
August 1, 2024
Page 2

party—it held that I could redact the names of the reporting party, but that if I did so I must "identify the reporting party's relationship to the individual on the Central Registry." Dkt. 52 at 11.

Of course, the reason Defendant offered this approach was to try and protect the privacy interests of the children involved, the adults on the registry, and the reporting parties. Moreover, Defendant was trying to find an easily exportable set of information that could be redacted, which did not require individual review of relevant case files for the thousand or so names of information—and to still allow Defendant sufficient time for it to double check the export of information.

With this background information in mind, I'll turn now to your specific questions.

1. <u>Decision and Order (Dkt. 52) pp. 8-12</u>:  Defendant's supplemental responses to Interrogatories 6, 8, 13 and RFP 5 indicate "Plaintiff should see the information produced in accordance with the Court's order," without identifying what the information is or where it is located.  **Is Defendant referring to documents in its supplemental production stamped IDHW_00003609—3725?**

**Response to Question 1:**
Defendant provided an image with the required categories of information, as ordered by the Court, at IDHW_00003609–3725.

2. <u>Documents stamped IDHW_00003609—3725</u>:
   a. Please provide unredacted pages for column "T," which is "assigned worker," (e.g., IDHW_00003725) or identify the grounds in the Court's Order (Dkt. 52) for redacting column T. Such IDHW employees are witnesses in this case.
   b. It appears that this .pdf report is printed/imaged from an Excel spreadsheet. In so doing, it cuts each row into at least 3 separate pages. If the spreadsheet was produced by IDHW to you in an Excel (e.g., .xlsx format), please provide a copy of the report in that electronic format so neither Plaintiff nor the Court is required to tape 3 pages together to see a single row.

R. Hearn, Esq.
E. MacMaster, Esq.
August 1, 2024
Page 3

**Response to Question 2(a):**
Thank you for bringing this to my attention. This category was accidentally redacted on 3 of the 117 pages: IDHW_00003719, IDHW_00003722, and IDHW_00003725. The document has been re-imaged without that redaction. I'll provide a revised OneDrive link by email soon. The new bates numbers for that corrected production are IDHW_00003774–3890.

**Response to Question 2(b):**
Defendant is unable to provide a native file. As identified in the March 19 letter, cited above, Defendant was willing to produce an image. This allowed Defendant to redact the information through commercial discovery document management software, so that relevant load file information (text, etc.) could be provided to you. The original excel file containing this information had to be redacted in accordance with Defendant's proposal and the Court's Memorandum Decision and Order, dated June 11, 2024. Because I assume the metadata in an Excel file could reveal underlying information about information required to be redacted, and because of concerns about modifying an original export of information, I am unable to provide a native file.

3. Decision and Order (Dkt. 52) pp. 10-12: The Order requires Defendant to indicate whether the reporting party is a family member, nurse, doctor, police officer, school official, etc., as well as the name of any reporters that are hospital, police, fire, or emergency services (including city or county of such reporting agency). This court-ordered information was due to be disclosed last Friday. Please identify where it has been provided for our review.

**Response to Question 3:**
Defendant was only required to identify the relationship of a reporter if that information was redacted. Dkt. 52 at 11; *see also* 43-39 at 3–4. As was brought to your attention in the letters dated March 8, March 19, and April 5, 2024, the Department of Health and Welfare does not maintain in the Registry a separate category identifying the name of the reporting party, the reporting party's relationship, etc. Defendant's concern was that such information may appear in the Disposition Statement field, and hence why Defendant suggested redacting that information if it did appear. The Court agreed we could redact the name but must identify a relationship if we did so.

I am informed that there were no names of reporting parties redacted as part of the disposition statement—only the name/initials of the mother or name/initials of the

R. Hearn, Esq.
E. MacMaster, Esq.
August 1, 2024
Page 4

children involved. Those, of course, were redacted in accordance with the Court's order. *See* Dkt. 52 at 9–10.

4. <u>RFP 12</u>: We discussed a short extension if needed but did not discuss an extension of a week.  Please produce whatever you can produce now without further delay, and we can then discuss further concerns, if any, that you may have.  Defendants' court-ordered supplemental response with documents was due last Friday; while we want to cooperate, it cannot be to Plaintiff's detriment.

**Response to Question 4:**
Thank you for discussing my letter dated July 18 during our conference call on July 24. As was discussed during that call, Defendant wanted to clarify that only name-based checks were at issue, and wanted to clarify that only third-party access to the Registry itself was at issue, based on the briefing submitted by Plaintiff's counsel. While I believe the parties were able to agree that the current request only covers name-based checks, Plaintiff's counsel identified that Plaintiff was seeking copies of the actual request forms that Department staff are processing—and was not focusing only on alleged third-party access to the Registry. This led to a discussion where we considered whether it would be possible to provide the number of name-based checks processed per year, and provide redacted copies of the forms where a person was found to have their name on the Child Protection Central Registry, which I referred to as a "hit." (Though not language used by Defendant or the Department of Health and Welfare, I used this language as a short-hand expression, and such language is not meant to be derogatory in any manner.)

Regarding name-based checks, let me provide some clarity in how these are processed.

Name-based checks are submitted manually (mailed), using the form you were provided, IDHW_00003769–00003770. Department staff receive and process the name-based check forms. If the form is properly completed and includes the relevant fee—including the required notarized signature of the person requesting the Department check if that person is on the Registry—then the Department staff member manually processes the form. After checking the registry, the Department staff member completes the form, and manually emails (or mails) a copy of the form with the appropriate box checked indicating whether the person who requested the name-based check is on the Registry or is not.

R. Hearn, Esq.
E. MacMaster, Esq.
August 1, 2024
Page 5

This is *neither* a system-automated process, nor a system-generated process. Department staff conducting the name-based check are checking the Registry, marking the form, and sending the email or mailing the form themselves. They are doing this manually. Though some electronic tracking of this process is maintained, there is not a dependable source of the specific number of "hits" unless a manual review is done of each of the emailed/mailed forms.[1] We estimate that a staff member locating each form, verifying the information within it, and documenting for our discovery purposes whether there was a "hit" or not would take 1 to 2 minutes per form. And a manual review of the forms would have to be done by the staff that would otherwise be conducting review of newly submitted forms requesting name-based checks.

Though 1 to 2 minutes per form does not sound like a lot of time, it is when the Department is processing thousands of name-based checks per year. For example, in 2023, the Department completed approximately 4,500 name-based checks. Even at 1 minute per form, it would take 75 staff hours to review those name-based checks to identify the number of hits as compared to the number of non-hits—and it would take up to 150 staff hours, using the 2-minute-per-form estimate. This is simply too burdensome and not proportional to the needs of the case, requiring staff to take away time from processing their current (incoming) name-based check forms to simply obtain numbers of those persons who submitted forms for a name-based check in the past. I don't think the Court understood or wished Defendant to undertake this burden, given Plaintiff's representations in the briefing regarding focusing on third-party access to the Central Registry. (I appreciate that Plaintiff's counsel identified on the call that the focus is now on the Department staff's processing name-based checks.)

However, here is what Defendant is willing to make available to resolve this RFP 12 dispute. For 2024 (January 1 through July 11), Defendant is willing to conduct the detailed review outlined above, to have the Department document the number of hits among the roughly 2,300 name-based checks performed thus far. Defendant will provide Plaintiff's counsel (1) the number of name-based checks performed and (2) the number of name-based checks that had a hit.

Defendant will also provide redacted copies of the name-based check forms for those individuals who were found to have a listing on the Idaho Child Protection Central

---

[1] What's more, in late 2022, the Department migrated the electronic tracking platform, such that data is not readily available before then.

R. Hearn, Esq.
E. MacMaster, Esq.
August 1, 2024
Page 6


Registry—redacting the name and contact details of the person listed on the Registry. Although this will involve significant staff time by the Department, Defendant would like to resolve any dispute here without unnecessarily involving the Court.

If Plaintiff's counsel advises Defendant's counsel by the end of the day on Friday, August 2, that Plaintiff is agreeable to resolving this dispute by providing the information identified by Defendant, and Defendant will provide the information by close of business on Monday, August 5.

   5.  Verification: We have not yet received Defendant's verification of these supplemental answers to interrogatories. Please provide it or let me know if I somehow missed it.

**Response to Question 5:**
I am providing the verification for Director Adams' supplemental answers to the interrogatories. Your question reminded me that we had also not provided Interim Director Cameron's verification to the interrogatories, and I'm transmitting a copy of that verification with this letter.

                              Respectfully,

                              /s/ *Brian V. Church*

                              BRIAN V. CHURCH
                              Lead Deputy Attorney General

cc:  Jim Craig, Division Chief,
        Civil Litigation and Constitutional Defense
     Tom Donovan, Division Chief,
        Health and Human Services Division
     Jack Corkery, Assistant Solicitor General,
        Office of the Solicitor General

## **VERIFICATION**

STATE OF IDAHO            )
                          ) ss.
County of Ada             )

    I, Dean Cameron, have read the foregoing responses to the Interrogatories on behalf of Defendant contained in Defendant's Responses to Plaintiff's First Set of Discovery Requests to Defendant, and know the contents thereof, and the same are true to the best of my knowledge and belief.

    DATED: _1.26.24_____

                            Dean Cameron
                            Interim Director
                            Department of Health and Welfare

## **VERIFICATION**

STATE OF IDAHO    )
                     ) ss.

County of Ada       )

I, Alex J. Adams, have read the foregoing supplemental responses (dated July 26, 2024) to the Interrogatories on behalf of Defendant contained in Defendant's First Supplemental Responses to Plaintiff's First Set of Discovery Requests to Defendant, and know the contents thereof, and the same are true to the best of my knowledge and belief.

I certify under penalty of perjury that the foregoing is true and correct.

DATED: _7/31/24_

_Alex J. Adams_
Alex J. Adams
Director
Department of Health and Welfare

**EXHIBIT G**

| From: | Emily MacMaster |
|---|---|
| To: | "Brian Church" |
| Cc: | "Richard Hearn"; "Alexis Kovacs"; "Jack Corkery"; "James Craig"; "Tom Donovan" |
| Subject: | RE: Rossow - Defendants" First Supplemental Discovery Responses |
| Date: | Tuesday, August 6, 2024 10:59:00 AM |
| Attachments: | image001.png |

Good morning Brian,

Thank you for your e-mail.  I have been detained on other matters and will turn to your letter at my earliest opportunity, with Rick Hearn's input.  However, I have briefly reviewed it. Therefore, in the meantime, please respond today with the following information:

1.  In your letter to Plaintiff's counsel, dated August 1, 2024, you state in regard to RFP 12:

> For 2024 (January 1 through July 11), Defendant is willing to conduct the detailed review outlined above [re "hits"], to have the Department document the number of hits among the roughly 2,300 name-based checks performed thus far. Defendant will provide Plaintiff's counsel (1) the number of name-based checks performed and (2) the number of name-based checks that had a hit.

> Defendant will also provide redacted copies of the name-based check forms for those individuals who were found to have a listing on the Idaho Child Protection Central Registry—redacting the name and contact details of the person listed on the Registry.

As your letter with this recommendation was sent on 8/1/24, and all documents in response to RFP 12 were due by 7/26/2024 under the Court's *Memorandum Decision and Order*, I assume the IDHW has at least these documents ready to produce, and your letter suggested that they could be produced by Monday, 8/5, which was yesterday.  Accordingly, please produce them today without further delay.  At a minimum, it is essential that we at least receive the "redacted copies of the name-based check forms for those individuals who were found to have a listing on the Idaho Child Protection Central Registry—redacting the name and contact details of the person listed on the Registry" without any further delay. We can then next address any other issues for compliance with the Court's Order. However, as Defendant has these documents available, it is already a violation of the Court's Order to not produce them and not having them is interfering with Plaintiff's ability to timely move for class certification.

2.  Please also provide a description of each column A-Z for the spreadsheet Bates Numbered as IDHW_00003774-3890. The columns do not seem to match up exactly to the descriptions of categories in your letter dated March 19, 2024 (Dkt. 43-39), which instead identifies categories

by "bullet point" – i.e., • - only.  Please identify these column descriptions to me for columns A-Z in the spreadsheet as soon as possible (an e-mail for now is fine) so that the continuing lack of this information does not risk interference with Plaintiff's preparation of a motion for class certification by the current deadline.

Also, please confirm that the bullet point descriptions in your March 19, 2024 letter for "Assigned Worker, Appeal Request Date, Appeal Decision, and "Appeal Decision Date" refer only to administrative reviews of "substantiated" dispositions, and that the bullet point descriptions for "Hearing Request Date, Hearing Request Decision, and Hearing Decision Date" refer only to the "Fair Hearing" and "Preliminary Order," and, if so, in which column(s) of the spreadsheet a decision on an "Agency Review" (aka Director's review") is identified.

I think if we can get this information taken care of right away, we can then address the other issues in your letter of August 1, 2024. Thank you for your immediate attention to these matters.

Emily

Emily Mac Master
✉️ *MacMaster Law, PLLC*
(208) 608-2235

---

**From:** Brian Church <brian.church@ag.idaho.gov>
**Sent:** Thursday, August 1, 2024 5:33 PM
**To:** Emily MacMaster <emily@macmasterlaw.com>
**Cc:** Richard Hearn <hearn@hearnlawyers.com>; Alexis Kovacs <Alexis.Kovacs@ag.idaho.gov>; Jack Corkery <Jack.Corkery@ag.idaho.gov>; James Craig <James.Craig@ag.idaho.gov>; Tom Donovan <tom.donovan@dhw.idaho.gov>
**Subject:** RE: Rossow - Defendants' First Supplemental Discovery Responses

Emily:

Please see Defendant's response to the questions below in the attached letter to counsel. I am attaching the verifications of Director Adams and Interim Director Cameron. I am also providing you a link to a corrected production, which fixes the redaction of the "assigned worker" column on 3 of the 117 pages of the document.

Here's the link to access the production. I'll send a separate email with the password.
VOL006

Brian
--



**Brian V. Church | Lead Deputy Attorney General**
Civil Litigation and Constitutional Defense Division
Office of the Attorney General | State of Idaho
Phone: (208) 334-2400

---

**From:** Emily MacMaster <emily@macmasterlaw.com>
**Sent:** Monday, July 29, 2024 5:31 PM
**To:** Brian Church <brian.church@ag.idaho.gov>
**Cc:** Richard Hearn <hearn@hearnlawyers.com>; Alexis Kovacs <Alexis.Kovacs@ag.idaho.gov>
**Subject:** FW: Rossow - Defendants' First Supplemental Discovery Responses

Hi Brian,

Thank you for the supplemental response provided this past Friday.  We do have a few questions/concerns, which we hope you can clear up, and we appreciate your quick attention to them, as follows:

1. <u>Decision and Order (Dkt. 52) pp. 8-12</u>:  Defendant's supplemental responses to Interrogatories 6, 8, 13 and RFP 5 indicate "Plaintiff should see the information produced in accordance with the Court's order," without identifying what the information is or where it is located.  **Is Defendant referring to documents in its supplemental production stamped IDHW_00003609—3725?**

2. <u>Documents stamped IDHW_00003609—3725</u>:
   a. Please provide unredacted pages for column "T," which is "assigned worker," (e.g., IDHW_00003725) or identify the grounds in the Court's Order (Dkt. 52) for redacting column T. Such IDHW employees are witnesses in this case.
   b. It appears that this .pdf report is printed/imaged from an Excel spreadsheet. In so doing, it cuts each row into at least 3 separate pages. If the spreadsheet was produced by IDHW to you in an Excel (e.g., .xlsx format), please provide a copy of the report in that electronic format so neither Plaintiff nor the Court is required to tape 3 pages together to see a single row.

3. <u>Decision and Order (Dkt. 52) pp. 10-12</u>:  The Order requires Defendant to indicate whether the reporting party is a family member, nurse, doctor, police officer, school official, etc., as well as the name of any reporters that are hospital, police, fire, or emergency services (including city or county of such reporting agency).  This court-ordered information was due to be disclosed last Friday. Please identify where it has been provided for our review.

4. <u>RFP 12</u>:  We discussed a short extension if needed but did not discuss an extension of a week. Please produce whatever you can produce now without further delay, and we can then

discuss further concerns, if any, that you may have.  Defendants' court-ordered supplemental response with documents was due last Friday; while we want to cooperate, it cannot be to Plaintiff's detriment.

5. Verification: We have not yet received Defendant's verification of these supplemental answers to interrogatories. Please provide it or let me know if I somehow missed it.

Plaintiff's deadline for moving for class certification is 8/16/2024.  The information requested above, if not received promptly, risks prejudicing Plaintiff in being able to meet obligations in this litigation. Hopefully, you can quickly respond to these concerns asap by tomorrow and avoid any further delay. Thank you very much Brian --

Emily

Emily Mac Master
*MacMaster Law, PLLC*
(208) 608-2235

---

**From:** Brian Church <brian.church@ag.idaho.gov>
**Sent:** Friday, July 26, 2024 6:03 PM
**To:** Emily MacMaster <emily@macmasterlaw.com>; Richard Hearn <hearn@hearnlawyers.com>
**Cc:** Alexis Kovacs <Alexis.Kovacs@ag.idaho.gov>; Jack Corkery <Jack.Corkery@ag.idaho.gov>
**Subject:** Rossow - Defendants' First Supplemental Discovery Responses

Counsel:

I've attached Defendant's First Supplemental Responses to Plaintiff's First Set of Discovery Requests to Defendant. You are also receiving two links to download files for today's production. I will transmit the passwords via a separate email.

VOL004

VOL005

Files within this production have been marked as confidential in accordance with the parties' protective order. Additionally, certain documents have been redacted in accordance with the Court's Memorandum Decision and Order, dated June 11, 2024.
--



**Brian V. Church | Lead Deputy Attorney General**
Civil Litigation and Constitutional Defense Division
Office of the Attorney General | State of Idaho
Phone: (208) 334-2400

**NOTICE:** This message, including any attachments, is intended only for the individual(s) or entity(ies) named above and may contain information that is confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law. If you are not the intended recipient, please reply to the sender that you have received this transmission in error, and then please delete this email.

**EXHIBIT H**

| From: | Brian Church |
|---|---|
| To: | Emily MacMaster |
| Cc: | Richard Hearn; Alexis Kovacs; Jack Corkery; James Craig; Tom Donovan |
| Subject: | RE: Rossow - Defendants" First Supplemental Discovery Responses |
| Date: | Tuesday, August 6, 2024 7:22:09 PM |
| Attachments: | image001.png |
| | 2024-08-06 Letter to Counsel.pdf |

Counsel:

Please see the attached letter. The redacted forms are being supplied here:
VOL007

A password will be transmitted by separate email.

Brian
--



**Brian V. Church | Lead Deputy Attorney General**
Civil Litigation and Constitutional Defense Division
Office of the Attorney General | State of Idaho
Phone: (208) 334-2400

**From:** Emily MacMaster <emily@macmasterlaw.com>
**Sent:** Tuesday, August 6, 2024 10:59 AM
**To:** Brian Church <brian.church@ag.idaho.gov>
**Cc:** Richard Hearn <hearn@hearnlawyers.com>; Alexis Kovacs <Alexis.Kovacs@ag.idaho.gov>; Jack Corkery <Jack.Corkery@ag.idaho.gov>; James Craig <James.Craig@ag.idaho.gov>; Tom Donovan <tom.donovan@dhw.idaho.gov>
**Subject:** RE: Rossow - Defendants' First Supplemental Discovery Responses

Good morning Brian,

Thank you for your e-mail.  I have been detained on other matters and will turn to your letter at my earliest opportunity, with Rick Hearn's input.  However, I have briefly reviewed it. Therefore, in the meantime, please respond today with the following information:

In your letter to Plaintiff's counsel, dated August 1, 2024, you state in regard to RFP 12:

For 2024 (January 1 through July 11), Defendant is willing to conduct the detailed review outlined above [re "hits"], to have the Department document the number of hits among the roughly 2,300 name-based checks performed thus far. Defendant will provide Plaintiff's counsel (1) the number of name-based checks performed and (2) the number of name-based checks that had a hit.

> Defendant will also provide redacted copies of the name-based check forms for those individuals who were found to have a listing on the Idaho Child Protection Central Registry—redacting the name and contact details of the person listed on the Registry.

As your letter with this recommendation was sent on 8/1/24, and all documents in response to RFP 12 were due by 7/26/2024 under the Court's *Memorandum Decision and Order*, I assume the IDHW has at least these documents ready to produce, and your letter suggested that they could be produced by Monday, 8/5, which was yesterday.  Accordingly, please produce them today without further delay.  At a minimum, it is essential that we at least receive the "redacted copies of the name-based check forms for those individuals who were found to have a listing on the Idaho Child Protection Central Registry—redacting the name and contact details of the person listed on the Registry" without any further delay. We can then next address any other issues for compliance with the Court's Order. However, as Defendant has these documents available, it is already a violation of the Court's Order to not produce them and not having them is interfering with Plaintiff's ability to timely move for class certification.

2. Please also provide a description of each column A-Z for the spreadsheet Bates Numbered as IDHW_00003774-3890. The columns do not seem to match up exactly to the descriptions of categories in your letter dated March 19, 2024 (Dkt. 43-39), which instead identifies categories by "bullet point" – i.e., • - only.  Please identify these column descriptions to me for columns A-Z in the spreadsheet as soon as possible (an e-mail for now is fine) so that the continuing lack of this information does not risk interference with Plaintiff's preparation of a motion for class certification by the current deadline.

   Also, please confirm that the bullet point descriptions in your March 19, 2024 letter for "Assigned Worker, Appeal Request Date, Appeal Decision, and "Appeal Decision Date" refer only to administrative reviews of "substantiated" dispositions, and that the bullet point descriptions for "Hearing Request Date, Hearing Request Decision, and Hearing Decision Date" refer only to the "Fair Hearing" and "Preliminary Order," and, if so, in which column(s) of the spreadsheet a decision on an "Agency Review" (aka Director's review") is identified.

I think if we can get this information taken care of right away, we can then address the other issues in your letter of August 1, 2024. Thank you for your immediate attention to these matters.

Emily

Emily Mac Master
*MacMaster Law, PLLC*

(208) 608-2235

---

**From:** Brian Church <brian.church@ag.idaho.gov>
**Sent:** Thursday, August 1, 2024 5:33 PM
**To:** Emily MacMaster <emily@macmasterlaw.com>
**Cc:** Richard Hearn <hearn@hearnlawyers.com>; Alexis Kovacs <Alexis.Kovacs@ag.idaho.gov>; Jack
Corkery <Jack.Corkery@ag.idaho.gov>; James Craig <James.Craig@ag.idaho.gov>; Tom Donovan
<tom.donovan@dhw.idaho.gov>
**Subject:** RE: Rossow - Defendants' First Supplemental Discovery Responses

Emily:

Please see Defendant's response to the questions below in the attached
letter to counsel. I am attaching the verifications of Director Adams and
Interim Director Cameron. I am also providing you a link to a corrected
production, which fixes the redaction of the "assigned worker" column on 3
of the 117 pages of the document.

Here's the link to access the production. I'll send a separate email with the
password.
VOL006

Brian
--


**Brian V. Church | Lead Deputy Attorney General**
Civil Litigation and Constitutional Defense Division
Office of the Attorney General | State of Idaho
Phone: (208) 334-2400

---

**From:** Emily MacMaster <emily@macmasterlaw.com>
**Sent:** Monday, July 29, 2024 5:31 PM
**To:** Brian Church <brian.church@ag.idaho.gov>
**Cc:** Richard Hearn <hearn@hearnlawyers.com>; Alexis Kovacs <Alexis.Kovacs@ag.idaho.gov>
**Subject:** FW: Rossow - Defendants' First Supplemental Discovery Responses

Hi Brian,

Thank you for the supplemental response provided this past Friday.  We do have a few
questions/concerns, which we hope you can clear up, and we appreciate your quick attention to
them, as follows:

1. Decision and Order (Dkt. 52) pp. 8-12:  Defendant's supplemental responses to
   Interrogatories 6, 8, 13 and RFP 5 indicate "Plaintiff should see the information produced in

accordance with the Court's order," without identifying what the information is or where it is located.  **Is Defendant referring to documents in its supplemental production stamped IDHW_00003609—3725?**

2. <u>Documents stamped IDHW_00003609—3725</u>:
    a. Please provide unredacted pages for column "T," which is "assigned worker," (e.g., IDHW_00003725) or identify the grounds in the Court's Order (Dkt. 52) for redacting column T. Such IDHW employees are witnesses in this case.
    b. It appears that this .pdf report is printed/imaged from an Excel spreadsheet. In so doing, it cuts each row into at least 3 separate pages. If the spreadsheet was produced by IDHW to you in an Excel (e.g., .xlsx format), please provide a copy of the report in that electronic format so neither Plaintiff nor the Court is required to tape 3 pages together to see a single row.

3. <u>Decision and Order (Dkt. 52) pp. 10-12</u>:  The Order requires Defendant to indicate whether the reporting party is a family member, nurse, doctor, police officer, school official, etc., as well as the name of any reporters that are hospital, police, fire, or emergency services (including city or county of such reporting agency).  This court-ordered information was due to be disclosed last Friday. Please identify where it has been provided for our review.

4. <u>RFP 12</u>:  We discussed a short extension if needed but did not discuss an extension of a week. Please produce whatever you can produce now without further delay, and we can then discuss further concerns, if any, that you may have.  Defendants' court-ordered supplemental response with documents was due last Friday; while we want to cooperate, it cannot be to Plaintiff's detriment.

5. Verification: We have not yet received Defendant's verification of these supplemental answers to interrogatories. Please provide it or let me know if I somehow missed it.

Plaintiff's deadline for moving for class certification is 8/16/2024.  The information requested above, if not received promptly, risks prejudicing Plaintiff in being able to meet obligations in this litigation. Hopefully, you can quickly respond to these concerns asap by tomorrow and avoid any further delay. Thank you very much Brian --

Emily

Emily Mac Master
*MacMaster Law, PLLC*
(208) 608-2235

---

**From:** Brian Church <brian.church@ag.idaho.gov>

**Sent:** Friday, July 26, 2024 6:03 PM
**To:** Emily MacMaster <emily@macmasterlaw.com>; Richard Hearn <hearn@hearnlawyers.com>
**Cc:** Alexis Kovacs <Alexis.Kovacs@ag.idaho.gov>; Jack Corkery <Jack.Corkery@ag.idaho.gov>
**Subject:** Rossow - Defendants' First Supplemental Discovery Responses

Counsel:

I've attached Defendant's First Supplemental Responses to Plaintiff's First Set of Discovery Requests to Defendant. You are also receiving two links to download files for today's production. I will transmit the passwords via a separate email.

VOL004

VOL005

Files within this production have been marked as confidential in accordance with the parties' protective order. Additionally, certain documents have been redacted in accordance with the Court's Memorandum Decision and Order, dated June 11, 2024.

--



**Brian V. Church | Lead Deputy Attorney General**
Civil Litigation and Constitutional Defense Division
Office of the Attorney General | State of Idaho
Phone: (208) 334-2400

**NOTICE:** This message, including any attachments, is intended only for the individual(s) or entity(ies) named above and may contain information that is confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law. If you are not the intended recipient, please reply to the sender that you have received this transmission in error, and then please delete this email.



**STATE OF IDAHO**

OFFICE OF THE ATTORNEY GENERAL

**RAÚL R. LABRADOR**

August 6, 2024

Rick Hearn
Hearn Law, PLC
    *Via email to hearn@hearnlawyers.com*

Emily MacMaster
MacMaster Law, PLLC
    *Via email to emily@macmasterlaw.com*

Re:    *Rossow v. Jeppesen*, No. 1:23-cv-00131-BLW

Dear Emily:

I am responding to your email from Tuesday, August 6.

**Topic 1 (quote)**
    In your letter to Plaintiff's counsel, dated August 1, 2024, you state in regard to RFP 12:

> For 2024 (January 1 through July 11), Defendant is willing
> to conduct the detailed review outlined above [re "hits"], to
> have the Department document the number of hits among
> the roughly 2,300 name-based checks performed thus far.
> Defendant will provide Plaintiff's counsel (1) the number of
> name-based checks performed and (2) the number of name-
> based checks that had a hit.
>
> Defendant will also provide redacted copies of the name-
> based check forms for those individuals who were found to
> have a listing on the Idaho Child Protection Central Regis-
> try—redacting the name and contact details of the person
> listed on the Registry.

R. Hearn, Esq.
E. MacMaster, Esq.
August 6, 2024
Page 2

As your letter with this recommendation was sent on 8/1/24, and all documents in response to RFP 12 were due by 7/26/2024 under the Court's *Memorandum Decision and Order*, I assume the IDHW has at least these documents ready to produce, and your letter suggested that they could be produced by Monday, 8/5, which was yesterday. Accordingly, please produce them today without further delay. At a minimum, it is essential that we at least receive the "redacted copies of the name-based check forms for those individuals who were found to have a listing on the Idaho Child Protection Central Registry—redacting the name and contact details of the person listed on the Registry" without any further delay. We can then next address any other issues for compliance with the Court's Order. However, as Defendant has these documents available, it is already a violation of the Court's Order to not produce them and not having them is interfering with Plaintiff's ability to timely move for class certification.

**Response to Topic 1**
Plaintiff's quotation omits the first sentence of the first quoted paragraph and omits a third paragraph that immediately followed the two quoted paragraphs. The first sentence said, "However, here is what Defendant is willing to make available to resolve this RFP 12 dispute." The third paragraph provided:

If Plaintiff's counsel advises Defendant's counsel by the end of the day on Friday, August 2, that Plaintiff is agreeable to resolving this dispute by providing the information identified by Defendant, and Defendant will provide the information by close of business on Monday, August 5.

Respectfully, Plaintiff's counsel are incorrect to infer that Defendant had any obligation to provide this material yesterday or earlier. As noted in my letter dated August 1, Plaintiff's counsel have changed what they are seeking with respect to RFP 12, and Defendant has attempted to create a workable solution that is not too burdensome and disproportionate to the needs of the case. Plaintiff's request for this information today, August 6, 2024, is being answered today, and so this response is timely.

Given Plaintiff's request for the compromise information identified by Defendant, Defendant will treat this RFP 12 dispute as resolved and will provide the following information:

R. Hearn, Esq.
E. MacMaster, Esq.
August 6, 2024
Page 3

For January 1, through July 11, 2024:
- 2,630 name-based registry check forms were submitted.
- 2,376 name-based registry checks were actually performed by the Department of Health and Welfare.
- ▉ name-based registry checks had a finding that the person was on the Idaho Child Protection Central Registry.
- Copies of the redacted forms for these ▉ requests, "redacting the name and contact details of the person listed on the Registry" are being provided. These records are being marked confidential in accordance with the protective order. Please see IDHW_00003891–00003927

**Topic 2 (quote)**

> Please also provide a description of each column A-Z for the spreadsheet Bates Numbered as IDHW_00003774-3890. The columns do not seem to match up exactly to the descriptions of categories in your letter dated March 19, 2024 (Dkt. 43-39), which instead identifies categories by "bullet point" – i.e., • - only.  Please identify these column descriptions to me for columns A-Z in the spreadsheet as soon as possible (an e-mail for now is fine) so that the continuing lack of this information does not risk interference with Plaintiff's preparation of a motion for class certification by the current deadline.

> Also, please confirm that the bullet point descriptions in your March 19, 2024 letter for "Assigned Worker, Appeal Request Date, Appeal Decision, and "Appeal Decision Date" refer only to administrative reviews of "substantiated" dispositions, and that the bullet point descriptions for "Hearing Request Date, Hearing Request Decision, and Hearing Decision Date" refer only to the "Fair Hearing" and "Preliminary Order," and, if so, in which column(s) of the spreadsheet a decision on an "Agency Review" (aka Director's review") is identified.

**Response to Topic 2**

Plaintiff was provided the information ordered by the Court, and therefore Plaintiff's counsel's reference to "the continuing lack of this information" is incorrect. Plaintiff's counsel were previously provided a thorough description of the data categories four months ago, and Plaintiff's counsel should refer to the letter dated April 5, 2024, for a

R. Hearn, Esq.
E. MacMaster, Esq.
August 6, 2024
Page 4

description of the columns. Plaintiff's counsel were informed that Defendant would provide 26 categories of information, which Defendant did.

Plaintiff's counsel also say that "The columns do not seem to match up exactly to the descriptions of categories…." Plaintiff's counsel should clarify which columns do not correlate. Only two categories "Gender," which was referred to as "Suspect Gender", and "Finding_Status," which was referred to as "Disposition Status," do not use the exact name as used in the April 5 letter. However, it seems that "Gender" and "Suspect Gender" and "Finding Status" and "Disposition Status" should not cause confusion.

Defendant provides the below table correlating the columns in IDHW 3609–3725 and IDHW 3774–3890 to the category description in the April 5, 2024 letter. As was noted in my prior letter, the only difference between IDHW 3609-3725 and 3774-3789, is that 3 of the 117 pages (pages 3719, 3722, and 3725) had column T redacted, such that the "assigned worker" was not showing. That was promptly corrected.

| Column in IDHW_3609-3725 and 3774-3789 | Column description in IDHW_3609-3725 and 3774-3789 | Category description in April 5, 2024 letter, including number |
|---|---|---|
| A | Gender | Suspect Gender (1) |
| B | Disposition | Disposition (3) |
| C | Basis to Substantiate | Basis to Substantiate (4) |
| D | Primary | Primary (5) |
| E | Safety Issue | Safety Issue (6) |
| F | IDAPA Code | IDAPA Code (7) |
| G | Level | Level (8) |
| H | Was Abuse Ongoing | Was Abuse Ongoing? (9) |
| I | Abuse Date | Abuse Date (10) |
| J | Disposition Statement | Disposition Statement (11) |
| K | Disposition Date | Disposition Date (12) |
| L | Finding_Status | Disposition Status (13) |
| M | Case ID | Case ID (14) |
| N | Notification Date | Notification Date (15) |
| O | Disposition ID | Disposition ID (2) |

R. Hearn, Esq.
E. MacMaster, Esq.
August 6, 2024
Page 5

| Column in IDHW_3609-3725 and 3774-3789 | Column description in IDHW_3609-3725 and 3774-3789 | Category description in April 5, 2024 letter, including number |
|---|---|---|
| P | Case Status | Case Status (16) |
| Q | Case Open Date | Case Open Date (17) |
| R | Case Close Date | Case Close Date (18) |
| S | Closure Reason | Closure Reason (19) |
| T | Assigned Worker | Assigned Worker (20) |
| U | Appeal Request Date | Appeal Request Date (21) |
| V | Appeal Decision | Appeal Decision (22) |
| W | Appeal Decision Date | Appeal Decision Date (23) |
| X | Hearing Request Date | Hearing Request Date (24) |
| Y | Hearing Request Decision | Hearing Request Decision (25) |
| Z | Hearing Decision Date | Hearing Request Date (26) |

Respectfully,

/s/ *Brian V. Church*

BRIAN V. CHURCH
Lead Deputy Attorney General

cc:  Jim Craig, Division Chief,
        Civil Litigation and Constitutional Defense
     Tom Donovan, Division Chief,
        Health and Human Services Division
     Jack Corkery, Assistant Solicitor General,
        Office of the Solicitor General

# **EXHIBIT I**

# **FILED UNDER SEAL**